# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| MAX E. WILKES, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civ. Action No.:** |
| | ) | |
| | ) | **3:07-CV-244** |
| | ) | |
| CITY OF PHENIX CITY, | ) | |
| ALABAMA, an Alabama municipal | ) | |
| corporation; Hon. JEFF HARDIN, | ) | |
| in his official capacity as Mayor | ) | |
| of Phenix City, Alabama, and | ) | |
| individually; Hon. RAY BUSH in | ) | |
| his official capacity as a member of the | ) | |
| Phenix City Council and individually; | ) | |
| And HON. JOHN STOREY, in his | ) | |
| official capacity as a member of the | ) | |
| Phenix City Council and individually, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS

COME NOW, Defendants, Phenix City, Alabama, Mayor Jeff Hardin, Ray Bush, and John Storey, and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, move the Court to grant Summary Judgment for these Defendants and against the Plaintiff on the ground that there is no genuine issue as to any material fact and these Defendants are entitled to a judgment in their favor as a matter of law.

1

PDF created with pdfFactory trial version www.pdffactory.com

## **Summary Judgment Standard**

Under rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d. 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id. at 322-324.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

PDF created with pdfFactory trial version www.pdffactory.com

designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. See Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The court will construe the facts in the light most favorable to the nonmovant when the parties' factual statements conflict or inferences are required. Barnes v. Southwest Forest Industries, 814 F.2d 607, 609 (11th Cir. 1987).

**Hearsay and Speculation**

The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment. Fed. R. Civ. P. 56(e) requires that "affidavits" that support or oppose summary judgment motions shall be

PDF created with pdfFactory trial version www.pdffactory.com

made on personal knowledge, and shall set forth such facts as would be admissible in evidence. This rule also applies to testimony given on deposition. <u>Macuba v. Deboer</u>, 193 F.3d 1316, 1322, (11th Cir. 1999).

### **Rules from the Phenix City Charter**

Defendant, the City of Phenix City, Alabama is organized pursuant to a city charter. <u>See Defendants' Exhibit 'A', Phenix City Charter.</u>

The City Council of Phenix City consists of five members, one of which is the Mayor. <u>See Defendants' Exhibit 'A', Phenix City Charter §§3.01, 3.06</u>

The city council and its members, including Defendants Ray Bush, John Storey, and Mayor Hardin, are authorized by the City Charter to "Adopt the budget of the city." <u>See Defendants' Exhibit 'A', Phenix City Charter §3.07.</u>

The city council and its members, including Defendants Ray Bush, John Storey, and Mayor Hardin, are authorized by the City Charter to "abolish offices, departments, boards or agencies other than the offices, departments, boards or agencies established by this act." <u>See Defendants' Exhibit 'A', Phenix City Charter, §3.12.</u>

The office of Municipal Court Clerk is not an office established by the City Charter. <u>See Defendants' Exhibit 'A', Phenix City Charter, generally.</u>

PDF created with pdfFactory trial version www.pdffactory.com

**Facts**

From 1978 to 1995, Plaintiff Max Wilkes (hereinafter "Wilkes") held the office of Municipal Court Clerk (sometimes referred to in various documents as "Director of Court Systems" or "Director of Court Operations" or "Director" or "clerk of municipal court" or "court clerk" and occasionally, in error, as "city clerk" but which hereinafter will be referred to as "Municipal Court Clerk") in the City of Phenix City, Alabama.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 9, Lines 8-11.  In 1995, Wilkes was asked to take on some additional duties as the "administrative assistant" to the city manager at that time, Bobby Gaylor. See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 9, Lines 12-15.  Wilkes agreed to and in fact received a pay raise to compensate him for taking on these extra duties.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 10, Lines 2-7.  In 1996, still serving as administrative assistant and as Municipal Court Clerk, Wilkes was appointed to the additional position of Director of Parks and Recreation by Bobby Gaylor. See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 10, Lines 14-16.  Again, Wilkes agreed to and in fact received a pay raise to compensate him for taking on these extra duties.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 11, Lines 5-18.  Bobby Gaylor later

PDF created with pdfFactory trial version www.pdffactory.com

removed Wilkes from the position of Director of Parks and Recreation; however, this did not result in a decrease in pay for Wilkes.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 14, Lines 13-19. After Bobby Gaylor's service as City Manager ended in 2001, H.H. "Bubba" Roberts was appointed city manager.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 12, Lines 20-23.  In addition to retaining his position as Municipal Court Clerk, Wilkes continued serving as administrative assistant to the city manager under Roberts.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 13, Lines 15-21.  In November of 2001, Wilkes was appointed on an interim basis to the additional office of Director of Personnel.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 16, Lines 22-23.  Wilkes agreed not to receive a pay increase for these additional duties, as he had never received a pay cut when he was relieved from his duties as Director of Parks and Recreation.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 14, Lines 13-19 and Page 17, Lines 13-16.  Wilkes held the position of Interim Personnel Director for only four months.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 18, Line 1-5.  When Wilkes left the position of Personnel Director, he was reappointed Director of Parks and Recreation.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 18, Lines 21-22.

6

From this time up until January, 2003, Wilkes served as Director of Parks and Recreation, Municipal Court Clerk, and administrative assistant to the city manager.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 20, Lines 20-23.[1]

In January 2003, the city manager of Phenix City, H. H. "Bubba" Roberts, was deployed for military service.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 20, Lines 6-19.  Wilkes was appointed interim city manager until such time as Roberts could return and reassume the position, and during this time was given a pay raise to reflect his position as City Manager.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 21, Lines 6-20.  Wilkes served as Interim City Manager for 23 months. See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 22, Lines 12-14.  At the time he was appointed Interim City Manager, Wilkes' was removed from the position of Director of Parks and Recreation.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 24, Lines 3-6. However, during his 23 month stint as Interim City Manager, Wilkes continued to hold the office of Municipal Court Clerk, relying heavily on his "two deputies, Pam Jarrell and Ruby White" to run the office since he spent the "majority of [his] time [as] city manager."  See Defendants' Exhibit 'B',

---

[1] In Line 21 of Page 20 of the Deposition of Max Wilkes, the title of "Municipal Court Clerk" was mistakenly referred to as "city clerk."

PDF created with pdfFactory trial version www.pdffactory.com

<u>Deposition of Max Wilkes, Page 22, Lines 1-8.</u>  Prior to becoming Interim

City Manager, Wilkes earned a salary of between $68,000 and $70,000 per

year; during his stint as City Manager, Wilkes agreed to and in fact was paid

a salary of $80,000 per year.  <u>See Defendants' Exhibit 'B', Deposition of</u>

<u>Max Wilkes, Page 42, Lines 15-23</u>.

In October of 2004, the beginning of the new fiscal/budget year,

Roberts was again appointed City Manager and he in turn again appointed

Wilkes as Interim City Manager, to serve until such time as Roberts was

able to return to the position a few months later, in December of 2004,

completing Wilkes' 23 month stint; however, at this time Roberts also

appointed Pam Jarrell to serve as Interim Municipal Court Clerk,

temporarily removing Wilkes from that office.  <u>See Defendants' Exhibit 'B',</u>

<u>Deposition of Max Wilkes, Page 22, Line 18 - Page 23, Line 9.</u>  Thus, in

December of 2004, when Roberts returned to resume his service as City

Manager, Wilkes "didn't have a job to go to."  <u>See Defendants' Exhibit 'B',</u>

<u>Deposition of Max Wilkes, Page 25, Lines 8-19.</u>  During the first month

Roberts was back, Wilkes, who at this time had no responsibilities with the

City, took "a whole month off."  <u>See Defendants' Exhibit 'B', Deposition of</u>

<u>Max Wilkes, Page 37, Line 11-16.</u>  However, despite having no job title, no

responsibilities, and doing no work for the City during this month, Wilkes

PDF created with pdfFactory trial version www.pdffactory.com

continued to receive a salary in the amount he was receiving while serving as City Manager, which at that time had risen to about $82,000.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 37, Lines 17-20; See Also Page 43, Lines 2-6.  After this month of getting compensated despite not doing any work for the City, Wilkes was reappointed to the post of Municipal Court Clerk, and the Interim Municipal Court Clerk Pam Jarrell was appointed as his "assistant director."  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 38, Lines 9-12.  Wilkes, when he resumed serving as Municipal Court Clerk, was initially allowed to retain his interim city manager salary, minus six percent, resulting in a total of about $77,000.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 43, Line 18 - Page 44, Line 2.  Jarrell, as interim director, had been making a salary of $52,000.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 42, Lines 9-11.  Wilkes was in complete agreement with his salary when he was reappointed to the post of Municipal Court Clerk.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 45, Lines 11-12.

Due to projected decreases in sales tax revenues, Phenix City had to make some budget cuts in its proposal for the 2006-2007 fiscal year.  Phenix City Director of Finance Stephen Smith explained:

> "We had a little more difficult time balancing the budget than normal primarily because the new Wal-Mart's opening over in

PDF created with pdfFactory trial version www.pdffactory.com

Columbus impacted negatively our revenues significantly.  At the time we were preparing the budget, we had anticipated a loss of between $300,000 and $500,000 in revenue from that and we were having to make those adjustments in the budget." See Defendants' Exhibit 'C', Deposition of Stephen Smith, Page 15, Lines 13-19.

The position of Municipal Court Clerk cost the city approximately $90,000 to fund for one year.  See Defendants' Exhibit 'C', Deposition of Stephen Smith, Page 17, Lines 6-10.  Also, as Smith explains,

> ". . . the council, particularly Mr. Storey, felt like that the position [Municipal Court Clerk] was overpaid and that we were paying two people to do one job in the department . . . if you look at what that job pays statewide in various positions, we were paying substantially more than anybody else in the State of Alabama for that position; and from a fiscal accounting standpoint, that is unreasonable."

See Defendants' Exhibit 'C', Deposition of Stephen Smith, Page 38, Line 20 -  Page 39, Line 8.

In July 2006, months in advance of the beginning of the 2006-2007 fiscal year, City Manager H. H. Roberts and Personnel Manager Barbara Goodwyn met with Wilkes and gave him advance notice that the City was likely going to have to abolish the position of Municipal Court Clerk and remove it from the budget.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 46, Line 24 - Page 47, Line 3.

10

PDF created with pdfFactory trial version www.pdffactory.com

City Council ultimately approved a budget without the position of Municipal Court Clerk, feeling that the Municipal Court employees could continue running the office without need for a Municipal Court Clerk position. <u>See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 51.</u>

Council Member Ray Bush explained to Wilkes that, "when you can't afford to fill a position, then sometimes you just have to cut them out." <u>See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 53, Line 20-23.</u>

Defendant Council Member Storey told Wilkes that there was nothing the Council could do about it, and that they had to remove his position for budgetary reasons. <u>See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 56, Line 19 - Page 57, Line 1.</u>

Wilkes stated that he had never had any personal problems with any of the council members who approved the budget, and that in fact he liked them and they liked him. <u>See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 56, Lines 1-4.</u>

Since his position was removed from the budget, Wilkes has been drawing a retiree salary of "around" $55,000 or $58,000 per year, and in addition, receives other benefits including an insurance package. <u>See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 60, Line 21 - Page 62, Line 2.</u>

PDF created with pdfFactory trial version www.pdffactory.com

Wilkes recalls nobody ever saying anything to him indicating that he was being removed for any reasons other than budget concerns.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 60, Lines 3-12. Furthermore, Wilkes stated, under oath, in his deposition, that he couldn't think of any reason "unconnected to the budget" that his position was abolished and removed from the budget.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 60, Lines 13-17.

## Arguments

### I.    ABSOLUTE IMMUNITY

Defendants Hardin, Storey, and Bush respectfully request this court to dismiss them from this action on grounds that they are shielded from liability by the doctrine of absolute immunity.

### Absolute Immunity Rules

Legislators were entitled to absolute immunity from suit at common law and Congress did not intend the general language of §1983 to "impinge on a tradition so well grounded in history and reason." Bogan v. Scott-Harris, 523 US 44, 49, 118 S. Ct. 966, 140 L. Ed. 2d 79 (1998).  Regardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability. Id. at 52.  Any restriction on a legislator's freedom undermines the

PDF created with pdfFactory trial version www.pdffactory.com

public good by interfering with the rights of the people to representation in the democratic process.  Id. at 52.  Furthermore, the time and energy required to defend against a lawsuit are of particular concern at the local level, where the part-time citizen-legislator remains commonplace; the threat of liability may significantly deter service in local government, where prestige and pecuniary rewards may pale in comparison to the threat of civil liability.  Id. at 52.

Thus, the Supreme Court of the United States had held that local legislators, including city council members, are absolutely immune from suit, including suits brought under §1983, for their legislative activities.  Id. at 54.

Absolute legislative immunity attaches to all actions taken "in the sphere of legitimate legislative activity."  Id. at 54.  Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it.  Id. at 54.  See Also Tenney v. Brandhove, 341 U.S. 367, (1951)(holding that local legislator had acted in a legislative capacity even though he allegedly singled out the plaintiff in order to intimidate and silence the plaintiff)

This leaves us with the question whether, stripped of all considerations of intent and motive, the Defendants' actions were legislative.

13

PDF created with pdfFactory trial version www.pdffactory.com

<u>Bogan v. Scott-Harris</u> 523 US 44, 55 (1998). Voting for an ordinance by a city council is quintessentially legislative. <u>Id.</u> at 55. The introduction of a budget and signing it into law is also formally legislative. <u>Id.</u> at 55.

The participation in budget reviews and approval by a mayor, despite that the mayor is in the executive branch of government, is also legislative and entitled to the protection of absolute immunity because the U.S. Supreme Court has recognized that officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions. <u>Id.</u> at 55.

## Analysis and Argument

In <u>Bogan v. Scott-Harris</u>, 523 U.S. 44, the Plaintiff was a city government administrator who had planned to fire a city employee for using racial slurs against colleagues. However, the employee was well-connected politically and was merely suspended rather than fired. In the next budget proposal and approval process, the administrator's job was cut out of the budget, presumably in part because of the disciplined city employee's political connection with a city council member. The record also indicated that the mayor and legislators were forced to cut items out of the budget because of an anticipated 5 to 10 percent reduction in state aid. The <u>Bogan</u> jury found that the administrator's constitutionally protected speech was a

14

PDF created with pdfFactory trial version www.pdffactory.com

substantial motivating factor in the elimination of her position from the

budget and so the District Court held that the Mayor and City Council

member were not shielded from liability.  The First Circuit Court of Appeals

upheld this, holding that the challenged conduct was "not legislative" since

the legislators seemed to have been factoring in improper considerations and

targeting one person in particular when making budget cuts.  Id. at 46-49.

The United States Supreme Court (Thomas, J.) overturned this ruling

and held that all individual defendants were entitled to the protection of

absolute legislative immunity from suit, explaining:

> "Whether an act is legislative depends on the nature of the act,
> rather than on the motive or intent of the official performing it.
> The privilege of absolute immunity would be of little value if
> legislators could be subjected to the cost and inconvenience and
> distractions of a trial upon a conclusion of the pleader, or to the
> hazard of a judgment against them based upon a jury's
> speculation as to motives.  Furthermore, it simply is not
> consonant with our scheme of government for a court to inquire
> into the motives of legislators.  We therefore held that the
> defendant in Tenney (cited supra) had acted in a legislative
> capacity even though he allegedly singled out the plaintiff for
> investigation in order to intimidate and silence plaintiff and
> deter and prevent him from effectively exercising his
> constitutional rights. . . . The ordinance [in Bogan] reflected a
> discretionary, policymaking decision implicating the budgetary
> priorities of the city and the services the city provides to its
> constituents.  Moreover, it involved the termination of a
> position, which, unlike the hiring or firing of a particular
> employee, may have prospective implications that reach well
> beyond the particular occupant of the office.  And the city
> council, in eliminating [the position] certainly governed in a
> field where legislators traditionally have power to act."

PDF created with pdfFactory trial version www.pdffactory.com

(<u>Bogan v. Scott-Harris</u>, 523 US 44, 54-56, (1998) (internal quotation marks
and some internal citations removed))

In the present case, local legislators in the City Council, trimming a
budget in order to adjust to projected lost revenues, ultimately deemed that
Plaintiff's position with the City, which cost about $90,000 per year to fund,
was dispensable.  Plaintiff has presented no admissible evidence suggesting
that there was any improper motivation on the part of the City Council,
including the Mayor.  However, even if there was compelling, admissible
evidence that the Mayor and City Council had singled out the Plaintiff and
intentionally manipulated the budget in order to terminate the Plaintiff's
employment, on the strength of the <u>Bogan</u> case, absolute legislative
immunity would nevertheless apply to shield Defendants Storey, Bush, and
Hardin from liability.

Therefore, we ask this Honorable Court to dismiss the Defendants
Hardin, Storey and Bush in their individual capacities from this lawsuit.

## II.   <u>CLAIMS BROUGHT UNDER 42 U.S.C. §1983 et seq AND ANY OTHER CONSTITUTIONAL CLAIMS</u>

Plaintiff cannot carry his burden to show that he was deprived of a
property right "secured by the laws of the Constitution of the United States."
Furthermore, Plaintiff cannot show by a preponderance that Defendants'

16

PDF created with pdfFactory trial version www.pdffactory.com

legitimate, budgetary reason for abolishing his position was merely a pretext for terminating Plaintiff's employment. Therefore, Defendants respectfully ask this Honorable Court to grant them Summary Judgment on Plaintiffs §§1983, 1985, 1986 and 1988 claims and any other Constitutional claims.

### A.    Rules

Plaintiff must show two elements in order to state a claim under 42 U.S.C. §1983:  First, that he was deprived of rights secured by the laws or Constitution of the United States and, second, that the Defendant acted under color of law.  <u>Gilbert v. West Ga. Med. Center</u>, 784 F.2d 402, (11th Cir. 1986).

Once met, the burden shifts to the Defendant to articulate a legitimate, non-discriminatory reason for removing the Plaintiff's job from the budget. <u>Id.</u>  If Defendants articulate such a reason, the burden shifts back to Plaintiff, who must prove by a preponderance of the evidence that the articulated reason was merely a pretext for terminating the Plaintiff's employment.  <u>Id.</u>

Plaintiff cannot prevail in a §1983 claim if he cannot show that he suffered a "deprivation of . . . rights, privileges, or immunities secured by the Constitution."  <u>42 U.S.C. §1983</u>.

PDF created with pdfFactory trial version www.pdffactory.com

State law determines whether a public employee has a property interest in his or her job. Warren v. Crawford, 927 F.2d 559, 562, 11th Cir. (1991). A constitutionally protected property interest is created if there are rules or mutually explicit understandings that support a claim of entitlement. Id. at 562. To obtain a protected property interest in employment, a person must have more than a mere unilateral expectation of continued employment; one must have a legitimate claim of entitlement to continued employment. Id. at 562.

For purposes of establishing a property right in continued employment under Alabama law, the crucial question is whether the employment is terminable by the employer "at will" or whether the employer's discretion to discharge the employee is somehow fettered. Green v. City of Hamilton, 937 F.2d 1561, 1564, 11th Cir. (1991).

**B.    Arguments**

**i.    Defendants §1983 et seq and other United States Constitutional claims fail because Defendant's alleged property right, his employment as Municipal Court Clerk, is not Constitutionally protected in that City Council, and/or the City Manager, are authorized, at any time and for any reason, to abolish the position of Municipal Clerk, or, if they had so desired, to simply terminate Plaintiff's employment.**

The Phenix City Charter §3.07 provides that,

PDF created with pdfFactory trial version www.pdffactory.com

"All powers of the city, including all powers vested in it by this act, by the laws, general and local, of the state, and by Title 62 of the Code of Alabama of 1910, as amended {now obsolete}, and the determination of all matter of policy, shall be vested in the council.  Without limitation of the foregoing, the council shall have power to:
. . .
(c) Adopt the budget of the city.
. . .
(f) Appoint the members of all boards, commissions or other bodies authorized hereunder or by law. . . and shall include power to remove any member of any board, commission or body . . . and to appoint another in his stead.

(See Defendants' Exhibit 'A', Phenix City Charter §3.07)

The Phenix City Charter further provides, in §3.12,

The council by ordinance may create, change, and abolish offices, departments, boards or agencies, other than the offices, departments, boards or agencies established by this act.

(See Defendants' Exhibit 'A', Phenix City Charter §3.12.)

Not only do these rules make it clear that City Council can, at any time, either abolish a position such as Municipal Clerk or remove the current clerk and appoint a different clerk, at will, and without cause, but this is also clear in practice, and was clear to Wilkes in his experiences as a City Employee.

Wilkes' own deposition testimony makes it clear that the City Council, often when proposing and approving their budget each fiscal year, freely creates and abolishes employment positions and also freely appoints,

19

PDF created with pdfFactory trial version www.pdffactory.com

removes, and reappoints people to these jobs.  Former City Manager Bobby

Gaylor, for example, appointed Wilkes to the newly-created position of

Administrative Assistant to the City Manager. <u>See Defendants' Exhibit 'B',</u>

<u>Deposition of Max Wilkes, Page 9.</u>

      Wilkes was appointed to the position of Director of Parks and

Recreation <u>Id., Page 10,</u> removed from that position  <u>Id., Page 14,</u> later

reappointed,  <u>Id., Page 18,</u> and then removed again.  <u>Id., Page 24.</u>

      Wilkes also held the position of Director of Personnel for a total of

only 4 months before he was removed and someone else appointed.  <u>Id.,</u>

<u>Page 18.</u>

      Prior to this suit being filed, Wilkes had been appointed <u>Id., Page 9,</u>

removed <u>Id., Page 23,</u> and reappointed <u>Id., Page 45,</u> to the employment

position which is the subject of this suit, the Municipal Court Clerk.

      In addition to all this, Wilkes never had a written employment

contract for his position as Municipal Court Clerk.  <u>Id. at Page 75, Lines 12-</u>

<u>15.</u>

      Based on the laws contained in the City Charter and on Wilkes' own

experiences being shuffled in and out of positions in the City, and the fact

that no contract existed, it is difficult to fathom that Wilkes could have been

PDF created with pdfFactory trial version www.pdffactory.com

under the impression that he had a legal entitlement to continued

employment.

Furthermore, Wilkes was aware that whether in or outside of the

context of submitting the budget proposals, the City Manager can dismiss

any department head at any time for any reason. Wilkes admits this in his

deposition:

> Q.    . . . As clerk of municipal court, were you considered a
> department head?
>
> A.    I was, uh-huh.

Id., Page 10.

> Q.    Is it true that all the department heads serve at the
> pleasure of the city manager?
>
> A.    That's correct.
>
> . . .
>
> Q.    Well in fact, is the department head even in the merit
> system?
>
> A.    It's mentioned in there, but you don't have any - -
>
> Q.    You don't have merit system protection, so to speak?
>
> A.    Protection, right.
>
> . . .
>
> Q.    Would it be your position, being a former city manager,
> that the city manager can terminate or let go of any department
> head at any time?

PDF created with pdfFactory trial version www.pdffactory.com

A.     I'm sure that it pretty much -- pretty much reads that way.

Id., Pages 58-60.

Thus, Plaintiff never had a reasonable expectation or apprehension that his job was permanent or even protected in any way under the Merit System or any other laws.  He was aware, as a former City Manager himself, that employees holding jobs like his (e.g. "department heads") could be terminated at any time at the will of the City Manager, whose job it is to prepare the budget proposal.  Furthermore, Plaintiff never had an employment contract.

These above premises considered, Defendants ask this Honorable Court to find that Plaintiff had no Constitutionally protected right in his employment, and dismiss all claims made by Plaintiff pursuant to 42 U.S.C. §1983 et seq. as well as any other claims found in Count II of Plaintiff's Complaint and any other Constitutional claim based upon Plaintiff's allegation of having had Constitutionally protected property taken from him.

**ii.     Even if this Court held that Plaintiff had a protected property right in his employment as Municipal Court Clerk, Plaintiff's §1983 et seq and other Constitutional claims should fail because Plaintiff cannot show by a preponderance of the evidence that the City's legitimate, budget-related concerns were a mere pretext for terminating the Plaintiff's employment.**

PDF created with pdfFactory trial version www.pdffactory.com

Defendants hereby offer the following legitimate, non-discriminatory and non-retaliatory reason for abolishing Plaintiff's employment position.

Plaintiff's job, Clerk of Municipal Court, was abolished pursuant to the rights of City Council found in Phenix City Charter §3.12 and removed from the budget pursuant to the authority granted City Council in Phenix City Charter §3.07(c).  The reason for this is best explained by the City Finance Director, Stephen Smith:

> "We had a little more difficult time balancing the budget than normal primarily because the new Wal-Mart's opening over in Columbus impacted negatively our revenues significantly.  At the time we were preparing the budget, we had anticipated a loss of between $300,000 and $500,000 in revenue from that and we were having to make those adjustments in the budget."

See Defendants' Exhibit 'C', Deposition of Stephen Smith, Page 15, Lines 13-19.

In order to sustain their claim, Plaintiff must show, by a preponderance of the evidence, that this reason is a mere pretext.  Plaintiffs cannot meet this burden because Plaintiffs have offered no admissible evidence that Defendants' legitimate budgetary concerns are pretext.

Plaintiff revealed in his deposition that he had no credible, admissible evidence or personal knowledge supporting the allegations in

23

PDF created with pdfFactory trial version www.pdffactory.com

Plaintiff's Complaint that suggested that Plaintiff was fired because of the

perception by Mayor Hardin and others that Plaintiff was going to run for

Mayor; rather, all he had was hearsay, double hearsay, speculation, and

suspicion:

> Q.    Let me back up to 23 [Paragraph 23 in Plaintiff's Complaint].  It says here:  "In the early summer of 2006, Phenix City Fire Chief Wallace Hunter met with City Manager Roberts at City Hall.  During this meeting, Hunter told Roberts that Hunter had told a group of women that Sonny Colter and Max Wilkes would make good candidates for Mayor in 2008."
>
> Then the next paragraph, 24:  "At this point Fire Chief Hunter noticed that City Councilman Ray Bush had been standing in the hall near Roberts' office.  After hearing Hunter's comments, Hunter saw Bush go into the conference room where Mayor Hardin was working."
>
> Did anybody tell you what was said between Bush and Mayor Hardin in the conference room?
>
> A.    No.
>
> Q.    Do you know if - - do you know, sitting here today, if the reason Bush went into the conference room was to talk anything about that situation?
>
> A.    I can't say that, you know, what they talked about, but - -
>
> Q.    I mean, that's what you suspect?
>
> A.    We suspect that.
>
> Q.    But you don't know that?
>
> A.    Chief Hunter did, too, but we don't know that.
>
> Q.    And you don't have any evidence that occurred?

PDF created with pdfFactory trial version www.pdffactory.com

A.    No.

Q.    Then it says:  [in Paragraph 25] "In June of '06, City Manager Roberts prepared a proposed budget for the fiscal year 2006-2007 and the budget as proposed by Roberts, includ[ed] funding for plaintiff's job.  We have already talked about that.

A.    Uh-huh.

Q.    Then the next thing it says, it says [in Paragraph 26] "On or about July 26, 2006, Mayor Hardin, Councilman Ray Bush, and Councilman John Storey met with City Manager Roberts and told Roberts to take plaintiffs' salary out of the budget because Hardin had heard that plaintiff was going to run for Mayor in 2008."  Where did you learn about this allegation?

A.    About what he had said?

Q.    Yes, look at [Paragraph] 26 there, if you would.

A.    26?

Q.    Just take a minute or so to review it.

A.    I got that from -- in the conversation with Stephen Smith.

Q.    Okay.  Did Stephen Smith say he was present when this occurred?

A.    He was not present.  Mr. Roberts came to his office and told him this had taken place and --

Q.    So Stephen Smith was told by Mr. Roberts that Bush, Storey, and Hardin had had a conversation with Mr. Roberts where they said that you were to be taken out of the -- that your salary was to be taken out of the budget specifically because Hardin had heard that you were going to run for mayor in 2008?

A.    That's right.

25

PDF created with pdfFactory trial version www.pdffactory.com

Q.      And that's what Stephen Smith told you?

A.      That's right.

Q.      Okay,  And Stephen Smith said he heard that from City Manager Roberts?

A.      That's correct.

Q.      Okay.  And this says that that happened on July 26, 2006.

A.      That would probably be the correct date.

Q.      Where did you get that date from?

A.      Apparently, that was one of my notes that - - when I talked to Mr. Smith.

Q.      Okay.  How did that conversation between you and Mr. Smith take place?

A.      We were just talking about the budget and how it might have come out.

Q.      Well, I mean, were y'all present with one another or was that on the phone?  Or how did that occur?

A.      I think it was probably on the phone.

Q.      Okay.  And why were you speaking with him on the phone about the budget?

A.      The reason I spoke to him was to just try to determine how it all came about, because he's the one that eventually puts it together.

. . .

PDF created with pdfFactory trial version www.pdffactory.com

Q.    Okay, so basically, this allegation in [Paragraph] 26 [of the Plaintiff's Complaint] is based on what you were told someone else said; is that right?

A.    That's right.  Yes.

Q.    You don't know that it was said.  Mr. Smith told you that's what Mr. Roberts told him that he was told by three council members --

A.    That's correct.

Q.    Is that right?

A.    That's how it all came about.

(See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 70, Line 19 - Page 74, Line 24.)

Not only does Plaintiff's "evidence," supporting his claim that he was terminated because Mayor Hardin and/or others feared he was going to run for Mayor, consist totally of hearsay, double hearsay, speculation, and other matters about which the Plaintiff has no personal knowledge, but it is also controverted by testimony of the people whose statement and impressions he claims to be relying upon.  Stephen Smith recalls the following in his deposition:

Q.    Did Mr. Roberts mention to you any other objections or problems that those three city councilmen had with Mr. Wilkes?

A.    No.

Q.    At any other point in time?

27

A.     Directly from Mr. Roberts, he - - the main objection again all along was that the position was far overpaid for what it was and that between Mr. Wilkes and Pam Jarrell, we were paying two people to do the same job.  Mr. Roberts never told me specifically any other reason that the council would have wanted to make that job -- that change.

Q.     Did Mr. Roberts ever mention to you the mayor or anyone else mentioning the fact that Mr. Wilkes may be planning to run for mayor?

A.     After the budget was prepared, some considerably [sic] time later, there was a rumor going around the City Hall that Mr. Wilkes was going to run for mayor. . . . but this was some time later, not during the actual budget preparation.

Q.     Any rumors around City Hall to the effect that Max's position was removed because he was planning to run for mayor?

A.     Nobody ever expressed that to me directly, no.

. . .

Q.     So if Mr. Wilkes' recollection of that telephone conversation is different from yours, if he ever recalls that you had told him that Roberts had related to you that he was told to remove the position from the budget because Mr. Wilkes was going to run for mayor --

A.     That's not correct.

(See Defendants' Exhibit 'C', Deposition of Stephen Smith, Page 39, Line 15 - Page 42, Line 8.)


Chief Wallace Hunter, in his deposition, explains his own lack of

personal knowledge about the allegations:

PDF created with pdfFactory trial version www.pdffactory.com

> Q.     Were you aware of any concerted effort on behalf of
> Mayor Hardin to get -- get rid of Max Wilkes because he might
> not be a candidate for mayor?
>
> A.     That wouldn't be nothing that they would let me in on,
> no, sir.  I don't -- I don't -- I haven't been in any meetings
> where anybody to tell me that, so I couldn't -- I couldn't just
> say that and be right about it.

(See Defendant's Exhibit 'D', Deposition of Wallace Hunter, Page 19, Lines

6-13.)

Furthermore, Wilkes stated, under oath, in his deposition, that he

couldn't think of any reason "unconnected to the budget" that his position

was abolished and removed from the budget.  See Defendants' Exhibit 'B',

Deposition of Max Wilkes, Page 60, Lines 13-17.  After break in the

deposition requested by the Plaintiff's attorneys, Plaintiff's attorneys

revisited this issue with Plaintiff, inviting him to change his answer.  See

Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 63, Line 17 - Page

64 Line 17.  At this point, Plaintiff advanced the suggestion, supported by

the same combination of hearsay, double-hearsay, and speculation, that he

thought his job was terminated because the Mayor and others didn't want the

Plaintiff to run against the Mayor in an upcoming election.  See Defendants'

Exhibit 'B', Deposition of Max Wilkes, Page 64, Line 18 - Page 67, Line 12.

The general rule is that inadmissible hearsay cannot be considered on

a motion for summary judgment.  Fed. R. Civ. P. 56(e) requires that

PDF created with pdfFactory trial version www.pdffactory.com

"affidavits" that support or oppose summary judgment motions shall be made on personal knowledge, and shall set forth such facts as would be admissible in evidence.  This rule also applies to testimony given on deposition.  <u>Macuba v. Deboer</u>, 193 F.3d 1316, 1322, (11th Cir. 1999).

Plaintiff lacks any admissible evidence that could persuade any finder of fact by a preponderance of the evidence that Defendants' stated legitimate, non-retaliatory and budget-related reason for abolishing Plaintiff's job position is mere pretext.

Therefore, Defendants ask this Honorable Court to dismiss all §§1983, 1985, 1986 and 1988 claims as well as all other claims contained in Count II of Plaintiff's Complaint, as well as any other Constitutional claims which rely on the unsupported allegations referenced in Plaintiff's Complaint as to the reason Plaintiff alleges his job was removed from the budget.

## III.    <u>TORT OF OUTRAGE AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

To recover under a theory of the Tort of Outrage and Intentional Infliction of Emotional Distress in Alabama, Plaintiff must show that Defendants, "by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to another."  <u>American Road Service</u>

PDF created with pdfFactory trial version www.pdffactory.com

<u>Company v. Inmon</u>, 394 So. 2d 361, 365, (Ala. 1981).  The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it.  <u>Id.</u>  The conduct must be "so outrageous in character and so extreme in the degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." <u>Id.</u>

Defendants in this case cut Plaintiff's job out of a city budget because of lost revenues.  Even if Plaintiff could prove his unsubstantiated suspicion that this was done because the mayor heard that Plaintiff may run against the Mayor, this would not rise to the level of being "so outrageous in character and so extreme in the degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Furthermore, there is no evidence that Plaintiff has suffered any severe emotional distress.

Based on these premises, Defendants respectfully request that this Honorable Court dismiss Count V of the Plaintiff's Complaint in its entirety.

## IV.    <u>BREACH OF CONTRACT AND UNJUST ENRICHMENT</u>

Count IV of the Plaintiff's Complaint seems to be based upon the theory that since Plaintiff at times held more than one title with the City, that

PDF created with pdfFactory trial version www.pdffactory.com

the City was unjustly enriched since it paid one person to do more than one job.

Also, Plaintiff alleges in his Complaint that there was some sort of contract governing his employment that was breached when City Council chose to cut the Plaintiff's job out of the budget.

As Plaintiff Max Wilkes acknowledges, under oath, in his deposition, there is no written employment contract between the Plaintiff and the Defendants.  See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 75, Line 12-15.

In order for a plaintiff in Alabama to prevail on a claim of unjust enrichment, (also known as quasi-contract) the plaintiff must show that the defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud.  The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and in good conscience to disallow one to be unjustly enriched at the expense of another.  Mantiply v. Mantiply, 951 So.2d 638, (Ala. 2006.)

One is unjustly enriched if his retention of a benefit would be unjust. The retention of a benefit is unjust if (1) the donor of the benefit acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of

PDF created with pdfFactory trial version www.pdffactory.com

the benefit engaged in some unconscionable conduct, such as fraud,

coercion, or abuse of a confidential relationship.  In the absence of mistake

or misreliance by the donor or wrongful conduct by the recipient, the

recipient may have been enriched, but he is not deemed to have been

unjustly enriched.  Id.

Defendants offer the following from Plaintiff's deposition:

> Q.    There's a count in here [Plaintiff's Complaint] for breach of contract.  You didn't have an employment contract with the City, did you?
>
> A.    No.  No written contract.
>
> Q.    Okay,  And I believe you previously testified on all these positions that you worked in, you were in agreement with what you were compensated for those positions; is that correct?
>
> MR JACKSON:  Object to the form.
>
> A.    Well, when you say in agreement, that's all I was offered. So I took it so I could continue.
>
> Q.    You didn't say, well, I'm not doing this for that and leave?
>
> A.    I didn't.  Didn't leave or didn't refuse it.  But when you - - you know, you look at --
>
> Q.    Well, did you ever ask for more?
>
> A.    I can't recall.

(See Defendants' Exhibit 'B', Deposition of Max Wilkes, Page 75, Line 12-

Page 76, Line 3.

PDF created with pdfFactory trial version www.pdffactory.com

There is no evidence of a mistake of fact or a misreliance. Plaintiff was never told, and it was never suggested by any Defendants, that Plaintiff would ever be compensated anymore than Plaintiff already has been compensated for the work Plaintiff did for the City. Plaintiff has provided no evidence of any such mistake of fact or misreliance.

Furthermore, there is no evidence that the City engaged in any unconscionable conduct, fraud, coercion, or abuse of a confidential relationship.

Therefore, in consideration of these premises, Defendants request that this Honorable Court dismiss all of Count IV of Plaintiff's Complaint.

## V.    COUNT ONE OF PLAINTIFF'S COMPLAINT INCLUDING ALL ALABAMA CONSTITUTIONAL CLAIMS

Count I, Paragraph 30 of the Plaintiff's Complaint contains allegations that Defendants have violated the *"Constitution of Alabama of 1901*, Article 1, §§ 1, 5, 6, 7, 11, 13, 23, 35, 36 and/or 235 (and any amendments thereto)."

Plaintiff has made no specific allegations and shown absolutely no evidence that Defendants are in violation of any of these Constitution of Alabama code sections, most of which bear absolutely no relationship, even

PDF created with pdfFactory trial version www.pdffactory.com

by the most creative and farfetched apprehensions of the law, to the present case.

For example, §1 provides, "That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."

§5 provides, "That the people shall be secure in their persons, houses, papers, and possessions from unreasonable seizure or searches, and that no warrants shall issue to search any place or to seize any person or thing without probable cause, supported by oath or affirmation."

§6 deals with the "rights of persons in criminal prosecutions;" §7 the "accusation, arrest and detention; punishment limited to laws established prior to offense;" §11 the "Right to trial by jury;" §13 that "all courts shall be open . . . and justice shall be administered without sale, denial, or delay;" §23 with Eminent Domain; §35 with the proper "Objective of government," §36 the "Construction of Declaration of Rights;" and finally, §235 with the "Taking of property for public use by municipal and other corporations."

Because Plaintiff cannot offer any evidence in this case pertaining to any of these Constitution of Alabama code sections, or to any other state law claims, the Defendants request that this Honorable Court dismiss all allegations found in Count I from this case.

PDF created with pdfFactory trial version www.pdffactory.com

## VI.    **QUALIFIED IMMUNITY**

If this Honorable Court should rule that Absolute Immunity does not apply, Defendants Hardin, Storey, and Bush respectfully request this court to dismiss them, in their individual capacities, from this lawsuit on the grounds that they are shielded from liability by the doctrine of Qualified Immunity.

**Qualified Immunity Rules**

Under the qualified immunity rule, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Hartwell v. The City of Montgomery, 487 F. Supp 2d 1313, M.D. Alabama (2007)

The court applies a two-step analysis in determining whether qualified immunity applies to an official sued in his individual capacity.

First, the defendant official must demonstrate that during the alleged conduct, he acted within the scope of discretionary authority. Id.  Here, the inquiry is whether the defendant was performing a legitimate job-related function through means that were within his power to utilize, temporarily putting aside the question whether it was unconstitutional.  Id.

PDF created with pdfFactory trial version www.pdffactory.com

If the defendant can demonstrate that he was acting within the scope of discretionary authority, he will be shielded by qualified immunity unless the plaintiff, in the second step of the analysis, can carry his burden to demonstrate that the conduct in question violated clearly established law.  Id.

Law is "clearly established" for qualified immunity purposes if the contours of the right violated are sufficiently clear that a reasonable official would understand that what he is doing violates that right.  Oladeinde v. Birmingham,  230 F.2d 1275, 11th Cir. (2000).

### Argument

All defendants acted within the scope of their discretionary authority. The Phenix City Charter expressly authorizes the City Council, including the Mayor, to adopt the budget for the city, and also to abolish the position of Municipal Court Clerk.  See Defendants' Exhibit 'A', Phenix City Charter §§3.07, 3.12.  Therefore, Defendants in their individual capacities will be shielded from liability by qualified immunity unless the Plaintiff can show that the conduct violated clearly established law.

After making a diligent search of case law and authorities, Defendants cannot find any "clearly established law" which suggests that it is violative of Plaintiff's Constitutional Rights for Defendants to cut a position out of a budget in order to account for lost sales tax revenues.

PDF created with pdfFactory trial version www.pdffactory.com

Furthermore, even if there is a case to that effect, Defendants contend that there is encoded law and case law precedent, set forth *supra* in this memorandum, which led them to believe, reasonably, that their actions were not in violation of "clearly established law":

(a)    The Phenix City Charter authorizes the City Council to approve the budget and to abolish any job not specifically created by the Charter.

(b)    As Max Wilkes has said, under oath, in his deposition, cited and quoted *supra*, the position of County Clerk can be terminated at any time, with or without cause, by the City.

(c)    As developed in reference *supra* to encoded laws, rules, and case law precedents (see Defendant's Exhibit 'A', Phenix City Charter §§3.07-12; see also Warren v. Crawford, 927 F.2d 559 (11th Cir. 1991); see also Green v. City of Hamilton, 937 F.2d 1561, (11th Cir. 1991); see also 42 U.S.C. §1983), Defendants have adequate reason to believe that Plaintiff never had a constitutionally protected right in his employment with the city. It follows that Defendants have reason to believe that their actions cannot have violated a Constitutionally protected right of Plaintiff.  It is not "clearly established" by rules or precedents that the Defendants' position in this regard is incorrect.

PDF created with pdfFactory trial version www.pdffactory.com

(d)    Nobody in the City, including Max Wilkes himself, has any

personal knowledge that the Plaintiff's position was terminated or proposed

to be terminated for any reason other than legitimate budgetary concerns.

In consideration of these premises, Defendants request that this

Honorable Court find that the Defendants Storey, Bush, and Hardin, in their

individual capacities, be dismissed from this lawsuit on grounds that they are

shielded from liability by Qualified Immunity.

## Conclusion

WHEREFORE, considering the above premises, the Defendants in

this case respectfully request this Honorable Court to dismiss all counts of

this claim filed against them by Plaintiff, or to dismiss all such counts as this

Honorable Court deems appropriate, or to dismiss any such named

Defendants, in their individual or official capacities, as this Honorable Court

deems appropriate to dismiss at this time.

*/s/ James R. McKoon, Jr.*

_____
James R. McKoon, Jr., MCK020
Joshua R. McKoon, MCK057
James P. Graham, Jr., GRA030
Attorneys for Defendants

**OF COUNSEL:**
McKoon, Thomas & McKoon
Post Office Box 3220
Phenix City, Alabama 36868-3220
334.297.2300

39

**OF COUNSEL:**

The Graham Legal Firm
Post Office Box 3380
Phenix City, AL 36868-3380
334.291.0315

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 10th day of December, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:


Raymond L. Jackson, Jr.
Post Office Box 3575
Auburn, Alabama 36831-3575

Thomas F. Worthy
Post Office Box 2392
Phenix City, Alabama 36868-2392


*/s/ James R. McKoon, Jr.*
_____
OF COUNSEL

PDF created with pdfFactory trial version www.pdffactory.com

# DEFENDANTS' EXHIBIT "A"

# CITY CHARTER OF PHENIX CITY

# PART I

## CHARTER AND RELATED LAWS

### SUBPART A

#### CHARTER*

**Article I.   Adoption of Council-Manager Form of Government—Election and Term of Council**

| | |
|---|---|
| 1.01. | Cities to which act applies. |
| 1.02. | Petition for election. |
| 1.03. | Call of election by mayor. |
| 1.04. | Second election not called within four years. |
| 1.05. | Question submitted: form of ballot. |
| 1.06. | Conduct, canvassing and declaration of result of election. |
| 1.07. | Election of first council: term of office. |
| 1.08. | The council. |

**Article II.   Legal Status: Form of Government: Powers**

| | |
|---|---|
| 2.01. | Legal status. |
| 2.02. | Form of government. |
| 2.03. | Powers of city. |

**Article III.   The Council**

| | |
|---|---|
| 3.01. | Number, election, term. |
| 3.02. | Statement of candidacy. |
| 3.02(a). | Campaign expenses. |
| 3.03. | Ballot. |
| 3.04. | Eligibility. |
| 3.05. | Compensation. |
| 3.06. | Presiding officer; mayor. |
| 3.07. | Powers. |
| 3.08. | Appointment of city manager. |
| 3.09. | Removal of city manager. |
| 3.10. | Council not to interfere in appointments or removals. |
| 3.11. | [Filling vacancy on council.] |
| 3.12. | Creation of new departments or offices: change of duties. |

*Editor's note—Printed in this subpart is Act No. 71 of 1977 (p. 100), being the city charter. Amendments are indicated by parenthetical history notes following amended provisions. The absence of a history note indicates that the provision remains unchanged from the original. Obvious misspellings and punctuation errors have been corrected without notation. For stylistic purposes, headings and catchlines have been made uniform and the same system of citations to state statutes as appears in the Code of Ordinances has been used. Additions for clarity are indicated by brackets.

PHENIX CITY CODE

3.13.        City clerk.
3.14.        Induction of council into office: meetings of council.
3.15.        Council to be judge of qualifications of its members.
3.16.        Rules of procedure.
3.17.        Meetings, passage of ordinances, etc.
3.18.        Granting of franchises.
3.19.        Codification authorized.
3.20.        Examination of books and publication of accounts.


### Article IV.   The City Manager

4.01.        The city manager: qualifications.
4.02.        The city manager: powers and duties.
4.03.        Absence of city manager.
4.04.        Administrative department.
4.05.        Directors of departments.
4.06.        Departmental divisions.


### Article V.   Budget

5.01.        Fiscal year.
5.02.        Preparation and submission of budget proposal.
5.03.        Budget proposal a public record.
5.04.        Publication of notice of public hearing.
5.05.        Public hearing on budget proposal.
5.06.        Further consideration of budget proposal.
5.07.        Adoption of budget.
5.08.        Vote required for adoption.
5.09.        Date of final adoption; failure to adopt.
5.10.        Effective date of budget; certification; copies made available.
5.11.        Budget establishes appropriations.
5.12.        Budget message; current operations.
5.13.        Budget message; capital improvements.
5.14.        Budget message: capital program.
5.15.        Budget message: supporting schedules.
5.16.        Budget.
5.17.        Anticipated revenues.
5.18.        Anticipated revenues compared with other years.
5.19.        [Repealed].
5.20.        Miscellaneous revenues.
5.21.        Miscellaneous revenues; anticipated surplus from municipal utility or other
             public service enterprise.
5.22.        Miscellaneous revenues; measure of estimates.
5.23.        Miscellaneous revenues; receipts from special assessments.
5.24.        Miscellaneous revenues; from new sources.
5.25.        Proposed expenditures.
5.26.        Proposed expenditures: comparison with other years.
5.27.        Down payments on capital projects.
5.28.        Budget summary.

CHARTER

### Article VI.   Department of Finance

| | |
|---|---|
| 6.01. | Director of finance; appointment. |
| 6.02. | Director of finance: qualifications. |
| 6.03. | Director of finance; surety bond. |
| 6.04. | Director of finance: powers and duties. |
| 6.05. | Work programs: allotments. |
| 6.06. | Allotments constitute basis of expenditures and are subject to revision. |
| 6.07. | Transfers of appropriations. |
| 6.08. | Accounting supervision and control. |
| 6.09. | When contracts and expenditures prohibited. |
| 6.10. | Appropriations lapse at end of year. |
| 6.11. | Fees shall be paid to city government. |
| 6.12. | Purchases. |
| 6.13. | Competitive bidding. |
| 6.14. | Contracts for city improvements. |
| 6.15. | Accounting control of purchases. |
| 6.16. | No contract executed until bond ordinance effective. |
| 6.17. | Emergency appropriations. |
| 6.18. | Borrowing to meet emergency appropriations. |
| 6.19. | Borrowing in anticipation of property taxes. |
| 6.20. | Borrowing in anticipation of other revenues. |
| 6.21. | Notes redeemable prior to maturity. |
| 6.22. | Sale of notes: report of sale. |

### Article VII.   Council Districts

| | |
|---|---|
| 7.01. | Number established. |
| 7.02. | Establishment of the original districts. |
| 7.03. | Reapportionment. |

### Article VIII.   Succession in Government

| | |
|---|---|
| 8.01. | Rights of officers and employees preserved. |
| 8.02. | Continuance of present officers. |
| 8.03. | Status of officers and employees holding positions when the council-manager form of government is adopted. |
| 8.04. | Transfer of records and property. |
| 8.05. | Continuity of offices, departments, boards or agencies. |
| 8.06. | Continuance of contracts and public improvements. |
| 8.07. | Pending actions and proceedings. |
| 8.08. | Pension and relief funds. |
| 8.09. | Independent authorities, boards, agencies, etc. |
| 8.10. | When provisions take effect. |
| 8.11. | Continuance of ordinances and resolutions. |

### Article IX.   General Provisions

| | |
|---|---|
| 9.01. | Prohibition on appointment or removal of officers and employees. |
| 9.01(a). | Removal of officers or employees. |
| 9.02. | Right of city manager and other officers in council. |

PHENIX CITY CODE

9.03.        Investigations by council or city manager.
9.04.        Contracts extending beyond one year.
9.05.        Publicity of records.
9.06.        Officers and employees not to be privately interested in city's contracts.
9.07.        Official bonds.
9.08.        Oath of office.

### Article X.   Abandonment of Council-Manager Form of Government

10.01.       Generally.
10.02.       Petition for change of form of government.
10.03.       No election on change more often than two years.

### Article XI.   General Statutory Provisions

11.01.       Effect of this act on existing law.
11.02.       Separability clause.
11.03.       Short title.
11.04.       Effective date.

CHARTER                                                     1.02

Act No. 71 H. 114—Baker, Whatley

AN ACT

To permit any city in the State of Alabama having a population of not less than 23,000 nor more than 27,000 inhabitants according to the 1970 or any subsequent federal decennial census to adopt the council-manager form of municipal government, to provide for the calling and holding of elections to vote thereon, to provide for the election and term of the first council, to define the legal status, form of government and powers of the city, to provide for subsequent elections of members of the council, their number and their terms of office, to provide for the qualification, powers and authority of the council, the mayor and the city clerk, and for the election of the mayor and city clerk, to provide for the appointment and removal and to define the powers of the city manager, to provide for an annual budget, its preparation, submission, adoption and effect, to create and define the powers and duties of a department of finance and of the director thereof, to regulate purchases and contracts of the city, and to define their powers and authority, to set up the terms and effects of succession in government of any city adopting the council-manager form of government, to provide for the establishment and re-establishment of districts, to make various other provisions for such form of government of any such city, and to provide for the means of abandoning the council-manager form of government.

Be It Enacted by the Legislature of Alabama:

## Article I. Adoption of Council-Manager Form of Government—Election and Term of Council

### 1.01. Cities to which act applies.

Any city in the State of Alabama, which has a population of not less than 23,000 nor more than 27,000 inhabitants according to the 1970 or any subsequent federal decennial census, may adopt the council-manager form of government by proceeding in the manner hereafter in this act provided.

### 1.02. Petition for election.

The filing of a petition signed by ten percent or more of the number of qualified voters who voted in the last city general election held in such city, asking that the question of the adoption of the council-manager form of government for such city be submitted to the qualified voters thereof, with the judge of probate of the county in which such city is located, shall mandatorily require an election to be held as herein provided. Whenever such a petition purporting to be signed by at least ten percent of the number of qualified voters who voted in the last city general election held in such city shall be presented to such judge of probate, he shall examine such petition and determine whether or not the same is signed by at least ten percent of the number of qualified voters who voted in the last city general election held in such city, and if such petition is signed by the requisite number of voters to require such an election, he shall

1.02                              PHENIX CITY CODE

within 15 days from the receipt of such petition certify such fact to the mayor or other chief executive officer of the city for which such election is so petitioned, and the certificate of the judge of probate as to the sufficiency of said petition shall be final.

### 1.03. Call of election by mayor.

The mayor or other chief executive officer of such city shall immediately upon receipt of such certificate from the probate judge, by proclamation, submit the question of the adoption of the council-manager form of government for such city, under this act, at a special election to be held at a time specified in such proclamation, not less than 40 days and not more than 60 days after the receipt of said certificate from said probate judge, unless a general or regular election is to be held within 90 days after receipt of such certificate, in which event the special election herein provided for shall be held at the same time as such general or regular election. Should the election not be called by proclamation within ten days after receipt of his certificate, the judge of probate shall call such election by order at a time specified therein but not less than 40 days and not more than 60 days after the receipt by said mayor or other chief executive officer of the said certificate of the probate judge, unless a general or regular election is to be held within 90 days after receipt of such certificate, in which event the special election herein provided for shall be held at the same time as such general or regular election.

### 1.04. Second election not called within four years.

If the council-manager form of government is not adopted at the special election so called, the question of adopting such form of government shall not be resubmitted to the voters of such city for adoption within four years thereafter, and then the question of adopting said form of government may be resubmitted in the manner above provided.

### 1.05. Question submitted: form of ballot.

At such election the question to be submitted shall be printed in plain prominent type on separate ballots and shall read as follows: "Shall the council-manager form of government, as provided by the city manager Act of 1977 be adopted for the City of _____.

"Yes _____"

"No _____"

The voter shall mark his ballot with a cross mark before or after the word which expresses his choice. No other question shall be submitted to the voters of such city upon this ballot. If voting machines are used at any voting place in such election, the above question may at the discretion of the election commission of the city or other body having charge of the conduct of municipal elections in such city, be submitted as a separate question on voting machines so used.

### 1.06. Conduct, canvassing and declaration of result of election.

The election thereupon shall be conducted, the vote canvassed and the result declared in the same manner as provided by law in respect to other city elections. If the majority of the votes

CHARTER                                                                    2.01

shall be "yes" or in favor of such question, the provisions of this article shall thereby be adopted for such city, and the mayor shall within five days of the election transmit to the governor, to the secretary of state, and to the judge of probate of the county in which the city is located, each, a certificate of adoption stating that such question was adopted by such city.

**1.07. Election of first council: term of office.**

Within five days of the date of his receipt of the certificate of adoption the probate judge with whom the certificate was filed shall call an election to be held on the first Tuesday in September after the first full month of July following the adoption of this act. The expenses of this election shall be paid by the city. Before calling such election the probate judge shall cause the city to be divided into three districts containing as nearly equal number of people as possible. Candidates shall qualify in the manner prescribed in Section 3.02 hereof and shall have the qualifications and eligibility set forth in Sections 3.03 and 3.04 hereof. Each candidate shall announce if he is to become a candidate for mayor, or councilman-at-large, or if he desires to become a candidate for one of three district posts, either District Post 1, District Post 2 or District Post 3. A candidate for a district post shall reside in his district. Each voter in the election may cast one vote for a candidate for mayor and one vote for councilman-at-large and one vote for a candidate from the district in which he resides. Any candidate receiving a majority of the total votes cast for candidates for mayor, councilman-at-large, District Post 1, District Post 2 and District Post 3 shall be elected as the councilman from his post. In the event no candidate received such a majority in the said election, there shall be a run-off election to be held two weeks after the first election. In the run-off election only those two candidates from each post who received the largest vote in the first election shall be eligible in the run-off election, and only these two shall have their names placed on the ballot for the run-off election. Any candidate receiving a majority of the total votes cast in the run-off election shall be elected councilman from his post. The councilmen so elected shall take office on the first Monday in October following the election. Each councilman shall hold office for three years, but shall serve until his successor shall have qualified. A councilman may succeed himself in office.

**1.08. The council.**

The councilman provided for in this article shall be known collectively as the council of the city of _____ (Name of said city to be inserted) and shall have the powers and duties hereinafter provided. The council first elected shall qualify and take office in the manner hereinafter prescribed on the first Monday in October following the date when the election of all councilmen is completed, and thereupon such city shall be and become organized under the council-manager form of government provided under this act, and shall thereafter be governed by the provisions of this act.

## Article II. Legal Status: Form of Government: Powers

**2.01. Legal status.**

Any municipal corporation which adopts the council-manager form of government shall continue its existence as a body corporate without change in the name of the municipal

2.01                              PHENIX CITY CODE

corporation. The word "city" as hereinafter used shall mean and refer to any municipal corporation which has adopted the council-manager form of government. The city shall continue as a municipal corporation, within the corporate limits as then established, and as thereafter fixed in the manner prescribed by law, subject to all the duties and obligations then pertaining to or incumbent upon it as a municipal corporation and shall continue to enjoy all the rights, immunities, powers and franchises then enjoyed by it, as well as those that may thereafter be granted to it.

### 2.02. Form of government.

The municipal government of any such city proceeding under this act shall be known as the "council-manager form of government." Pursuant to the provisions and limitations of this act and subject to the limitations imposed by the Constitution of Alabama and its laws, all powers of the city shall be vested in the council elected as herein provided and hereinafter referred to as "the council." All powers of the city shall be exercised in the manner prescribed by this act, or if the manner be not prescribed, then in such manner as may be prescribed by law or by ordinance.

### 2.03. Powers of city.

The city shall have all the powers granted to municipal corporations and to cities by the constitution and laws of this state together with all the implied powers necessary to carry into execution all the powers granted. The city may acquire property within or without its corporate limits for any city purpose, in fee simple or any lesser interest or estate, by purchase, gift, devise, lease or condemnation, and may sell, lease, mortgage, hold, manage and control such property as its interest may require; and, except as prohibited by the constitution and laws of this state or restricted by this act, the city shall and may exercise all municipal powers, functions, rights, privileges and immunities of every name and nature whatsoever. The enumeration of particular powers by this act shall not be deemed to be exclusive, and in addition to the powers enumerated herein or implied thereby, or appropriate to the exercise of such powers, it is intended that the city shall have and may exercise all powers which, under the constitution of this state, it would be competent for this act specifically to enumerate.

### Article III. The Council

### 3.01. Number, election, term.

The council in the municipality shall have five members with two elected at-large by all of the voters of the municipality and three elected from districts by voters within each district, the council elected in the manner prescribed in Section 1.07 of Act 71. The regular municipal elections in the municipality shall be held on the first Tuesday in September, 2001, and each three years thereafter, and when necessary, a second or runoff election shall be held on the third Tuesday next thereafter following the regular election. Each council member shall hold office for three years, but shall serve until his or her successor shall have qualified. Beginning in 2004, the regular municipal elections in the municipality shall be held on the first Tuesday

in September, 2004, and each four years thereafter, and when necessary, a second or runoff election shall be held on the third Tuesday next thereafter following said regular election. Each council member shall hold office for four years beginning with the election of 2004, but shall serve until his or her successor shall have qualified. A council member may succeed himself or herself in office. Each of the three district council members shall reside within the limits of his or her district during the term of his or her office and if any district council member shall remove from within the limits of his or her district for 60 consecutive days his or her office shall become vacant.

(Act No.1989-832, § 1; Act No. 2000-641, § 2)

### 3.02. Statement of candidacy.

Any person desiring to become a candidate at any election for the office of councilman may become such candidate by filing in the office of the judge of probate of the county in which such city is situated, a statement in writing of such candidacy, accompanied by an affidavit taken and certified by such judge of probate or by a notary public that such person is duly qualified to hold the office for which he desires to be a candidate. Such statement shall be filed at least 30 days before the day set for such election and shall be in substantially the following form:

State of Alabama

County of _____

I, the undersigned, being first duly sworn, depose and say that I am a citizen of the City of _____, that I desire to become a candidate for the office of councilman, Post _____, in said City at the election for said office to be held on the _____ day of September next and I am duly qualified to hold said office if elected thereto and I hereby request that my name be printed upon the official ballot at said election.

Signature of candidate

_____

Typed name of candidate

Subscribed and sworn to before me by said _____ on this ____ day of _____, 19____.

Filed in my office on this _____ day of _____, 19____.

_____

Judge of Probate

Said statement shall be accompanied by a petition signed by not less than, nor more than ten electors, who shall be designated as said candidate's sponsors. In the case of a candidate for a district post, sponsors may but need not reside within the district in which the candidate

3.02                              PHENIX CITY CODE

resides. No elector shall sign more than one such petition, and should an elector do so, he shall be guilty of a misdemeanor. With each signature shall be stated the place of address of each sponsor. Nominating petitions shall be in substantially the following form:

"We, the undersigned ten electors of the city of _____, hereby nominate and sponsor _____, whose residence is _____, as a candidate for the office of councilman, Post _____, in the election to be held on the _____day of September, 19____; and we individually certify that our names have appeared on the rolls of registered voters of this city within the last year, that we are qualified to vote for a candidate for the council and that we have not signed any other nominating petition for that office. We further state that we know said _____ to possess the qualifications necessary for said office, and to be in our judgment a fit and proper person to hold said office. Witness our hands on this the ____ day of _____, 19____."

## 3.02(a). Campaign expenses.

Each candidate shall file with the probate judge, within ten days after the election in which he has been a candidate, an accounting of all campaign contributions and expenditures exceeding $10.00 and shall comply with provisions in existing law which require the filing of campaign contributions and expenses.

## 3.03. Ballot.

At every such election all ballots to be used by voters shall be printed and prepared by the election commission or other body having charge of the conduct of municipal elections in said city, and shall contain the names of all candidates for each post directly underneath the words "For members of the council from post _____." No name shall appear upon said ballot as a candidate for election except the names of such persons as have become candidates according to provisions as above set forth; no ballot shall be used at any such election except the official ballot prepared by the election commission or other body having charge of the conduct of municipal elections in said city, except that the names of candidates may be suitably placed on voting machines if such machines are used to conduct such election.

## 3.04. Eligibility.

Councilmen shall be qualified electors of the city, and shall hold no other public office except that of notary public or member of the national guard or naval or military reserve. If the councilman shall cease to possess any of these qualifications or shall be convicted of crime involving moral turpitude, his office shall immediately become vacant.

## 3.05. Compensation.

Effective at the beginning of the next term of office, the mayor shall receive as compensation for his or her services the sum of $1,000.00 per month, provided that the total does not exceed $12,000.00 per annum. Each council member shall receive as compensation for his or her services the sum of $800.00 per month, provided that the total does not exceed $9,600.00 per

annum. The mayor and council members may be reimbursed for actual expenses incurred in and about the performance of their duties, only if such expenses are approved by the council at a regular meeting. No salary increase may be made effective except at the beginning of a new term.

(Act No. 1980-301, § 1; Act No. 1988-385, § 1; Act No. 2001-643, § 2)

### 3.06. Presiding officer; mayor.

The mayor shall preside at meetings of the council, and shall be recognized as head of the city government for all ceremonial purposes and by the governor for purposes of military law, but shall have no regular administrative duties. The council shall elect from its membership at the first regular meeting a mayor pro-tem who shall act as mayor during the absence or disability of the mayor. The mayor and mayor pro-tem when so elected shall hold their respective officers until the next council takes office; provided that if the mayor or mayor pro-tem or both shall cease to be a member of the council his or their offices as such mayor or mayor pro-tem shall become vacant. If the mayor's post is vacated with less than 12 months remaining in the term, the mayor pro-tem will fill the unexpired term of the mayor. If the mayor's post is vacated with 12 months or more remaining in the term, a special election will be called, in accordance with provisions for special elections. The probate judge shall call said special election within 15 days and no more than 60 days after certification of the vacancy by the council.

### 3.07. Powers.

All powers of the city, including all powers vested in it by this act, by the laws, general and local, of the state, and by Title 62 of the Code of Alabama of 1910, as amended [now obsolete], and the determination of all matters of policy, shall be vested in the council. Without limitation of the foregoing, the council shall have power to:

(a)  Appoint and remove the city manager.

(b)  Establish other administrative departments and distribute the work of divisions.

(c)  Adopt the budget of the city.

(d)  Authorize the issuance of bonds or warrants.

(e)  Inquire into the conduct of any office, board, department or agency of the city and make investigations as to municipal affairs.

(f)  Appoint the members of all boards, commissions or other bodies authorized hereunder or by law. This provision for appointment of members of boards, commissions or other bodies authorized hereunder or by law shall supersede any different provision for appointment of such members contained in any statute or ordinance in effect at the time of adoption by the city of the council-manager form of government set up by this act, and shall include power to remove any member of any board, commission or body to the same extent as might be done by the governing body of the city at the time of adoption by the city of the council-manager form of government set up by this act and

3.07                              PHENIX CITY CODE

to appoint another in his stead. And wherever in any statute in effect at the time of adoption by the city of said council-manager form of government the chief executive officer of the city is designated to act in any capacity ex-officio, the mayor shall act.

**Editor's note**—Title 62 of the Code of Alabama of 1910 (referenced in the first sentence of Section 3.07) was a compilation of local acts. Such compilation is no longer in the current state statutes and has not been kept current.

### 3.08. Appointment of city manager.

The council by a majority vote of the whole qualified membership of the council shall appoint a city manager, who shall be an officer of the city and shall have the powers and perform the duties in this act provided. No councilman shall receive such appointment during the term for which he shall have been elected, nor within one year after the expiration of his term; nor shall he receive any appointment as city manager under the provisions of Section 4.03 of this act during the term for which he shall have been elected. The civil service act, if any, applicable to the city shall not apply to the approval or the removal of the city manager.

A temporary, acting city manager may be designated by the council to serve for not more than four months in these events but in only these events:

(a) When the first council shall take office after adoption of this act by the city.

(b) Following the removal of any permanent city manager.

Such temporary acting city manager shall perform the duties and assume the obligations of the office of city manager but he may be removed summarily by the council at any time. If the council shall permit the temporary acting city manager to serve for longer than four months he shall become the permanent city manager and shall be entitled to all benefits granted the permanent city manager.

### 3.09. Removal of city manager.

The council shall appoint the city manager for an indefinite term, but the council may remove him at any time by a majority vote of the whole qualified membership of the council.

### 3.10. Council not to interfere in appointments or removals.

Neither the council nor any of its members shall direct or request the appointment of any person to, or his removal from, office by the city manager or by any of his subordinates, or in any manner take part in the appointment or removal of officers and employees in the administrative service of the city. Except for the purpose of inquiry, the council and its members shall deal with the administrative service solely through the city manager and neither the council nor any member thereof shall give orders to any subordinates of the city manager, either publicly or privately.

CHARTER                                                                3.14

### 3.11. [Filling vacancy on council.]

If a council post is vacated with 12 months or more remaining in the term, a special election shall be called by the mayor. Such special election shall be held and conducted, the returns thereof made and certificates given and the election regulated in all respects by the provisions of the election of councilmen under this act. If a council post is vacated with less than 12 months remaining in the term, the vacancy shall be filled by the council at any regular meeting within four weeks after the vacancy occurs. In event of a deadlock and for the purpose of breaking the deadlock, the mayor shall cast an additional vote. For the purposes of this section a deadlock shall be deemed to exist when, at the end of the third regular meeting of the council following the creation of a vacancy the council shall not have selected a person to fill the vacancy. The person selected to fill a vacancy shall possess all of the qualifications set out in this act including residence in the district he represents, and he shall hold office until the next election of councilman.

(Act No.1981-426, § 1)

### 3.12. Creation of new departments or offices: change of duties.

The council by ordinance may create, change, and abolish offices, departments, boards or agencies, other than the offices, departments, boards or agencies established by this act. The council by ordinance may assign additional functions or duties to offices, departments, boards or agencies established by this act, but may not discontinue or assign to any other office, department, board or agency, any function or duty assigned by this act to a particular office, department, board or agency.

### 3.13. City clerk.

If the city clerk of any city which adopts the council-manager form of government holds office subject to any civil service or merit system, such clerk shall continue to be the city clerk under the council-manager form of government of such city, and his successor shall be selected and hold office subject to the provisions of such civil service or merit system. If the city clerk of any city which adopts the council-manager form of government does not hold office subject to any civil service or merit system, the council shall elect the city clerk. The city clerk shall give notice of meetings of the council, shall keep the journal of its proceedings which shall be authenticated by his signature. He shall record in full in said journal all ordinances and resolutions and the minutes of all the meetings of the council. He shall also record in said journal any written certificates or declarations received by the council under the provisions of Section 5.22 and 5.24 hereof. He shall perform such other duties as shall be required by this act or by ordinance, and such duties as are imposed by general law of Alabama upon city clerks and as to which other provisions are not made in this act. He shall keep the journal open for public inspection at all reasonable times.

### 3.14. Induction of council into office: meetings of council.

The first meeting of each newly elected council for induction into office shall be held at 10:00 a.m. on the first Monday in October next following its election, after which the council shall meet regularly at such times as may be prescribed by its rules, but not less frequently than once each month. All meetings of the council shall be open to the public.

### 3.15. Council to be judge of qualifications of its members.

The council shall be the judge of the election and qualifications of its members and for the purpose of investigating such election and qualifications shall have power to subpoena witnesses and require the production of records, but the decision of the council in any such case shall be subject to review by the courts.

### 3.16. Rules of procedure.

The council shall determine its own rules and order of business.

### 3.17. Meetings, passage of ordinances, etc.

The council shall hold regular public meetings as may be prescribed by its own rules, provided that a regular hour and day shall be fixed by the order of said council, and publicly announced. It may hold such adjourned, called, special or other meetings as the business of the city may require. The mayor when present and in his absence the mayor pro-tem shall preside at all meetings of said council. A majority of the whole qualified membership of the council shall constitute a quorum for the transaction of any and every power conferred upon said council. The affirmative vote of a majority of the quorum shall be necessary and sufficient for the passage of any resolution, rule or ordinance, or the transaction of any business of any sort by the said council or the exercise of any of the powers conferred upon it by the terms of this act or which may hereafter be conferred upon it. No resolution or ordinance granting any franchise, appropriating any money for any purpose, providing for any public improvements, any regulation concerning the public health, or of any other general or permanent nature shall be enacted except at a regular public meeting of said council or an adjournment thereof; provided that a resolution or ordinance of any emergency nature may be passed by the council at any meeting. A resolution or ordinance shall be deemed to be of any emergency nature if it shall be declared so to be by an affirmative vote of not less than four-fifths of the whole qualified membership of the council. Every ordinance introduced shall be in writing and read before any vote thereon shall be taken, and the yeas and nays thereon shall be recorded. A record of the proceedings of every meeting of the council shall be taken and prepared by the city clerk, and the record of the proceedings of the meeting shall, when approved by the council, be signed by the mayor and the city clerk and entered in the journal. The journal shall be kept available for inspection by all persons at all reasonable times. No ordinance of permanent operation shall be passed at the meeting at which it was introduced except by unanimous consent of all members of the council present and such unanimous consent shall be shown by the aye and nay votes entered upon the minutes of said meeting; provided, however, that if all members of the council present vote for the passage of the ordinance and their names are so entered of record as voting in favor thereof, it shall be construed as giving unanimous consent to the action upon such ordinance at the meeting at which it is introduced. Publication of ordinances shall be had as provided in Alabama Code of 1940, Title 37, Section 462, as amended [now Code of Ala. 1975, § 11-45-8].

### 3.18. Granting of franchises.

No resolution or ordinance, granting to any person, firm or corporation any franchise, lease or right to use the streets, public highways, thoroughfares, or public property of the city, either in, under, upon, along, through, or over same shall take effect and be enforced until 30 days after the final enactment of same by the council and publication of said resolution or ordinance in full once a week for three consecutive weeks in some newspaper published in said city, which publication shall be made at the expense of the persons, firm or corporation applying for said grant. Pending the passage of any such resolution or ordinance or during the time intervening between its final passage, and the expiration of the 30 days during which publication shall be made as above provided, the legally qualified voters of said city may, by written petition or petitions addressed to said council object to such grant, and if during such period such written petition or petitions signed by at least five percent of the legally qualified voters of the city shall be filed with said council, said council shall forthwith order an election, which shall be conducted by the election commission of the city or other body having charge of the conduct of municipal elections of the city at which election the legally qualified voters of said city shall vote for or against the proposed grant. In the call for said election, the said resolution or ordinance making such grant shall be published one time at length and in full at the expense of the city in a newspaper published in said city. If a majority of the votes cast at such election shall be against the protected grant, then and in those events, said resolution or ordinance shall not become effective nor shall it confer any rights, powers or privileges of any kind; otherwise, said resolution or ordinance and said grant shall thereupon become effective as fully and to the same extent as if said election had not been called or held. If, as the result of said election, said resolution or ordinance shall be disapproved, then it shall be deemed null and void. But if as a result of said election the proposed grant shall be approved, the council shall adopt a resolution stating the fact of such approval, and such resolution shall, without further proceedings or advertisement, operate as the adoption of the proposed grant. No grant of any franchise or lease or right of user, or any other right in, under, upon, along, through, or over the streets, public highways, thoroughfares or public property of any such city, shall be made or given nor shall any such rights of any kind whatever be conferred upon any person, firm or corporation, except by a resolution or ordinance duly passed by the council at some regular or adjourned meeting and published as above provided for in this section; nor shall any extension or enlargement of any such rights or powers previously granted be made or given except in the manner and subject to all conditions herein provided for as to the original grant of same. It is expressly provided, however, that the provisions of this section shall not apply to the grant of side track or switching privileges to any railroad or street car company for the purpose of reaching and affording railway connections, and switch privileges to the owners or users of any industrial plant, store or warehouse; provided further that said side track or switch shall not extend for a greater distance than 1,320 measured along said track or switch.

### 3.19. Codification authorized.

The council may provide for the revision and codification of its ordinances and permanent resolutions, or for the adoption of a code or codes.

**3.20. Examination of books and publication of accounts.**

The council shall each month make available in the office of the city manager a detailed statement of all receipts and expenses of the city, and a summary of its proceedings during the preceding month. At the end of each year, the council shall cause a full and complete examination of all the books and accounts of the city to be made by a qualified public accountant, and shall cause the result of such examination to be placed in the office of the city clerk and the office of the city manager, to be open for inspection by all persons. Such examination shall not be made more than two years in succession by the same accountant or firm.

### Article IV. The City Manager

**4.01. The city manager: qualifications.**

The city manager shall be chosen by the council solely on the basis of his executive and administrative qualifications with special reference to his actual experience in, or his knowledge of, accepted practice in respect to the duties of his office as hereinafter set forth. At the time of his appointment, he may but need not be a resident of the city or state, but during his tenure of office he shall reside within the city.

**4.02. The city manager: powers and duties.**

The city manager shall be the head of the administrative branch of the city government. He shall be responsible to the council for the proper administration of all affairs of the city and, subject to the provisions of any civil service or merit system law applicable to such city and except as otherwise provided herein, he shall have power and shall be required to:

(1)  Enforce all laws and ordinances.

(2)  Appoint and, when necessary for the good of the service, remove all officers and employees of the city except as otherwise provided by this act and except as he may authorize the head of a department or office to appoint and remove subordinates in such department or office; provided that he shall not appoint or remove officers and employees of:

   (a)  Any library board of the city;

   (b)  Any board of the city having control over any park, recreation facility, fair or exhibit;

   (c)  Any school board of the city;

(3)  Exercise administrative supervision and control over all officers, employees, offices, departments, boards and agencies created by this act or hereafter created by the council, except those enumerated in Subdivisions (a) to (i) inclusive of Subsection (2) of this section, and except those otherwise given independent status.

CHARTER                                                                    5.01

(4)  Keep the council fully advised as to the financial conditions and needs of the city; to prepare and submit the budget proposal annually to the council and be responsible for its administration after its adoption; to prepare and submit, as of the end of the fiscal year, a complete report on the financial and administrative activities of the city for such year.

(5)  Recommend the council such actions as he may deem desirable.

(6)  Prepare and submit to the council such reports as may be required of him.

(7)  Perform such other duties as may be prescribed by this act or required of him by ordinance or by resolution of the council not inconsistent with this act.

(Act No. 1978-426, § 1)

**4.03. Absence of city manager.**

To perform his duties during his temporary absence or temporary disability, the manager may designate by letter filed with the city clerk a qualified administrative officer of the city. In the event of failure of the manager to make such designation, the council may by resolution appoint a qualified administrative officer of the city to perform the duties of the manager until he shall return or his disability shall cease.

**4.04. Administrative department.**

There shall be a department of finance, and such other departments as may be established by ordinance upon the recommendation of the manager.

**4.05. Directors of departments.**

At the head of each department there shall be a director, who shall be an officer of the city and shall have supervision and control of the department subject to supervision and control of the city manager. Two or more departments may be headed by the same individual. The city manager may head one or more departments. Directors of departments may also serve as chiefs of divisions.

**4.06. Departmental divisions.**

The work of each department may be distributed among such divisions thereof as may be established by ordinance upon the recommendation of the city manager. Pending the passage of an ordinance or ordinances distributing the work of departments under the supervision and control of the city manager among specific divisions thereof, the city manager may establish temporary divisions.

## Article V. Budget

**5.01. Fiscal year.**

The fiscal year of the city government shall begin on the first day of October and shall end on the last day of September of each calendar year. Such fiscal year shall also constitute the budget and accounting year. As used in this act, the term "budget year" shall mean the fiscal year for which any particular budget is adopted and in which it is administered.

5.02                          PHENIX CITY CODE

**5.02. Preparation and submission of budget proposal.**

The city manager, at least 35 days prior to the beginning of each budget year, shall submit to the council a budget proposal and an explanatory budget message in the form and with the contents provided by Sections 5.12 to 5.15, inclusive, of this act. For such purpose, at such date as he shall determine, he, or an officer designated by him, shall obtain from the head of each office, department, board or agency estimates of revenue and expenditure of that office, department, board or agency, detailed by organization units and character and object of expenditure, and such other supporting data as he may request; together with an estimate of all capital projects pending or which such department head believes should be undertaken (a) within the budget year and (b) within the five next succeeding years. In preparing the budget, the city manager shall review the estimates, shall hold hearings thereon and may revise the estimates, as he may deem advisable.

**5.03. Budget proposal a public record.**

The budget proposal and budget message and all supporting schedules shall be a public record in the office of the city clerk open to public inspection by anyone. The city manager shall cause sufficient copies of the budget proposal and budget message to be prepared for distribution to interested persons.

**5.04. Publication of notice of public hearing.**

At the meeting of the council at which the budget proposal and budget message are submitted, the council shall determine the date and time of the public hearing on the budget proposal, and shall cause to be published a notice of the place and date, not less than seven days after the date of publication nor later than 15 days prior to the beginning of the next budget year, at which the council will hold a public hearing. Publication shall be made at least once in a newspaper published and of general circulation in the city.

**5.05. Public hearing on budget proposal.**

At 7:00 p.m. on the date advertised, or at any night to which such public hearing shall from time to time be adjourned, the council shall hold a public hearing on the budget proposal, at which all interested persons shall be given an opportunity to be heard, for or against the estimates or any item thereof.

**5.06. Further consideration of budget proposal.**

After the conclusion of such public hearing the council may insert new items or may increase or decrease the items of the budget proposal, except items in proposed expenditures, fixed by law or prescribed by Subsections (a), (b), (c), (d), (e), (f), (g), (h) and (i) of Section 5.25. The council may not vary the titles, description or conditions of administration specified in the budget proposal. Before inserting any new item or increasing or decreasing any item of appropriation, it must cause to be published, in the manner provided in Section 5.04 of this act, a notice setting forth the nature and amount of the proposed increases or decreases and fixing

CHARTER                                                                5.11

a place and date, not less than five days after publication, at which the council will hold a
public hearing thereon. The public hearing shall be held at 7:00 p.m. on the date specified in
the notice, or at any night to which such public hearing shall from time to time be adjourned.

## 5.07. Adoption of budget.

After the public hearing prescribed in Section 5.05 hereof, the council may at its next or any
subsequent regular public meeting or any adjournment thereof adopt as the budget, the budget
proposal without amendment or change. In this event it shall not be necessary that the council
have further consideration of the ordinance as prescribed in Section 5.06 hereof. If such further
consideration is made necessary by the insertion of any new item or by the increase or decrease
of any item, then the council, after the public hearing prescribed in Section 5.06 hereof, may
at its next or any subsequent regular meeting or any adjournment thereof, adopt the budget.
The council may insert in this budget the additional item or items or make the increase or
decrease to the amount in each case indicated by the published notice, or to a lesser amount,
but where the total proposed expenditures shall be increased, the total anticipated revenue
shall also be increased to an amount at least revenue shall also be increased to an amount at
least equal to the total proposed expenditures.

## 5.08. Vote required for adoption.

The budget shall be adopted by the favorable votes of at least a majority of the whole
qualified membership of the council.

## 5.09. Date of final adoption; failure to adopt.

The budget shall be finally adopted not later than the first day of October of each year. If for
any reason the council fails to adopt the general fund budget on or before such day, the general
fund budget of the current fiscal year shall be the general fund budget for the ensuing year,
until such time as a newly revised budget shall be adopted by the council, and, until such time,
shall have full force and effect to the same extent as if the same had been adopted by the
council, notwithstanding anything to the contrary in this act.

## 5.10. Effective date of budget; certification; copies made available.

Upon final adoption, the budget shall be in effect for the budget year. A copy of the budget,
as finally adopted, shall be certified by the city manager and city clerk and filed in the office
of the director of finance. The budget so certified shall be printed, mimeographed or otherwise
reproduced and sufficient copies thereof shall be made available for the use of all offices,
departments, boards and agencies and for the use of interested persons.

## 5.11. Budget establishes appropriations.

From the effective date of the budget, the several amounts stated therein as proposed
expenditures shall become appropriated to the several objects and purposes therein named.

5.12                                PHENIX CITY CODE

**5.12. Budget message; current operations.**

The budget message submitted by the city manager to the council shall be explanatory of the budget, of the budget proposal and shall contain an outline of the proposed financial policies of the city for the budget year and shall describe in connection therewith the important features of the budget plan. It shall set forth the reasons for proposed important changes from the previous year in cost and revenue items and shall point up and explain any proposed important changes in policy.

**5.13. Budget message; capital improvements.**

As a part of the budget message, with relation to the proposed expenditures for down payments and other proposed expenditures for capital projects stated in the budget proposal, the city manager shall include a statement of pending capital projects and proposed new capital projects, relating each project to respective amounts proposed to be raised therefor by appropriations in the budget proposal and the respective amounts, if any, proposed to be raised therefor by the issuance of bonds or obligations during the budget year.

**5.14. Budget message: capital program.**

The city manager shall also include in the budget message, or attach thereto, a capital program of proposed capital projects for the five fiscal years next succeeding the budget year, prepared by the planning board and city manager together with his comments thereon and any estimates of costs prepared by any office, department, board or agency. For the use of the planning board and city manager in preparing such capital program, copies of the departmental estimates of capital projects, filed with the city manager pursuant to Section 5.02 of this article, shall be filed with the board.
(Act No. 1980-301, § 2)

**5.15. Budget message: supporting schedules.**

Attached to the budget message shall be such supporting schedules, exhibits and other explanatory material, in respect to both current operations and capital improvements, as the city manager shall believe useful to the council.

**5.16. Budget.**

The budget and budget proposal shall provide a complete financial plan for the budget year. It shall contain in tabular form:

(a)  A general summary;

(b)  Detailed estimates of all anticipated revenues;

(c)  Detailed estimate of all proposed expenditures.

The total of such anticipated revenues shall equal the total of such proposed expenditures.

### 5.17. Anticipated revenues.

In the budget and budget proposal, anticipated revenues shall be classified as 'miscellaneous revenues' and 'amount to be raised by property tax': miscellaneous revenues shall be subclassified by sources and shall be estimated as prescribed in this article.
(Act No. 1980-301, § 3)

### 5.18. Anticipated revenues compared with other years.

In the budget and budget proposal in parallel columns opposite the several items of anticipated revenues there shall be placed the amount of each such item in the budget of the last completed fiscal year, the amounts of such items actually received during the last completed budget year, the amount of each such item in the budget of the current fiscal year and the amount actually received to the time of preparing the budget proposal plus receipts for the remainder of the current fiscal year estimated as accurately as may be.

### 5.19. [Repealed].
(Act No. 1980-301, § 5)

### 5.20. Miscellaneous revenues.

Miscellaneous revenues shall include anticipated revenues from the collection of taxes other than the general property tax; the amount of state aid to be received; the amount by which the city is expected to benefit from taxes collected by the state; the amounts estimated to be received from services and sales, fines and forfeitures, pension or retirement system payments, special assessments, borrowed monies and any other special or non-recurring sources. Nothing in this section shall, however, be construed as permitting or requiring the diversion of ear-marked, pledged or dedicated funds to purposes other than those for which they are earmarked, pledged or dedicated.

### 5.21. Miscellaneous revenues; anticipated surplus from municipal utility or other public service enterprise.

The anticipated revenues and proposed expenditures of each utility or other public service enterprise owned, or operated, by the city, shall be stated in a separate section of the budget (each bearing the name of the utility); and as to each such utility, any anticipated surplus, if legally available for general purposes, shall be stated as an item of miscellaneous revenue in the budget and the budget proposal.

### 5.22. Miscellaneous revenues; measure of estimates.

No miscellaneous revenue from any source shall be included as an anticipated revenue in the budget in an amount in excess of the average of the amount actually realized in cash from the same source in the next preceding fiscal year, and that actually realized in the first ten months of the current fiscal year plus that to be received in the remaining two months of the

5.22                         PHENIX CITY CODE

year estimated as accurately as may be, unless the city manager shall determine that the facts clearly warrant the expectation that such excess amount will actually be realized in cash during the budget year and shall certify such determination in writing to the council.

**5.23. Miscellaneous revenues; receipts from special assessments.**

In the budget and budget proposal revenues from the collection of special assessments on property specially benefited shall not be stated in an amount which is in excess of the amount of the receipts so derived which it is estimated will be held in cash on the first day of the budget year.

**5.24. Miscellaneous revenues; from new sources.**

No revenue from a new source not stated in the budget for the current budget year shall be included in the budget unless the city manager shall determine that the facts clearly warrant the expectation that such revenue will be actually realized in cash during the budget year in the amount stated and shall certify such determination in writing to the council. If the new revenue is to be received from the state, the anticipated amount shall not exceed the amount which the proper officer of the state shall declare in writing to be the amount which may reasonably be anticipated in the budget year.

**5.25. Proposed expenditures.**

In the budget and budget proposal the proposed expenditures shall be itemized in such form and to such extent as shall be provided by law, and in the absence of such provision, by regulations established by ordinance. Separate provision shall be included in the budget and budget proposal for at least:

(a)  Interest, amortization and redemption charges on the public debt for which the faith and credit of the city is pledged;

(b)  Other statutory expenditures;

(c)  The payment of all judgments;

(d)  The amount by which the total receipts of miscellaneous revenues in the last completed fiscal year failed to equal the total of the budget estimated of receipts from miscellaneous revenues in that year.

(e)  An amount equal to the aggregate of all taxes levied for the third fiscal year prior to the budget year which are delinquent and outstanding on the 60th day prior to the beginning of the budget year, except to the extent the city may have made provision therefor by reserving the full amount of said delinquent taxes;

(f)  An amount equal to the aggregate of all cancellation, remissions, abatements and refunds of taxes, that have been made during the current fiscal year;

(g)  An amount equal to the aggregate of all special revenue notes which it is estimated will be outstanding at the end of the current year in anticipation of the collection of revenues other than the property tax;

CHARTER

(h)  An amount equal to the aggregate of all emergency notes which it is estimated will be outstanding at the end of the current year;

(i)  If the city is required to make up the deficit arising from the operations of utility or other public service enterprises, an amount equal to the deficit from such operations during the last completed fiscal year, separately stated for each utility or other public service enterprise which appears in a separate section of the budget;

(j)  Administration, operation and maintenance of each office, department, board or agency of the city itemized by character and object of expenditure;

(k)  Contingent expense in an amount not more than three percent of the total amount stated pursuant to Subsection (j) of this section;

(l)  Expenditures proposed for capital projects, including provisions for down payments on capital projects, as required by Section 5.27 of the act.

### 5.26. Proposed expenditures: comparison with other years.

In the budget and budget proposal in parallel columns opposite the several items of proposed expenditures, there shall be placed the amount of each such item in the budget of the current year and the amount actually expended to the times of preparing the budget proposal plus the expenditures for the remainder of the current fiscal year estimated as accurately as may be.
(Act No. 1980-301, § 4)

### 5.27. Down payments on capital projects.

In the budget and budget proposal under the special caption of "down payments on capital projects," as provided in Subsection (1) of Section 5.25 of this act, there shall be separately stated as to each capital project for which it is expected that bonds will be authorized during the budget year, a sum which is not less than five percent of the amount of bond; to be authorized for that project. For purposes of the down payment, all street improvements expected to be partly financed by the issuance of bonds during the budget year may be considered a single project; so also may all proposed extensions of the water system, and likewise all extensions of the sewer system. Such an appropriation for a down payment shall not be required before the issuance of bonds to finance any capital expenditure which is the result of fire, flood or other disaster, or which is for a city owned, or operated, utility or other public service enterprise, or which is to be met in part, in cash, labor or materials, by any agency of the government of the United States of America, or of this state.

### 5.28. Budget summary.

At the head of the budget and budget proposal shall appear a brief summary.

6.01                            PHENIX CITY CODE

### Article VI. Department of Finance

### 6.01. Director of finance; appointment.

There shall be a department of finance, the head of which shall be the director of finance, who shall be appointed by the city manager, subject to the provisions of any merit or civil service system applicable to such city. The chief financial officer of any city which adopts the council-manager form of government who holds office under any civil service or merit system shall be the director of finance under the council-manager form of government.

### 6.02. Director of finance: qualifications.

The director of finance shall have knowledge of municipal accounting and taxation and shall have had experience in budgeting and financial control.

### 6.03. Director of finance; surety bond.

The director of finance shall provide a bond with such surety and in such amount as the council may require by ordinance. The premium shall be paid by the city.

### 6.04. Director of finance: powers and duties.

The director of finance shall have charge of the administration of the financial affairs of the city, and to that end he shall have authority and shall be required to:

(1) Compile the current expense estimates for the budget for the city manager;

(2) Compile the capital estimates for the budget for the city manager;

(3) Supervise and be responsible for the disbursement of all monies and have control over all expenditures to ensure that budget appropriations are not exceeded;

(4) Maintain a general accounting system for the city government and each of its offices, departments and agencies; keep books for and exercise financial budgetary control over each office, department and agency; keep separate accounts for the items of appropriation contained in the city budget, each of which accounts shall show the amount of the appropriation, the amounts paid therefrom, the unpaid obligations against it and the unencumbered balance; require reports of receipts and disbursements from each receiving and spending agency of the city government to be made daily or at such intervals as he may deem expedient;

(5) Submit to the council through the city manager a monthly statement of all receipts and disbursements in sufficient detail to show the exact financial condition of the city;

(6) Prepare for the city manager, as of the end of each fiscal year, a complete financial statement and report;

(7) Supervise and make all special assessments for the city government, and give such notice of special assessments as may be required by law;

CHARTER                                                    6.07

(8)  Collect all special assessments, license fees and other revenues of the city for whose collection the city is responsible and receive all money receivable by the city from the county, state or federal government, or from any court, or from any office, department, board or agency of the city.

(9)  Have custody of all public funds belonging to or under the control of the city, or any office, department, board or agency of the city government, and deposit all funds coming into his hands in such depositories as may be designated by resolution of the council, or, if no such resolution be adopted, by the city manager, subject to the requirements of law as to surety and the payment of interest on deposits, but all such interest shall be the property of the city and shall be accounted for and credited to the proper account.

(10) Have custody of all investments and invested funds of the city government, or in possession of such government in a fiduciary capacity and have the safekeeping of all bonds and notes of the city and the receipt and delivery of city bonds and notes for transfer, registration or exchange;

(11) Approve all proposed expenditures; unless he shall certify that there is an unencumbered balance of appropriation and available funds, no expenditure shall be approved.

## 6.05.  Work programs: allotments.

Before the beginning of the budget year, the head of each office, department, board, or agency shall submit to the city manager, when required by him, a work program for the year, which program shall show the requested allotments of the appropriations for such office, department, board or agency, by monthly periods, for the entire budget year. The city manager shall review the requested allotments in the light of the work program of the office, department, board or agency concerned, and may revise, alter or change such allotments before approving the same. The aggregate of such allotments shall not exceed the total appropriation available to said office, department, board or agency for the budget year. An approved allotment may be revised during the budget year in the same manner as the original allotment was made. If, at any time during the budget year, the city manager shall ascertain that the available income, plus balances, for the year will be less than the total appropriations, he shall reconsider the work programs and allotments so as to forestall the making of expenditures in excess of the said income.

## 6.06.  Allotments constitute basis of expenditures and are subject to revision.

The city manager shall file a copy of the original allotments and of each revised allotment with the director of finance, who shall authorize all expenditures for the offices, departments, boards and agencies to be made from the appropriations on the basis of approved allotments and not otherwise.

## 6.07.  Transfers of appropriations.

The city manager may at any time transfer any unencumbered appropriation balance or portion thereof between general classifications of expenditures within an office, department,

6.07                              PHENIX CITY CODE

board or agency, subject to Subdivision (a) to (j) inclusive of Subsection (2) of Section 4.02. At
the request of the city manager and within the last three months of the budget year, the council
may by resolution transfer any unencumbered appropriation balance or portion thereof from
one office, department, board or agency, subject to Subdivisions (a) to (j) inclusive of Subsection
(2) of Section 4.02. No transfer shall be made from the appropriations fixed by law or required
by Subsections (a), (b), (c), (d), (e), (f), (g), (h), and (i) of Section 5.25 of this act.

## 6.08. Accounting supervision and control.

The director of finance shall have power and shall be required to:

(1)    Prescribe the forms of receipts, vouchers, bills or claims to be used by all the offices,
       departments, boards, and agencies of the city government;

(2)    Examine and approve all contracts, orders and other documents by which the city
       government incurs financial obligations, having previously ascertained that monies
       have been appropriated and allotted and will be available when the obligations shall
       become due and payable;

(3)    Audit and approve before payment all bills, invoices, payrolls and other evidences of
       claims, demands or charges against the city government and with the advice of the city
       attorney determine the regularity, legality and correctness of such claims, demands or
       charges;

(4)    Inspect and audit any accounts or records of financial transactions which may be
       maintained in any office, department, board or agency of the city government apart
       from or subsidiary to the accounts kept in his office.

## 6.09. When contracts and expenditures prohibited.

No officer, department or agency shall, during any budget year, expend or contract to expend
any money or incur any liability, or enter into any contract which by its terms involves the
expenditure of money, for any purpose, in excess of the amounts appropriated for that general
classification of expenditure pursuant to this act. Any contract, verbal or written, made in
violation of this act shall be null and void. Any officer or employee of the city who shall violate
this section shall be guilty of a misdemeanor and, upon conviction thereof, shall cease to hold
his office or employment. Nothing in this section contained, however, shall prevent the making
of contracts or the spending of money for capital improvements to be financed in whole or in
part by the issuance of bonds, nor the making of contracts of lease or for services for a period
exceeding the budget year in which such contract is made, when such contract is permitted by
law.

## 6.10. Appropriations lapse at end of year.

All appropriations shall lapse at the end of the budget year to the extent that they shall not
have been expended or lawfully encumbered.

### 6.11. Fees shall be paid to city government.

All fees received by any officer or employee shall belong to the city government and shall be paid daily to the department of finance. Any officer or employee who shall fail to pay such fees to the department of finance on the day such fees are received by him shall be guilty of a misdemeanor, and upon conviction thereof, he shall be dismissed from employment.

### 6.12. Purchases.

The director of finance, pursuant to rules and regulations established, shall be responsible for purchase, storage and distribution of all supplies, materials and equipment required by any office, department, board or agency of the city. The director of finance shall have power and shall be required to:

(1) Establish and enforce specifications with respect to supplies, materials, and equipment required by the city;

(2) Inspect or supervise the inspection of all deliveries of supplies, materials, and equipment, and determine their quality, quantity, and conformance with specifications;

(3) Have charge of such general storerooms and warehouses as the council may provide by ordinance;

(4) Transfer to or between offices, departments or agencies, or sell surplus, obsolete, or unused supplies, material and equipment.

### 6.13. Competitive bidding.

Before the city makes any purchase of supplies, materials or equipment, costing $1,500.00 or more, ample opportunity shall be given for competitive bidding, under such rules and regulations, and with such exceptions, as the council may prescribe by ordinance; provided, however, that the council shall not except individual purchases or sales from the requirement of competitive bidding.

### 6.14. Contracts for city improvements.

Any city improvement costing more than $1,500.00 shall be executed by contract. All such contracts for more than $1,500.00 shall be awarded to the lowest responsible bidder after such public notice and competition as may be prescribed by ordinance, provided the city manager shall have the power to reject all bids and advertise again. Alterations of any contract may be made when authorized by the council upon the written recommendation of the city manager.

### 6.15. Accounting control of purchases.

All purchases made by the purchasing agent shall be pursuant to a written requisition from the head of the office, department, board or agency whose appropriation will be charged, and no contract or order shall be issued to any vendor unless and until the director of finance

certifies that there is to the credit of such office, department, board or agency a sufficient unencumbered appropriation balance to pay for the supplies, materials, equipment or contractual services for which the contract or order is to be issued.

### 6.16. No contract executed until bond ordinance effective.

No contract shall be executed for the acquisition of any property or the construction of any improvement to be financed by the issuance of bonds until the ordinance authorizing the issuance of such bonds shall have taken effect and any contract executed before such day shall be voidable.

### 6.17. Emergency appropriations.

At any time in any budget year, the council may, pursuant to this section, make emergency appropriations to meet a pressing need for public expenditure, for other than a regular or recurring requirement, to protect the public health, safety or welfare. Such appropriation shall be by resolution adopted by the favorable votes of at least four-fifths of the whole qualified membership of the council, and shall be made only upon written recommendation of the city manager. The total amount of all emergency appropriations made in any budget year shall not exceed five percent total operating appropriations made in the budget for that year.

### 6.18. Borrowing to meet emergency appropriations.

In the absence of unappropriated available revenues to meet emergency appropriations under the provisions of Section 6.17, the council may by resolution authorize the issuance of notes, each of which shall be designated "emergency note" and may be renewed from time to time, but all such notes of any fiscal year and any renewals thereof shall be paid not later than the last day of the fiscal year next succeeding the budget year in which the emergency appropriation was made.

### 6.19. Borrowing in anticipation of property taxes.

In any budget year, in anticipation of the collection of the property tax for such year, whether levied or to be levied in such year, the council may by resolution authorize the borrowing of money by the issuance of negotiable notes of the city, each of which shall be designated "tax anticipation note for the year 19___" (stating the budget year). Such notes may be issued for periods not exceeding one year and may be renewed from time to time for periods not exceeding one year, but together with renewals shall mature and be paid not later than the end of the fiscal year after the budget year in which the original notes shall have been issued. The amount of the tax anticipation notes originally issued in any budget year shall not exceed 50 percent of the amount of the property tax levied in that year for general city purposes. On renewal of tax anticipation notes of any given fiscal year, the amount renewed in the next succeeding fiscal year shall not exceed 20 percent of the amount originally issued, and the amount renewed in the second fiscal year succeeding the year of levy shall not exceed four percent of the amount originally issued.

**6.20. Borrowing in anticipation of other revenues.**

In any budget year, in anticipation of the collection or receipt of other revenues of that budget year, the council may by resolution authorize the borrowing of money by the issuance of negotiable notes of the city, each of which shall be designated "special revenue note for the year 19___" (stating the budget year). Such notes may be renewed from time to time; but all such notes, together with the renewals thereof, shall mature and be paid not later than the end of the fiscal year after the budget year in which the original notes shall have been issued.

**6.21. Notes redeemable prior to maturity.**

No notes shall be made payable on demand, but any note may be made subject to redemption prior to maturity on such notice and at such time as may be stated in the note.

**6.22. Sale of notes: report of sale.**

All notes issued pursuant to this article may be sold by the director of finance at not less than par and accrued interest at private sale and without previous advertisement.

## Article VII. Council Districts

**7.01. Number established.**

There shall be established three council districts to be designated respectively as District Post 1, District Post 2 and District Post 3, which districts shall have as nearly as is reasonable, the same population. The designation and boundaries of the initial council districts shall be specifically described and set forth. The two at-large posts on the council shall be designated as mayor and councilman at-large.

**7.02. Establishment of the original districts.**

Under the provisions of Section 1.07 hereof, the probate judge shall establish the original districts, which shall contain as nearly equal a number of people as possible.

**7.03. Reapportionment.**

Whenever there shall be a change in population in any of the three districts heretofore established, evidenced by a federal census of population published following the last federal census of population preceding the adoption of this act, or by virtue of a change in the corporation limits, there shall be a reapportionment of the council districts in the manner hereinafter provided:

(1)    The manager shall within six months after the publication of each federal census of population for the city, following the last federal census of population preceding the adoption of this act, or if within six months after there shall have been any change in

the corporate limits of the city, file with the council a report containing a recommended plan for reapportionment of the council district boundaries to comply with the following specifications:

(a)   Each district shall be formed of contiguous and to the extent reasonably possible, compact territory, and its boundary lines shall be the center lines of streets or other well defined boundaries.

(b)   Each district shall contain as nearly as is possible the same population.

(2)   The council shall enact a redistricting ordinance within six months after receiving such report. If the council fails to enact the redistricting ordinance within the said six months, the redistricting plan submitted by the manager shall become effective without enactment by the council, as if it were a duly enacted ordinance.

(3)   Such redistricting ordinance shall not apply to any primary or regular or special election held within six months after its becoming effected. No incumbent councilman or member of the board or commission shall be deprived of his expired term of office because of such redistricting.

## Article VIII. Succession in Government

### 8.01. Rights of officers and employees preserved.

Nothing in this act contained, except as specifically provided, shall affect or impair the rights or privileges of officers or employees of the city or of any office, department, board or agency existing at the time when this act shall take effect, or any provision of law in force at the time when the council-manager form of government shall be adopted and not inconsistent with the provisions of this act, in relation to the personnel, appointment, ranks, grades, tenure of office, promotion, removal, pension and retirement rights, civil rights or any other rights or privileges of officers or employees of the city or any office, department, board, or agency thereof.

### 8.02. Continuance of present officers.

All persons holding administrative office at the time the council-manager form of government is adopted shall continue in office and in the performance of their duties until provision shall have been made in accordance therewith for the performance of such duties or the discontinuance of such office. The powers conferred and the duties imposed upon any office, department, board or agency of the city by the laws of the state shall, if such office, department, board or agency, be abolished by this act, or under its authority, be thereafter exercised and discharged by the office, department, board or agency designated by the council unless otherwise provided herein.

CHARTER                                                                          8.07

**8.03. Status of officers and employees holding positions when the council-manager form of government is adopted.**

Any person holding an office or position in the civil service of the city under any civil service or merit system applicable to the city when the council-manager form of government shall be adopted shall continue to hold such office in the civil service of the city under the council-manager form of government and with the same status, rights and privileges and subject to the same conditions under such applicable civil service or merit system.

**8.04. Transfer of records and property.**

All records, property and equipment whatsoever of any office, department or agency or part thereof, all the powers and duties of which are assigned to any other office, department or agency by this act, shall be transferred and delivered to the office, department or agency to which such powers and duties are so assigned. If part of the powers and duties of any office, department or agency, or part thereof, are by this act assigned to another office, department or agency, all records, property and equipment relating exclusively thereto shall be transferred and delivered to the office, department or agency to which such powers and duties are so assigned.

**8.05. Continuity of offices, departments, boards or agencies.**

Any office, department, board or agency provided for in this act with a name or with powers and duties the same or substantially the same as those of an office, department, board or agency heretofore existing shall continued to exercise its powers and duties, until otherwise provided. Any provision in any law, rule, regulation, contract, grant or other document relating to such a formerly existing office, department, board or agency, shall, so far as not inconsistent with the provisions of this act, apply to such office, department, board or agency provided for by this act.

**8.06. Continuance of contracts and public improvements.**

All contracts entered into by the city, or for its benefit, prior to the adoption by such city of the council-manager form of government, shall continue in full force and effect. Public improvements for which legislative steps have been taken under laws existing at the time of the adoption of the council-manager form of government shall be carried to completion in accordance with the provisions of such existing laws.

**8.07. Pending actions and proceedings.**

No action or proceeding, civil or criminal, pending at the time of the adoption of the council-manager form of government, brought by or against the city of any office, department, board or agency or officer thereof, shall be affected or abated by the adoption of the council-manager form of government or by anything therein contained in this act.

**8.08. Pension and relief funds.**

All laws and parts of laws relating to pension, retirement and relief funds for any employees of the city, contained in the general or local laws of the state or in Title 62 of the Code of Alabama, as amended, as the same may apply and be in effect with respect to any city at the time when such city shall elect to be governed by the provisions of this act, shall continue in full force and effect, and without interruption or change as to any rights which have been acquired thereunder.

Editor's note—Title 62 of the Code of Alabama of 1910 (referenced in the first sentence of Section 8.08) was a compilation of local acts. Such compilation is no longer in the current state statutes and has not been kept current.

**8.09. Independent authorities, boards, agencies, etc.**

All laws relating to the school board, library board, hospital board, airport board, housing authority, plumbers or electricians board, planning board, zoning board, park or recreation board, municipally owned public utility and any municipally owned service enterprise, including inter alia electric, gas and water boards, agencies, etc., and any board, authority, agency, etc., given such independent status, as the same may apply and be in effect at the time when such city shall elect to be governed by the provisions of this act, shall continue in full force and effect and without interruption or change as to the establishment or conduct of any such authority, board or agency, until otherwise provided by law.

**8.10. When provisions take effect.**

For the purpose of nominating and electing members of the council, the provisions of this act shall become applicable to any city adopting the council-manager form of government upon the filing of the certificate of adoption by the judge of probate with the mayor of the city as provided for in Section 1.05 hereof. For all other purposes the provisions of this act shall become applicable to said city at the time when the first council of such city elected under the provisions hereof takes office and qualifies.

**8.11. Continuance of ordinances and resolutions.**

All ordinances and resolutions of the city in effect at the time of adoption by the city of the council-manager form of government herein set up shall continue in effect unless and until changed or repealed by the council.

## Article IX. General Provisions

**9.01. Prohibition on appointment or removal of officers and employees.**

No person shall be appointed to or removed from, or in any way favored or discriminated against with respect to any city position or appointive city administrative office because of race, sex, political or religious opinions or affiliations.

### 9.01(a). Removal of officers or employees.

Subject to the provisions of any civil service or merit system applicable to the city, any officer or employee whose successor may be appointed by the city manager or by the head of any office, department, board or agency, may be removed by the manager or other appointing officer at any time, and the decision of the city manager, or other appointing officer, shall be subject to appeals therefrom, if any, provided by applicable law.

### 9.02. Right of city manager and other officers in council.

The city manager, the heads of all departments, and such other officers of the city as may be designated by the council, shall be entitled to attend meetings of the council, but shall have no vote therein. The city manager shall have the right to take part in the discussion of all matters coming before the council, and the directors and other officers shall be entitled to take part in all discussions of the council relating to their respective office, departments, boards or agencies.

### 9.03. Investigations by council or city manager.

The council, the city manager, or any person or committee authorized by either of them, shall have power to inquire into the conduct of any office, department, board or agency or officer of the city and to make investigations as to municipal affairs, and for that purpose may subpoena witnesses, administer oaths, and compel the production of books, papers and other evidence. Failure to obey such subpoena or to produce books, papers or other evidence as ordered under the provisions of this section shall constitute a misdemeanor and shall be punishable by a fine not to exceed $100.00 or by imprisonment not to exceed six months, or both.

### 9.04. Contracts extending beyond one year.

No contract involving the payment of money out of the appropriation of more than one year shall be made for a period of more than five years, nor shall any such contract be valid unless made or approved by ordinance, and signed in the name of the city by the mayor and countersigned by the manager.

### 9.05. Publicity of records.

All records and accounts of every office, department, board or agency of the city shall be open to inspection by any person at all reasonable times and under reasonable regulations established by the city manager, except competitive bids for contracts under negotiation.

### 9.06. Officers and employees not to be privately interested in city's contracts.

No member of the council, officer or employee elected or appointed shall be interested, directly or indirectly, in any contract for work or material, or the profits thereof, or services to be furnished or performed for the city, and no such member of the council, officer or employee shall be interested, directly or indirectly, in any contract for work or material, or the profits

9.06                                PHENIX CITY CODE

thereof, or services to be furnished or performed for any person, firm or corporation operating interurban railway, street railway, gas works, electric light or power plant, heating plant, telegraph line or telephone exchange within the territorial limits of said city. No such member of the council, officer or employee of such city shall be interested in or an employee or attorney of any corporation operating any public service utility within said city. No such member of the council, officer or employee shall receive directly or indirectly, from any person, firm or corporation operating within the territorial limits of said city any interurban railway, railway, street railway, gas works, water works, electric light or power plant, heating plant, telegraph line, or telephone exchange, or other business using or operating under a public franchise, and frank, free pass, free ticket or free service, or accept or receive, directly or indirectly, from any such person, firm or corporation, any gift or other thing of value, or any service upon terms more favorable than are granted to the public generally. Any violation of the provisions of this section shall be a misdemeanor, and upon conviction thereof, the guilty person shall be punished by a fine of not less than $100.00 nor more than $300.00, and may be imprisoned in the county jail for not more than 90 days, and his office shall be vacated. Such prohibition of free transportation shall not apply to policemen or firemen in uniform nor to policemen in the discharge of their duty; nor shall service to city officials in their official capacity heretofore provided by any franchise or ordinance be affected by this section.

**9.07. Official bonds.**

The city manager, the director of finance, and such other officers or employees as the council may by general ordinance require so to do, shall give bond in such amount and with such surety as may be approved by the council. The premiums on such bonds shall be paid by the city.

**9.08. Oath of office.**

Every councilman, officer and employee of the city shall, before entering upon the duties of his office, take and subscribe to the following oath or affirmation, to be filed and kept in the office of the city clerk:

"I solemnly swear (or affirm) that I am eligible for the office of _____ and will execute the duties of same according to the best of my ability, and that I will support the constitutions and will obey the laws of the United States and of the State of Alabama; that I will, in all respects, observe the provisions of the ordinances of the city of _____ and will faithfully discharge the duties of the office of _____."

### Article X. Abandonment of Council-Manager Form of Government

**10.01. Generally.**

No city may change from the council-manager form of government within two years after the adoption thereof. At the end of such period, or at any time thereafter, the city may change its form of municipal government either to:

(a)   The form of municipal government applicable to the city prior to its adoption of the council-manager form of government, or to

(b)  The mayor-council form of municipal government provided such enabling legislation has been enacted.

(c)  One of the commission forms of municipal government provided by Title 37, Alabama Code of 1940, as amended and supplemented [now Code of Ala. 1975, § 11-40-1 et seq.].

### 10.02. Petition for change of form of government.

Such change shall, however, first be initiated by petition and submitted to a vote of the qualified electors at an election and shall receive at such election a majority of the votes "yes" or in favor thereof in the same manner and subject to the same requirements as provided in Sections 1.02 to 1.05 of Article I of this act except that the proposition on the ballot shall be changed to reflect the proposed form of municipal government to be submitted to the vote of the qualified electors. The officers and members of the governing body of such newly adopted form of municipal government shall be elected as soon as may be under the provisions of the law applicable thereto; and upon their election and qualification for office the term of office of all members of the council under the council-manager form of government shall terminate.

### 10.03. No election on change more often than two years.

No election on the abandonment of the council-manager form of government shall be held within two years after any other election thereon.

## Article XI.  General Statutory Provisions

### 11.01. Effect of this act on existing law.

(a)  All laws and parts of laws, general, local or special, relating to or affecting the city, its powers, functions, duties and property, in force when this act shall take effect are hereby continued in effect; but all such laws relating to the exercise of powers, functions and duties by the commission or mayor-council or some other form of government shall be superseded to the extent that the same are inconsistent with the provisions of this act.

### 11.02. Separability clause.

If any section or part of section of this act shall be held invalid by a court of competent jurisdiction, such holding shall not affect the remainder of this act nor the context in which such section or part of section so held invalid may appear, except to the extent that an entire section or part of section may be inseparably connected in meaning and effect with the section or part of section to which such holding shall directly apply.

### 11.03. Short title.

This act shall be known and may be cited as the "City Manager Act of 19___."

11.04                              PHENIX CITY CODE

**11.04. Effective date.**

This act shall become effective immediately upon its passage and approval by the governor, or upon its otherwise becoming a law.

Approved March 4, 1977.

Time: 2:30 P.M.

# DEFENDANTS'
# EXHIBIT "B"

# DEPOSITION OF
# MAX WILKES

**Page 1**

```
1                    IN THE CIRCUIT COURT
2                            OF
3                    RUSSELL COUNTY, ALABAMA
4
5    MAX E. WILKES,
6           Plaintiff,
7    vs.              CASE NO. CV-07-049
8    CITY OF PHENIX CITY, ALABAMA,
     an Alabama Municipal Corporation;
9    Hon. JEFF HARDIN, in his official
     capacity as mayor of Phenix City,
10   Alabama, and individually;
     Hon. RAY BUSH, in is official capacity
11   as a member of the Phenix City
     Council and individually; and
12   Hon. JOHN STOREY, in his official
     capacity as a member of the Phenix
13   City Council and individually,
14          Defendants.
15
16                 * * * * * * * * * *
17          DEPOSITION OF MAX E. WILKES, taken pursuant
18   to stipulation and agreement before Shannon M.
19   Williams, Certified Court Reporter #156 and
20   Commissioner for the State of Alabama at Large, in
21   the Law Offices of Jackson Law Group, Phenix City,
22   Alabama, on October 16, 2007, commencing at
23   approximately 10:00 a.m..
24
25                 * * * * * * * * * *
```

**Page 2**

```
1                       APPEARANCES
2
3    FOR THE PLAINTIFF:
4    THOMAS F. WORTHY
     P.O. Box 2392
5    Phenix City, Alabama
6    RAYMOND JACKSON, JR.
     Jackson Law Group, P.C.
7    P.O. Box 3875
     Auburn, Alabama 36831
8
9    FOR THE DEFENDANTS:
10   JAMES R. MCKOON, JR.
     McKoon & Associates
11   925 Broad Street
     P.O. Box 3220
12   Phenix City, Alabama 36868-3220
13   JAMES P. GRAHAM, JR.
     P.O. Box 3389
14   Phenix City, Alabama 36868-3380
15
16                 EXAMINATION INDEX
17   BY MR. MCKOON                    5
     BY MR. JACKSON                   65
18   FURTHER BY MR. MCKOON            68
19
20                    EXHIBIT INDEX
21   Defendant's Exhibit
22   1      Complaint                 76
23
24
25
```

CONDENSED COPY

**Page 3**

```
1                 * * * * * * * * * *
2                    STIPULATIONS
3          It is hereby stipulated and agreed by and
4    between counsel representing the parties that the
5    deposition of MAX E. WILKES is taken pursuant to
6    stipulation and agreement; that all formalities with
7    respect to procedural requirements are waived; that
8    said deposition may be taken before Shannon M.
9    Williajms, Certified Court Reporter #156 and
10   Commissioner for the State of Alabama at Large,
11   without the formality of a commission; that
12   objections to questions other than objections as to
13   the form of the questions need not be made at this
14   time but may be reserved for a ruling at such time
15   as the deposition may be offered in evidence or used
16   for any other purpose as provided for by the Alabama
17   Rules of Civil Procedure.
18          It is further stipulated and agreed by and
19   between counsel representing the parties that the
20   filing of the deposition is hereby waived and that
21   the deposition may be introduced at the trial of
22   this case or used in any manner by either party
23   hereto provided for by the Statute.
24          It is further stipulated and agreed by and
25   between the parties hereto and the witness that the
```

**Page 4**

```
1    signature of the witness to this deposition is
2    hereby waived.
3                 * * * * * * * * * *
4                    MAX E. WILKES
5          The witness, having first been duly sworn
6    or affirmed to speak the truth, the whole truth and
7    nothing but the truth, testified as follows:
8                    EXAMINATION
9    BY MR. MCKOON:
10         Q. Would you state your name for the Record,
11   please, sir?
12         A. Max Wilkes.
13         Q. And what's your address, Mr. Wilkes?
14         A. 2413 Beacon Street, Phenix City.
15         Q. How long have you lived at that address?
16         A. About 35 years.
17         Q. As you know -- of course everybody in this
18   room knows one another -- but my name is Jim McKoon
19   and I, along with Mr. Graham here, represent the
20   City in this lawsuit that you have filed against the
21   City and three council members; Jeff Hardin, Ray
22   Bush, and John Storey.
23         The purpose of this deposition today really is
24   to find out what you are claiming, and I'll just be
25   asking you questions about your claim. If at any
```

5

1  time you don't understand my question, let me know
2  so that I can rephrase it.  Is that fair enough?
3      A.  That's fair.
4      Q.  And if you do that, then I'll rephrase it.
5  But if you answer my question, then I'm going to
6  assume you understood it and that that's your answer
7  to it.  Is that okay?
8      A.  That's okay.
9      Q.  Have you ever had your deposition taken
10  before?
11      A.  Not for myself, no.
12      Q.  For any reason?
13      A.  No.
14      Q.  Okay.  So you've never been in a setting
15  like this and given a deposition where a court
16  reporter was present?
17      A.  I have been in depositions where folks gave
18  depositions but not where I gave one.
19      Q.  Not where you were the one giving the
20  testimony?
21      A.  Exactly right.
22      Q.  Okay.  That's fine.  Well, you can relax.
23  Like I said, there's not going to be any Perry Mason
24  moments or anything.  All I'm going to do is be
25  asking you questions, like I said, mainly about your

6

1  Complaint.
2      A.  Okay.
3      Q.  How old are you?
4      A.  I'm 68.
5      Q.  Well, you look good for 68.  I hope I can
6  make it that far.
7      A.  Thank you.
8      Q.  What's your date of birth?
9      A.  September 5th, '39.
10      Q.  And just one other question.  What is your
11  Social?
12      A.  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.
13      Q.  All right.  As far as formal education,
14  what's the extent of your formal education?
15      A.  Was high school and then business courses.
16      Q.  Where did you graduate high school?
17      A.  Central High School.
18      Q.  And your business courses were where?
19      A.  Through the Air National Guard and through
20  the Equifax Services and through Municipal Court.
21      Q.  In your complaint, you allege that you were
22  a long-time employee of the City of Phenix City for
23  many years.  How long were you employed with the
24  City of Phenix City?
25      A.  I was employed on January 30, 1978, until

7

1  September 22, 2006.
2      Q.  Okay.  Prior to 1978 when you became a city
3  employee, what did you do?
4      A.  I was an investigator for Equifax Services,
5  formerly a retail credit company.
6      Q.  What was the nature of that work?
7      A.  We did insurance investigations.
8      Q.  Give me an example, if you would.
9      A.  Well, if someone applied for insurance,
10  automobile or life insurance, we did a background
11  check, the people that applied for it, through
12  records and through neighborhood investigations.
13      Q.  How long were you with Equifax?
14      A.  Thirteen years.
15      Q.  And prior to that, who were you with?
16      A.  Prior to that, I worked for -- I was in the
17  National Guard, active duty, for three months.  And
18  then prior to that, I worked for Columbus Iron
19  Works.
20      Q.  Let's see.  Backing up 13 years, that would
21  have been 1965 when you were in the National Guard?
22      A.  '63.
23      Q.  '63?
24      A.  Uh-huh.
25      Q.  And so you said prior to the National

8

1  Guard, you were with Columbus Iron Works?
2      A.  Columbus Iron Works.
3      Q.  What did you do over there?
4      A.  I worked with the Char-broil division of --
5  I was in on the ground floor when they started doing
6  Char-broils.
7      Q.  How long did you work at that job?
8      A.  Until I went into the National Guard.
9      Q.  In terms of time?
10      A.  Three years, yes.
11      Q.  Okay.  All right.  I want you to do this
12  for me, if you would.  In your Complaint, you
13  detailed some of your positions that you have held
14  with the City of Phenix City.  If you would, just go
15  through those for me from 1978 forward.
16      A.  Okay.  I was appointed as the clerk of
17  municipal court in 1978.  And then probably around,
18  I guess, '95, '96 -- in '96, I was appointed
19  director of parks and recreation, and maintained the
20  job as clerk of municipal court at that time.  I did
21  that for six years.
22      Q.  So you're saying you were -- from 1996 to
23  about 2002, you acted as both clerk of municipal
24  court and director of parks and rec?
25      A.  That's correct.  And now prior -- let me --

9

```
1   prior to '96 when the administration went in
2   probably a year prior to that, I was appointed
3   administrative assistant to the city manager.
4       Q.  In '95, you think?
5       A.  '95, I believe that was correct, when that
6   administration went in.  And Bobby Gaylor was
7   appointed city manager.
8       Q.  So let me see if I can get this straight.
9   From '78 until '95, you were solely the clerk of the
10  municipal court?
11      A.  That's correct.
12      Q.  And then in '95, while still clerk of the
13  municipal court, you were appointed administrative
14  assistant to the city manager, who was Mr. Gaylor?
15      A.  That's correct.
16      Q.  Did that involve any increase in pay?
17      A.  A percentage raise.  I'm not sure exactly
18  the amount.
19      Q.  Well, I mean, in your mind, were you being
20  paid for both of those jobs?
21      A.  Not really.
22      Q.  You just got a percentage increase?
23      A.  Right.
24      Q.  Was that the same as all other employees
25  received?  Or was that a percentage increase just
```

10

```
1   for Max Wilkes?  Or do you know?
2       A.  I'm sure it was just for Max Wilkes at that
3   time.  Just probably like a five percent raise to
4   take on some extra duties there.
5       Q.  So did you understand, though, at the time,
6   that that was the reason for the raise?
7       A.  That is correct.  He appointed two people
8   at that time to fill those two slots.
9       Q.  Who was the other person?
10      A.  Bubba Roberts.
11      Q.  Did each of you get the same raise at the
12  time?
13      A.  We did.
14      Q.  And then in '96, who was it that appointed
15  you director of parks and recreation?
16      A.  Bobby Gaylor.  He was the city manager.
17      Q.  As city clerk, were you considered a
18  department head?
19          MR. GRAHAM:  Not city clerk.
20      Q.  Not city clerk.  I'm sorry.  As clerk of
21  municipal court, were you considered a department
22  head?
23      A.  I was, uh-huh.
24      Q.  This administrative assistant, though, that
25  wasn't a department head.
```

11

```
1       A.  It was not a department head.
2       Q.  -- job?  Okay.  Director of parks and rec,
3   was that also a department head position?
4       A.  It was.
5       Q.  Were you given any increase in pay for
6   taking on that responsibility in 1996?
7       A.  I was given a percent pay increase.
8       Q.  How much was that?
9       A.  It was --
10      Q.  If you recall.
11      A.  I don't know exact amount.  I would just
12  have to estimate it.
13      Q.  Did you understand that that was --
14  whatever the increase was, that that increase was
15  given in consideration of you taking on these
16  additional responsibilities as director of parks and
17  recreation?
18      A.  It was.
19      Q.  And were you in agreement with that?  In
20  other words, was that agreeable to you?
21      A.  Well, I thought it was going to be a
22  short-term thing and it was at that time, but it
23  turned into seven years.
24      Q.  Okay.  At any time during that seven-year
25  period, were you given raises in consideration of
```

12

```
1   your continuing service as director of parks and
2   recreation and clerk of the municipal court?
3       A.  Only pay raises I got was what other
4   employees got after that.
5       Q.  So after that, they were only merit raises?
6       A.  Merit raises, yes, sir.
7       Q.  But you continued to serve in the capacity
8   of both clerk of municipal court and the director of
9   parks and rec?
10      A.  I did.
11      Q.  Were you also continuing to serve from '96
12  to '02 as this administrative assistant to the city
13  manager?
14      A.  I was.
15      Q.  Okay.  When did the administrative
16  assistant position to the city manager terminate or
17  end, if it did?
18      A.  It ended the beginning of the present
19  administration.
20      Q.  Okay.  I think Mr. Gaylor went out in '01,
21  didn't he?
22      A.  '01.  But Bubba appointed me when he came
23  in as city manager.  And I held that until
24  December -- let's see -- October of that year that
25  the present administration went in, which would have
```

13

1  been '04? Is that --
2      Q. I guess. I don't know.
3      A. I don't recall exactly the date that they
4  went into office. It was October 1 of '04, I
5  believe, to the best of my memory.
6      Q. Let me go back and see if I can clarify
7  something, make sure I understand it.
8      A. All right.
9      Q. So this administrative assistant position
10  to Mr. Gaylor lasted until Mr. Gaylor left office?
11     A. That's correct.
12     Q. And then Mr. Roberts was the next appointee
13  of the city council to the city manager job?
14     A. That's right.
15     Q. So what I'm really trying to find out, you
16  said Mr. Roberts appointed you to some position when
17  he took over as city manager. What position was
18  that?
19     A. Administrative assistant.
20     Q. Okay. So it's the same thing?
21     A. Same thing. He continued that.
22     Q. All right. So were you continuing, then,
23  under Mr. Roberts initially when he came into office
24  to serve as clerk of the municipal court and
25  administrative assistant to the city manager and

14

1  director of parks and recreation?
2      A. No. When he came in, he appointed me
3  director of municipal court and administrative
4  assistant. He did not appoint me as director of
5  parks and recreation. He did later, but not at that
6  time.
7      Q. Okay. Well, did you just continue in that
8  job, though, as director of parks and recreation?
9      A. No. Not when he was -- when he came in as
10  city manager, someone else was appointed.
11     Q. All right. Who was appointed to that job
12  at that time?
13     A. Well, let me rephrase that. Prior to Bobby
14  Gaylor leaving office, he removed me from parks and
15  recreation and named Roy Culpepper as director of
16  parks and recreation.
17     Q. Did that result in any decrease in pay for
18  you?
19     A. No. I don't recall any decrease.
20     Q. So the director of parks and rec, you were
21  no longer serving in that capacity, but you were
22  continuing to draw the same salary you had drawn
23  previously with that responsibility?
24     A. From -- that was from September 10th until
25  he went -- Mr. Gaylor was no longer city manager.

15

1  That was several months that I did. I drew the same
2  salary that the -- the percent raise that I got for
3  going to parks and recreation, I continued to draw
4  that salary.
5      Q. Okay. And that's what I'm trying to clear
6  up. In other words, when you were no longer
7  director of parks and rec until you were reappointed
8  to that position --
9      A. Right.
10     Q. -- during that interim time, you drew the
11  same salary that you had previously drawn as
12  director of parks and rec, head of the municipal
13  court, and administrative assistant to the city
14  manager --
15     A. I did.
16     Q. -- is that right?
17     A. That's correct.
18     Q. Okay. And then after Mr. Gaylor left,
19  after his term ended in August --
20     A. Right.
21     Q. -- then what happened next, as I understand
22  it, is Mr. Roberts then reappointed you director of
23  parks and rec?
24     A. No. Not at that time.
25     Q. Then help me out. Tell me what happened

16

1  next.
2      A. Okay. When he came into office, he
3  appointed me -- as they always do each term,
4  appointed me director of municipal court and
5  administrative assistant to the city manager.
6      Q. Okay. So, initially, Mr. Culpepper stayed
7  on as director of parks and rec?
8      A. He did.
9      Q. Okay. How long did that arrangement
10  continue?
11     A. That continued until -- less than a year.
12     Q. Okay. And then what happened in regard to
13  your position?
14     A. Well, what happened prior to Mr. Culpepper
15  leaving parks and recreation, I was appointed as the
16  director of personnel, probably in November of that
17  term. I served as --
18     Q. Can you remember what year that was?
19     A. Oh -- they went in office in '01. It would
20  have been --
21     Q. That election was that summer.
22     A. Yes. So it would have been November of
23  '01, I was appointed director of personnel.
24     Q. Did you take somebody else's place or was
25  that a new position?

17

1    A.  Took someone's place that left.
2    Q.  Who was that?
3    A.  That was Dana McPherson.
4    Q.  And was that also a department head
5  position, director of personnel?
6    A.  Personnel is a division of the city
7  manager's office.
8    Q.  So it's not a department head?
9    A.  It's not a department head.
10    Q.  Okay.
11    A.  But it functions basically as an arm of the
12  city manager's office, kindly independent.
13    Q.  All right.  So you took that position.
14  Would that involve any differential in pay for you
15  when you took the director of personnel?
16    A.  It did not.
17    Q.  All right.  So at that time, you would have
18  been still clerk of municipal court, director of
19  personnel, and -- were you still assistant to the
20  city manager?
21    A.  I was.
22    Q.  That was as of November of '01?
23    A.  '01.
24    Q.  Okay.  So how long did you hold the
25  personnel position?

18

1    A.  I held that for four months.
2    Q.  Did you understand, when you were appointed
3  director of personnel, that that was an interim
4  appointment?
5    A.  I did.
6    Q.  So was somebody else appointed to that
7  position, I assume, four months later?
8    A.  Four months later, Barbara Goodwin was
9  appointed and I stayed there several more weeks
10  while she was in training.
11    Q.  Making the changeover?
12    A.  While she was in training, yes.
13    Q.  So let's just say you were there for six
14  months in the personnel position.  I mean, I don't
15  know how long.
16    A.  Okay.  That's a good number.
17    Q.  Okay.  If you do that, then after that
18  time, did you go back to just being the clerk of the
19  municipal court and the administrative assistant to
20  the city manager?
21    A.  Right after that, I was asked to go back to
22  parks and recreation.
23    Q.  So when you left the interim stint at
24  personnel, you were asked to go back to parks and
25  rec?

19

1    A.  Yes.  Part of that time, I was personnel
2  and parks and rec and municipal court.  I was doing
3  all three.
4    Q.  Okay.  Now, parks and rec is a department
5  head job?
6    A.  It is.
7    Q.  And clerk of the municipal court was a
8  department head job?
9    A.  That's correct.
10    Q.  Do you know what your pay rate was for
11  these?  In other words, if you could give me a
12  yearly salary for what you were making in 2001?
13    A.  I would have to look that up.  I cannot
14  recall the actual salary.
15    Q.  That's all right.  It would be in your
16  personnel file, wouldn't it?
17    A.  It would, yes.
18    Q.  Okay.  So how long did you continue as
19  parks and rec director?
20    A.  I continued as parks and rec director until
21  Bubba got activated for military service in Jan 13
22  of '03, I believe.
23    Q.  For the Record, we have been talking about
24  people that we all know, but if somebody else has to
25  read this, I have to make it clear.  Mr. Gaylor was

20

1  the city manager back in '95?
2    A.  That's correct.
3    Q.  All right.  And he served in that capacity
4  until 2001?
5    A.  Uh-huh.
6    Q.  And after that time, H.H. Roberts, also
7  known as Bubba Roberts, served as -- was appointed
8  city manager?
9    A.  That's correct.
10    Q.  Sometime in '01 or early '02, somewhere in
11  that time frame.  And he's served in that capacity
12  ever since with the exception of some military
13  service; is that correct?
14    A.  That's correct.
15    Q.  All right.  So we're now up to that point?
16    A.  Uh-huh.
17    Q.  Do you know when he was deployed for
18  military service?
19    A.  January 13 of '03.
20    Q.  Okay.  At that time, were you still serving
21  as parks and rec, city clerk, and an administrative
22  assistant to the city manager?
23    A.  I was.
24    Q.  So what, if anything, changed as far as
25  your employment when Mr. Roberts was called up by

**21**

1  the National Guard to serve due to the war effort in
2  Iraq in January of 2003?
3      A.  It was.
4      Q.  Like I said, what, if anything, changed
5  about your job situation?
6      A.  I was asked to serve as interim city
7  manager.  Bubba had appointed me and had gotten the
8  council's okay to accept that appointment that Bubba
9  did.
10      Q.  Now, were you given any more compensation
11  for serving as city manager at that point in time?
12      A.  I was.
13      Q.  Do you know what -- were you given the same
14  amount of money as far as salary that the regular
15  city manager was making?
16      A.  I was given the same salary that he was
17  making at that time.
18      Q.  So while you were city manager, you were
19  paid for being city manager?
20      A.  That's right.
21      Q.  Who was serving as municipal court clerk at
22  that point?
23      A.  I was.
24      Q.  You still were running that?
25      A.  I was still running that.

**22**

1      Q.  Who were the -- who was your top assistant
2  at the municipal court?
3      A.  I had two deputies, Pam Jarrell and Ruby
4  White.
5      Q.  When you became city manager, were you more
6  or less relying on them to run the Court?
7      A.  I spent some time in the municipal court,
8  but majority of the time was city manager.
9      Q.  It's a -- it's not a eight-hour job, is it?
10      A.  No.  It was -- that was some long hours,
11  long days.
12      Q.  That's what I thought.  How long did you
13  serve as interim city manager?
14      A.  Twenty-three months.
15      Q.  Was that exclusively during the time that
16  Mr. Roberts was away with the National Guard?
17      A.  That's right.
18      Q.  So once his obligation to the National
19  Guard was over, he came back and took over this city
20  manager job?
21      A.  He did.
22      Q.  Is that right?
23      A.  That's correct.
24      Q.  Now, when that happened, what positions did
25  you assume once you were no longer needed as interim

**23**

1  city manager?
2      A.  October of that year when this present
3  council went into office, Bubba had three months to
4  go on his military.  He appointed me interim city
5  manager for those remaining three months.  When he
6  came back, I did not have a position to go to.
7      Q.  Okay.  And why was that?
8      A.  Well, he had appointed Pam Jarrell as
9  interim clerk of municipal court.
10      Q.  Okay.  And, again, I'm -- it is confusing
11  to me.  I want to make sure I understand it.  I
12  thought when you were interim city manager you
13  continued as clerk of the municipal court?
14      A.  I did until that October.
15      Q.  You did until Mr. Roberts returned?
16      A.  Well, prior to his return, this present
17  council was sworn in to office.
18      Q.  Right.
19      A.  And they appointed him city manager even
20  though he was not physically here.
21      Q.  I gotcha.
22      A.  And then in turn, he appointed me as
23  interim city manager until his return in December.
24      Q.  Okay.  Well, what I'm saying is when was
25  the position of interim clerk of the municipal court

**24**

1  given to Ms. Jarrell?
2      A.  October 1 of that year.
3      Q.  Okay.  And when had you ended your stint as
4  director of parks and recreation?
5      A.  That ended when I was appointed as interim
6  city manager.
7      Q.  Okay.  Who took over that job?
8      A.  Lucy Burkett.  She was appointed interim
9  parks and recreation director.
10      Q.  So let me -- to review and try to get it
11  straight, when you became interim city manager at
12  the time that Mr. Roberts was called up to the
13  National Guard, at that point in time, you gave up
14  the parks and rec position?
15      A.  Mr. Roberts appointed Lucy as interim
16  director.
17      Q.  But at that time, you stayed -- you still
18  maintained your title as clerk of municipal court?
19      A.  I did.
20      Q.  And that didn't change until the new
21  council came in?
22      A.  That's right.
23      Q.  And, at that time, Mr. Roberts, I guess in
24  absentia, so to speak -- because he wasn't here to
25  do it, but he sent word or somehow sent a letter and

**25**

1  appointed Pam Jarrell as municipal court clerk?
2      A.  He wrote all the letters.  He reappointed
3  all the department heads, and he was actually here
4  that particular day.
5      Q.  But I mean, you weren't reappointed at that
6  time?
7      A.  No.
8      Q.  All right.  So when the interim city
9  manager stint was up, you didn't have a job to go to
10 at that time; is that right?
11     A.  That's correct.
12     Q.  When was that time wise?  Can you help me
13 with the date?
14     A.  Yes.  It was December 13th of that same
15 year that they were appointed.  Was that --
16     Q.  Let's see.  I'm trying to think.  Would
17 that have been '04 or '05?
18         MR. GRAHAM:  '04.
19     A.  December 13, '04.  That's correct.
20     Q.  So what was your position then?  Were you
21 through with the City at that time or what happened?
22     A.  Well, Mr. Roberts came in that day and
23 asked me to meet him at the city manager's office.
24 And --
25     Q.  Did you?

**26**

1      A.  I did.
2      Q.  Who all was present at this meeting?
3      A.  He and I.
4      Q.  Did y'all meet upstairs there on the third
5  floor where you had been acting as city manager and
6  so on, in that very office?
7      A.  In that office, yes.
8      Q.  Tell me what happened.
9      A.  I asked him did he want me to go over the
10 things that we had going on in the City.  And he
11 said no.  He said, I need to talk to you.
12     I said, okay, what's it about?
13     He said, you need to consider retirement.
14     Q.  Okay.  Why did he tell you that?  Or did he
15 explain why he thought you ought to do that?
16     A.  He did not really explain anything.  He
17 said, you just need to consider retirement, and take
18 a few days to think about it.
19     I said, well, I'll be glad to, but -- he said,
20 well, come back in a week.
21     So I went back in a week.  In the meantime, I
22 had written him a letter stating, you know, why I
23 did not want to retire.
24     Q.  Did you keep a copy of that letter?
25     A.  I did.

**27**

1      Q.  Okay.  And do you have that still?
2      A.  I still have it.
3      Q.  Well, did it come as a surprise to you when
4  he called you in and asked you to retire?
5      A.  It certainly did.
6      Q.  Was there some -- I mean, y'all had a
7  pretty good working relationship up to that point?
8      A.  We did.
9      Q.  What was it that you think triggered this
10 request by him for you to retire?
11     A.  Well, there was a problem, you know, during
12 the time he was gone.  And during that time he had
13 talked to me, you know, about some things, and it's
14 a pretty long discussion that he and I had.
15     Q.  Well, can you just briefly tell me what you
16 thought the problem -- well, let me back up and do
17 it this way.  When he called you up to the city
18 manager's office and told you he thought you ought
19 to retire, you were surprised about that?
20     A.  I was.
21     Q.  All right.  And I guess my question is, if
22 I had been in your shoes, I would have been
23 thinking, well, what's going on here?
24     A.  Uh-huh, exactly.
25     Q.  Is that the kind of thoughts you were

**28**

1  having?
2      A.  That's exactly what I felt like.
3      Q.  Or what could be the source of this?
4      A.  Uh-huh.
5      Q.  In your mind, had his attitude towards you
6  changed?
7      A.  It had.
8      Q.  And my question is, do you know what the
9  cause of that was?
10     A.  I don't know the cause.  I've got, you
11 know, just some ideas.
12     Q.  Give me your ideas.
13     A.  Okay.  During the time he was gone, he and
14 I would discuss things from time to time.  And then
15 one night he called and cursed me out, just all
16 kinds of things that he said to me and talked to me
17 about.
18     Q.  Well, what was he -- I take it he sounded
19 angry on the phone?
20     A.  He was angry.
21     Q.  What was he angry about?  Or did he express
22 that to you?
23     A.  Well, me keeping things from him.
24     Q.  Okay.
25     A.  I said, you know, I don't know what you

29

1 mean. You know, I can't -- I can't, you know, work
2 in the city manager's office and keep you up to date
3 of everything that's going on because a lot of
4 things go on in the city manager's office, working
5 with city council. So he just proceeded, you know,
6 to -- you know, I can move you anytime I want to.
7      I said, fine, you know; if you need to move me,
8 go right ahead and move me; it will be fine with
9 me. You know, I just agreed to do this until you
10 got back and I have no problem with that.
11      Q. All right.
12      A. If you want somebody else in there, that
13 will be great.
14      And then the next day, I asked city council to
15 meet with me so I could cover it with the city
16 council.
17      Q. Did you do that?
18      A. I did.
19      Q. Was that like in a work session type deal
20 or --
21      A. No. It was just a called meeting.
22      Q. -- private deal?
23      A. I mean, it was a open meeting.
24      Q. I wasn't trying to get into whether it was
25 open or not. Who all was present there at the

30

1 meeting?
2      A. City council and --
3      Q. City clerk there?
4      A. -- city clerk and Mr. Graham, our city
5 attorney.
6      Q. Okay. So you told them about that
7 Mr. Roberts was not happy or something like that?
8      A. I did.
9      Q. All right. What was the result of that
10 meeting?
11      A. Results of that meeting was the council had
12 asked Mr. Graham to write a letter to Mr. Roberts
13 and also talk to Mr. Roberts about the way he talked
14 to me and the things he said to me. And that he
15 could inquire about things, but he could not call
16 and tell me to do things, that he was in -- you
17 know, I was the interim and he was in the National
18 Guard. And Mr. Graham did that.
19      Q. All right. He wrote a letter to
20 Mr. Roberts about that?
21      A. He did. And also talked to him at length
22 about that. And things got better, you know.
23      Q. About -- I lost track of time. About when
24 was this when this kind of little blow-up occurred?
25 I'll call it that.

31

1      A. Yes. Probably about midway of the two
2 years.
3      Q. Okay. So if you went in in January of
4 '04 -- excuse me -- December of '04 --
5      A. It would have been sometime probably latter
6 part of --
7      Q. Latter part of '04 -- excuse me -- '05?
8      A. Probably. I wish I could remember the
9 date, but I don't have that.
10      Q. That's okay. How soon did the letter go
11 out after all this happened, you think, from
12 Mr. Graham to Mr. Roberts?
13      A. I think it went out within several days.
14      Q. Within a week?
15      A. Yes -- less than a week, I'm sure.
16      Q. That would help us with the date probably?
17      A. Uh-huh.
18      Q. Okay. So everything -- you said things
19 improved after that?
20      A. Well, as far as the calling and telling me,
21 you know, you gotta do this and you gotta do that.
22 And later on, you know, I would call him and ask
23 him, you know, some questions about things that
24 probably he had going on before he left. And, you
25 know, he would talk, but it was not -- it was never

32

1 the same.
2      Q. Okay. More just strictly business?
3      A. Uh-huh.
4      Q. Whereas before y'all had been friends, you
5 think?
6      A. Oh, yes. I mean, he and I have been
7 friends, refereed football for 25 years. Things
8 like that.
9      Q. So when he called you in and asked you
10 about retiring, like I said, you said that had come
11 as a shock to you, and you did go home and think
12 about it and then came back to see him?
13      A. I did.
14      Q. All right. And tell me about the next --
15 that meeting. And I may have messed up on the date
16 a minute ago, because I think you said he -- when
17 was it you said y'all had that first conversation
18 where he called you in and --
19      A. When he came back, his first day back?
20      Q. Yes.
21      A. December 13th.
22      Q. Okay. So all that we just talked about had
23 to predate that?
24      A. Uh-huh.
25      Q. Like I said, I was wrong if I said December

33

1  of '05.
2      A.  Yes.
3      Q.  Okay.  Go ahead.
4      A.  But the only thing he told me on that
5  occasion was -- I said, what's the problem, Bubba?
6      He said, well, y'all hurt me.
7      I said, hurt you how?
8      And he would not go into anything beyond that.
9      Q.  Who is y'all?
10     A.  I don't know.
11     Q.  Okay.  All right.  What happened next?
12     A.  And that goes back to, you know, where I
13  went back and went home that day, and then I wrote
14  him a letter.
15     Q.  Okay.
16     A.  Sent him a letter.  And then a week later,
17  I went back and talked to him some more.  And he
18  said, think about it some more.
19     Q.  Well, what was your position when he
20  asked -- when you first went home to think about it,
21  did you tell him you didn't want to do it or weren't
22  interested in retirement?
23     A.  I told him I wasn't going to retire and I
24  didn't intend to retire.
25     Q.  And then you wrote him a letter after

34

1  that.  And then after that, you followed up with a
2  visit?
3      A.  A visit.
4      Q.  And then what happened on that visit on
5  that occasion?
6      A.  Well, we talked, had a good talk.  And he
7  said, well, take another week and think about it
8  some more.  This was getting into Christmastime.  So
9  I came back probably another week later.  He said,
10  well -- no, the next week he couldn't see me; he was
11  tied up.  So he said, take another week.
12      So I took another week.  Got past Christmas,
13  went back.  He said, every time you come down here,
14  I'm losing ground.
15      I said, well, that's -- I still want my job,
16  you know.
17     Q.  What did he mean by that, that he was
18  losing ground?  If you know.
19     A.  I think what he meant was, you know, I'm
20  not going to be able to dismiss you, you know.
21     Q.  Did he ever tell you that there was anybody
22  on the council that wanted you gone or anything like
23  that?
24     A.  Not at this time.
25     Q.  Well, I'm talking about this time now.

35

1  We'll get to it later about other things.
2      A.  Okay.  No.
3      Q.  But I'm just talking about at this point in
4  time, had you heard anything about anybody on the
5  city council wanting you gone at this time?
6      A.  Not at this time.
7      Q.  Okay.  So after he told you he was losing
8  ground and you said you weren't going to leave, what
9  was the result?  What was the final result of all
10  this?
11     A.  Well, he gave me a form, a dismissal form,
12  said take this with you and when you decide, fill
13  this out and bring it in.
14      I said, well, I'm not going to take it; I'll
15  just leave it with the personnel director; I don't
16  need the form.
17     Q.  Well, was she there at the time?
18     A.  On that occasion she was.
19     Q.  All right.  These other conversations that
20  you had had, the first one you had with him and then
21  you wrote the letter, and then the next one you had
22  with him, was that just the two of you?
23     A.  Two of us.  The third one was when --
24     Q.  On the third occasion, Mrs. Goodwin was
25  there?

36

1      A.  She was there.
2      Q.  Was she there the entire time?
3      A.  Not the entire time.
4      Q.  How long do you say she was in the room
5  where --
6      A.  We talked quite awhile before she came in.
7  She was in the building waiting to come in.
8      Q.  All right.  And this conversation that we
9  are talking about now where the personnel director
10  ultimately came in, was that also at the city
11  manager's office?
12     A.  It was.
13     Q.  There's a little conference table in
14  there.  Were y'all sitting at the table?
15     A.  Sitting at that table.
16     Q.  And you said at some point in time he asked
17  her to come in?
18     A.  Uh-huh.
19     Q.  Was that before or after he gave you this
20  form?
21     A.  That was -- she came in.  She had the form
22  with her.
23     Q.  Okay.
24     A.  So I didn't know about the form until she
25  came in.

37

1  Q. Right. How long did the conversation go on
2  after she got in the room?
3  A. It didn't go on very long.
4  Q. Ten minutes?
5  A. Probably ten minutes --
6  Q. Okay.
7  A. -- fifteen minutes, something like that.
8  Q. So you didn't take the form? You just left
9  it with her?
10  A. Left it with her.
11  Q. Now, what position were you serving in
12  during -- you told me you didn't have a position
13  after he came back. What were you doing with your
14  time? I mean, were you still going to work?
15  A. First month I was not. It wound up me
16  taking a whole month off.
17  Q. Were you paid for that month?
18  A. I was. Bubba said it was on him.
19  Q. Okay.
20  A. I was paid.
21  Q. So it didn't cost you any leave time or
22  anything like that?
23  A. No. No leave time or salary.
24  Q. So what happened next after this meeting
25  with Mr. Roberts and Mrs. Goodwin?

38

1  A. I went back, I think it was January 10th of
2  '06. Is that right? Is that the date I'm looking
3  for? But anyway, I went back and --
4  Q. I think it's '05.
5  MR. GRAHAM: Yes. If he came back '04,
6  December 13, '04.
7  A. Yes, that's right. '05. I'm sorry.
8  Q. Okay. That's all right. It's confusing.
9  A. It is. '05, I went back. And he said,
10  just go on back to municipal court, and he appointed
11  me -- he said he was going to appoint me director
12  and Pam Jarrell assistant director.
13  Q. Okay. When you were city manager, did you
14  participate in the budget process?
15  A. I did.
16  Q. How did that -- how did that go? In other
17  words, tell me what that process was like. What did
18  you do?
19  A. Well, the city manager is basically
20  responsible for putting that together, but you
21  depend on your department heads and your finance
22  director. So I met with each department head and we
23  prepared their budget, and then we got them all
24  together. And during that time, I met daily with
25  the finance director to make sure we were headed in

39

1  the right direction on the budgets.
2  Q. It's basically a -- I just went through a
3  church budget, and it's basically a process of
4  looking at a line and seeing what you spent last
5  year and can we afford that this year, and can we
6  move some things around, and then finding out what
7  your revenue is; isn't that correct?
8  A. That's right.
9  Q. After you assembled the budget -- or during
10  the time you're doing that, putting the budget
11  together, do you get any input from city council
12  people on it?
13  A. During the time we were putting it
14  together, no.
15  Q. When do you first go to city council with
16  the proposed budget?
17  A. We go with a draft budget to the city
18  council, and that's when they first get a look at
19  what we have put together.
20  Q. And then do you sit down and go over it
21  with them?
22  A. What we normally did is we would go over it
23  with them and call in each department head to
24  explain their portion of their budget.
25  Q. And then the city council asks questions?

40

1  A. They would ask questions. And then we, as
2  the city manager and the council, would get together
3  and see where we might have some suggestions to cut,
4  because we had -- you know.
5  Q. So you have an initial meeting. And then
6  after that meeting, you go back and meet some more
7  sometimes with them?
8  A. We do.
9  Q. And the council is consulted in that
10  because they ultimately have to approve it --
11  A. They have to approve it.
12  Q. -- is that right?
13  A. That's right.
14  Q. How many times did you, in your experience,
15  consult with council before you got a final budget?
16  A. Probably -- we would go through several,
17  several sessions with the council.
18  Q. When does it usually start, Mr. Wilkes, as
19  far as -- I know you have to have it approved by
20  some certain date.
21  A. We have to approve it in September prior to
22  October 1 is what the target date is before the
23  fiscal year started.
24  Q. When did you generally start working on it?
25  A. We would start somewhere in May, April or

41

1  May. We would start our preliminary budgets. We
2  would send out the forms to department heads and get
3  them working on it.
4      Q. So basically sometime from April to May all
5  the way over into September?
6      A. Right.
7      Q. When would you generally have this
8  so-called draft budget ready for the council to
9  consider?
10     A. Somewhere end of July, first of August.
11     Q. Okay. And then they had to approve it
12 sometime between that time and the end of September?
13     A. Right. We would have to have a public
14 hearing and so forth.
15     Q. Were there occasions when city council
16 members made recommendations and cut things out of
17 the budget?
18     A. There would be.
19     Q. Were there sometimes when they would make
20 recommendations and add something to the budget?
21     A. They would.
22     Q. So I mean, that's just -- that's just the
23 normal budget process, isn't it?
24     A. That is. They have, you know -- as you
25 said, they have to approve it, so they have some

42

1  requests back and forth.
2      Q. Do you know whether when Mrs. Jarrell was
3  appointed to municipal court whatever it was, the
4  interim municipal court clerk, if she was making the
5  same salary you were making?
6      A. No, she wasn't. She was increased 20,000.
7      Q. Okay.
8      A. From her present salary was increased 20.
9      Q. Do you know what she was making as interim
10 clerk of the municipal court?
11     A. 52,000.
12     Q. What had you been making in that position,
13 in the administrative assistant position -- or I
14 guess let's just do it easy. We know what all
15 positions you held. Prior to being interim city
16 manager, what were you making?
17     A. Prior to that?
18     Q. Yes, sir.
19     A. Let's see. I can't remember exactly what
20 it was prior to -- it was around -- I'm going to
21 estimate it -- between 68 and 70.
22     Q. And as city manager, what did you make?
23     A. It was 80.
24     Q. And when you were reappointed this last
25 time, I guess, as clerk of municipal court, what was

43

1  your salary?
2      A. It was -- I had gotten, I guess, a pay
3  increase. It was 80 when I took the job, and we got
4  one pay increase from when I was -- the two years I
5  was there, I got one pay increase. I think it was
6  about 82. And Bubba decreased it six percent. He
7  said, I'm going to cut you six percent. That will
8  leave you in line with all the other department
9  heads.
10     Q. Okay.
11     A. But he did not -- he said, I'm not going to
12 touch Pam's salary. I'm going to leave it the
13 same.
14     Q. So let me go back again, because I want to
15 make sure I've got it straight. When you were
16 interim city manager, you made $80,000 a year?
17     A. That's right.
18     Q. When you stepped down from that position
19 and then ultimately were reappointed as clerk of the
20 municipal court, are you saying that the salary you
21 went to was 80,000?
22     A. It was six percent less.
23     Q. Okay. So that's 4,800. About 76,600,
24 something like that?
25     A. About 77, somewhere along in there.

44

1      Q. About 77?
2      A. Uh-huh.
3      Q. All right. Is the clerk of the municipal
4  court -- let me ask this. Maybe this is the way to
5  do it. Did Mr. Roberts' salary go up as city
6  manager? In other words, I'm trying to figure out
7  if you were making the same thing he was making
8  before he left, and that was $80,000; is that what
9  you're saying?
10     A. Uh-huh.
11     Q. So did his salary increase when he got back
12 or do you know?
13     A. I'm -- I think he got the increase of
14 whatever the increases were from the time he was
15 gone, yes. He had to get -- being activated then,
16 he was entitled to those increases.
17     Q. Did you get any increases while you were
18 serving as city manager as far as the city manager
19 salary?
20     A. One increase.
21     Q. Okay. So I guess what I'm really trying to
22 get at is as municipal court clerk, you were making
23 pretty close to what the city manager was making; is
24 that correct?
25     A. When I went back after Bubba came back?

45

1  Q. Yes, sir.
2  A. That -- the same less six percent.
3  Q. You were making the same as the city
4  manager less six percent?
5  A. Less six percent. And the reason given was
6  that I would be in line with the other department
7  heads.
8  Q. Well, did that make you in line with the
9  other department heads?
10  A. Yes.
11  Q. Were you in agreement with that?
12  A. I was.
13  Q. So how long did you continue as municipal
14  clerk after your reappointment sometime in early
15  2005?
16  A. Until September 22, '06.
17  Q. That was your last day with the City?
18  A. That was.
19  Q. All right. As the budget process -- let me
20  ask you this. When is the first time you learned
21  that your job might be eliminated from the budget?
22  When did you first hear of that?
23  A. In July.
24  Q. July of 2006?
25  A. That's correct.

46

1  Q. Prior to that time, had you had anymore
2  conversations with Mr. Roberts regarding retirement?
3  A. He would ask me from time to time, when are
4  you going to retire?
5  Q. And what would you tell him?
6  A. I would say, I'm not sure; when are you
7  going to retire?
8  Q. Okay. Did you ever at any time tell him or
9  say that you needed a specific amount of time before
10  you wanted to retire?
11  A. Well, we would talk about it, and I said I
12  would like to make a full 30 years. And he said,
13  well, if I retire before you, you might as well get
14  your hat because they're going to get you.
15  Q. Okay. And when did he first tell you that,
16  if you recall?
17  A. It was sometime after he put me back to
18  work and then we -- from time to time, we would just
19  talk about -- he would ask me, you know, when are
20  you going to retire.
21  Q. All right. How was it that you learned in
22  July of 2006 that your job may be eliminated from
23  the budget?
24  A. He came by -- he and Barbara Goodwin came
25  by my office and said, Max, we need to talk to you;

47

1  the city council is going to eliminate your job from
2  the budget. He said, whatever you need to do, do
3  it.
4  Q. All right. And that was he and
5  Mrs. Goodwin came down to the city court clerk's
6  office?
7  A. He did. That's correct.
8  Q. And was anybody else present during that
9  conversation other than you and Mr. Roberts and
10  Mrs. Goodwin?
11  A. No one else was there.
12  Q. Okay. And what was your response when he
13  came up?
14  A. I said, why?
15  He said, don't know. He said, but do whatever
16  you want to do.
17  I said, do you have a problem if I talk to city
18  council?
19  He said no.
20  Q. Did you talk to city council?
21  A. I did.
22  Q. Who did you speak with?
23  A. I didn't at that time.
24  Q. Okay.
25  A. But I did --

48

1  Q. Ultimately?
2  A. -- ultimately, yes.
3  Q. Well, what did you do initially then, if
4  anything?
5  A. Well, what happened, I continued to be in
6  the budget, you know. He kept me in the budget up
7  until the very end.
8  Q. Okay. He kept you in the budget that was
9  being proposed to council --
10  A. Right.
11  Q. -- for the following year?
12  A. That's right.
13  Q. Which would have been the 2006-2007 budget?
14  A. That's correct.
15  Q. All right. Were you under the impression
16  he was trying to keep your job in the budget?
17  A. I was.
18  Q. Do you believe today that he was trying to
19  keep your job in the budget?
20  A. I can't really -- I can't really say.
21  Q. I know you don't know. I'm just asking
22  what your gut feeling is.
23  A. Well, I think he was.
24  Q. Well, what had changed? I mean, it looked
25  like to me y'all were kind of on -- kind of not the

49

1  best of terms, I guess, based on the prior testimony
2  I've heard today. What was it that made you think
3  he was trying to help you or keep you in the
4  budget?
5      A. Well, when he put me back in municipal
6  court, the day I was taking all my personal goods
7  out of the office, Barbara came by and said, Bubba
8  can't talk to you now, but y'all have been friends
9  for a long time and he cannot, you know, dismiss
10  you. He's told me to come over and tell you you can
11  work in the court as long as you want to, as long as
12  he's city manager. So I felt like at that time --
13      Q. So in your mind, he was kind of holding out
14  a olive branch through her?
15      A. I guess, yes.
16      Q. Just old friends and couldn't -- too proud
17  to say "I was wrong" kind of thing?
18      A. Probably, yes.
19      Q. Is that the way you viewed it?
20      A. I kind of did. He just could not face me
21  and say, Max, you know, I was wrong, I cannot -- I
22  cannot dismiss you.
23      Q. Okay. So anyway, in your mind, he was
24  trying to keep you in the budget?
25      A. I think so.

50

1      Q. All right. What happened next?
2      A. The next thing is they had the work session
3  with the city council with all the department heads
4  there.
5      Q. Did you go to that?
6      A. I did.
7      Q. Did you talk with the city -- were you on
8  the agenda, so to speak, to talk with them about
9  your job?
10      A. No. All the department heads were there.
11  It was just they went through each department. And
12  when they got to municipal court, he said, are y'all
13  okay with the cuts in municipal court, including
14  Max's position.
15      Q. Who said that?
16      A. Bubba.
17      Q. Mr. Roberts?
18      A. Mr. Roberts did.
19      Q. I take it by that time the budget had
20  changed. In other words, you said up until a
21  certain point your job was left in the budget?
22      A. I understand it changed that day.
23      Q. Okay.
24      A. Prior to that meeting, it changed.
25      Q. Right before the work session?

51

1      A. Right before the work session.
2      Q. Okay. So what happened when -- you were
3  describing what happened when it came up.
4      A. He asked council, are y'all okay with this
5  budget? And it was kind of the municipal court
6  budget portion of it. It was kind of quiet, you
7  know. And then Mr. Bush said, I think the municipal
8  court is a little top heavy in salaries and I don't
9  think we can afford to fund that position.
10      Q. What was said? Anybody else make any
11  comment?
12      A. Then he went -- tried to get each council
13  member to comment and Mr. Hardin said yes.
14      Q. In relation to what Mr. Bush had just said?
15      A. Uh-huh.
16      Q. Anything else said?
17      A. Well, council member Gail Brantley said,
18  why are y'all picking on one person? She said, this
19  is the first I've heard of it -- something to that
20  nature. Why are y'all doing this? You're picking
21  on one person.
22      And there was no comment. No comment from
23  Mr. Sumbry and no comment from Mr. John Storey that
24  I recall.
25      Q. Did you speak up and say anything?

52

1      A. Yes. I asked could we meet in executive
2  session. They said, this does not qualify as an
3  executive session item; you'll have to do that at
4  city council meeting.
5      Q. Okay.
6      A. I said, well, can I speak to
7  council members -- I asked Bubba, can I speak to
8  council members individually? He said yes.
9      So when the meeting was over, I talked with
10  Mayor Hardin.
11      Q. Tell me about that conversation.
12      A. We talked about 15 minutes. He just
13  listened mainly and he said, I thought you were
14  going to retire.
15      Q. Okay.
16      A. He said, Mr. Roberts does the cuts in the
17  budget, not council.
18      Q. Okay.
19      A. I asked him would he talk to Mr. Roberts
20  and the rest of the council, and he said he would.
21      Q. Okay. Did you speak with anybody else
22  besides Mayor Hardin?
23      A. Not that day. But I did speak with all the
24  others over a period of a couple of weeks.
25      Q. Is there anything else that Mr. Hardin said

53

1  other than I thought you were going to retire and
2  what you just said --
3      A.  That's all.
4      Q.  -- that you can recall?
5      A.  He said he would get back with me, and he
6  never got back with me.
7      Q.  So tell me about your conversations with --
8  go through each one of them that you contacted.
9      A.  Okay.  I sat down and talked to Mr. Bush.
10     Q.  Where did you speak with him?
11     A.  In the conference room at the city
12 manager's office.
13     Q.  Did you ask for that meeting --
14     A.  I did.
15     Q.  -- or just happen to see him there?
16     A.  I asked for it.  And he sat down and we
17 talked at length.  And he talked about his previous
18 dismissal from Liberty National Insurance Company,
19 and he was in a position there.  And he said, things
20 like that happen.  When you can't afford to fill a
21 position, then sometimes you just have to cut them
22 out.  He said, I see no way that anything can be
23 done about it.
24     Q.  Did he seem to express any animosity or
25 anything towards you?

54

1      A.  He didn't appear to be.  He was just
2  adamant that we're not going to fill that position.
3      Q.  He was just saying there just wasn't enough
4  money for it?
5      A.  Said we don't -- we can't afford it.
6      Q.  Anybody else present in that meeting?
7      A.  No one else.
8      Q.  What about any other council members you
9  talked to?
10     A.  I talked to Gail Brantley.
11     Q.  I take it she was for keeping the position?
12     A.  She was.
13     Q.  What did Gail have to tell you, if
14 anything?
15     A.  I talked to her at length, and she said, I
16 was not involved in this decision, I didn't even
17 know about it until the meeting.  And that's when
18 she spoke up.  And she said, you know, nothing I can
19 do about it.
20     Q.  When the budget was laid out on the table,
21 was it already printed up with you out of it?
22     A.  It was, on that date.
23     Q.  Well, like I said, was that something that
24 could have been done that day?
25     A.  It was.

55

1      Q.  That's not something that had been done two
2  weeks sooner or something like that as far as you
3  know?
4      A.  As far as I know, it was done that day.
5  But --
6      Q.  Did she give you any ideas as to why it was
7  being done or did you ask -- did y'all discuss that?
8      A.  We did.  We talked at length about it.
9  Said she couldn't understand why it was done.  She
10 didn't know why it was done.  She did, you know,
11 vote for the budget, and we talked about that.  She
12 voted for it to be approved, but --
13     Q.  Now all of these council members -- Hardin,
14 Bush, Storey, Brantley and Sumbry -- are these all
15 the same council members that you had served as city
16 manager --
17     A.  That is correct.
18     Q.  -- when you were there?
19     A.  That's correct.
20     Q.  So did you feel pretty comfortable talking
21 to all of them?
22     A.  I did.  I felt real comfortable.
23     Q.  And had you ever had any previous problems
24 with any of them?  Mr. Hardin, Mr. Bush, Mr. Storey,
25 Mr. Brantley or Mr. Sumbry?

56

1      A.  I had never had any problems with them.
2      Q.  As far as you knew, they liked you and you
3  liked them?
4      A.  Right.
5      Q.  Who else did you talk to?  We have talked
6  about Mr. Hardin, Mr. Bush, and Mrs. Brantley.
7      A.  I talked to Mr. Sumbry.
8      Q.  All right.  What did Mr. Sumbry have to
9  say?
10     A.  He said, I don't go along with this.  If
11 you can get another -- if you can get three votes,
12 you'll be back in the budget.
13     Q.  Was he including himself?
14     A.  Yes.
15     Q.  Okay.
16     A.  He was including himself.  He said, I think
17 you can get Mrs. Brantley.  And that's basically --
18     Q.  That was pretty much the upshot of it?
19     A.  Pretty much on his part.  Then I talked
20 with Mr. Storey.  He said, Max, I don't know of any
21 way we can do anything about this.  He said just --
22 we are -- they were talking about like being
23 $140,000 over budget and they had to do some cuts,
24 and they felt like this one would be one that would
25 help them a great deal in reaching to balance the

57

1  budget.
2      Q.  That would have been more than half
3  of this -- if he was right about them being $140,000
4  over budget, this would have been more than half of
5  it; is that right?
6      A.  That's right.
7      Q.  Well, did you see -- had you examined the
8  budget yourself that year?
9      A.  I had.
10     Q.  Did you see anyplace else that cuts could
11  have been made that would have preserved your
12  position?
13     A.  I did.  I thought there would have been a
14  lot of areas that could have been cut that probably
15  was not cut.
16     Q.  Any of them come to mind?
17     A.  Well, you know, when I went back to court,
18  leaving the deputy at -- I had two deputies left,
19  one at 52,000, the other one at thirty-something
20  thousand, that was 20,000 right there.  We had other
21  department heads that when you look at their
22  salaries, they were more than mine.
23     Q.  Who was that?  I mean, I don't know.  I'm
24  just asking.
25     A.  Well, I know the utilities director's

58

1  salary was more than mine.
2      Q.  Is that Mr. Glass?
3      A.  That is.
4      Q.  Do you know?
5      A.  I don't remember, but it was three or four
6  thousand more than mine.
7      Q.  Was he making more than the city manager or
8  the same?
9      A.  No.  He was right under what the city
10  manager was making.
11     Q.  Right at it?
12     A.  Uh-huh.  And the city engineer which, you
13  know, he doubled up; he did public works and city
14  engineer job, his salary.
15     Q.  Talking about Mr. Kite?
16     A.  Uh-huh.
17     Q.  Who else?
18     A.  That's all I can -- I'm sure there was
19  others that I saw, but there was other areas that I
20  felt could have been cut.  Not only salaries but
21  some other things in the budget that we had to do
22  when I was there that we had to cut to make the
23  budget balance.
24     Q.  Is it true that all the department heads
25  serve at the pleasure of the city manager?

59

1      A.  That's correct.
2      Q.  So the city manager, if he wants to, can
3  dismiss any department head at any time as long as
4  it's for -- as long as it's not for an illegal
5  reason such as discrimination or something like
6  that?
7      A.  That's the way our merit system is.  They
8  serve at the pleasure of the city manager.
9      Q.  Well, in fact, is the department head even
10  in the merit system?
11     A.  It's mentioned in there, but you don't have
12  any --
13     Q.  You don't have merit system protection, so
14  to speak?
15     A.  Protection, right.
16     Q.  So let me get this -- and this is not a
17  trick question.  But I understand the allegations of
18  your complaint, or I think I do.  We're going to go
19  through it in just a little while.  But assuming
20  that there was no discrimination involved or no
21  First Amendment violation involved -- in other
22  words, no illegal reason like that -- would it be
23  your position, being a former city manager, that the
24  city manager can terminate or let go any department
25  head at any time?

60

1      A.  I'm sure that it pretty much -- pretty much
2  reads that way.
3      Q.  Now, after you talked to these people --
4  the mayor and the four city council members you've
5  mentioned -- was there anything that any of them
6  said that indicated that they were firing you for
7  any reason other than the budget reason?  In other
8  words, did any of them say anything to you that
9  indicated they were firing you for any reason that
10  was not connected to the budget?
11     A.  I don't recall anything that indicated
12  that.
13     Q.  Did you at any time learn or discover
14  anything that you thought was a reason unconnected
15  to the budget as the reason you were actually let go
16  from the City?
17     A.  I can't think of anything.
18     Q.  Okay.  Are you retired currently from the
19  City?
20     A.  I am.
21     Q.  And I understand you did go in and fill out
22  your retirement papers, and you gave me the last
23  day, September 22 of '06.  What is your income now
24  as a city retiree?
25     A.  That's a good question.

**61**

1    Q. I mean, do you know what it is on an annual
2 basis?
3    A. It's about -- I think it's around -- it's
4 around 55 to 58.
5    Q. Okay. Is there any insurance -- in other
6 words, I just want pure salary now, not any
7 benefits.
8    A. Right.
9    Q. So that would be the amount of money you
10 draw?
11    A. That's right.
12    Q. All right. In addition to that, do you get
13 an insurance benefit of some sort?
14    A. I do.
15    Q. What is that?
16    A. Blue Cross-Blue Shield. The City pays 85
17 percent of my Blue Cross-Blue Shield insurance.
18    Q. Okay. Does that include family coverage or
19 does it --
20    A. No. I have to pay the family.
21    Q. And that's you and your wife?
22    A. That's correct.
23    Q. So what does it cost you for your coverage
24 for Blue Cross-Blue Shield?
25    A. Both?

**62**

1    Q. Yes, for the two of you.
2    A. It's $476, I believe, monthly.
3    Q. All right. And I don't know if you have
4 looked into this or not, but had you served until --
5 and I'm assuming your dates are right -- let's just
6 assume you had worked there 20 years to the day, 30
7 years to the day -- I'm sorry -- and retired, would
8 there be any difference in the benefits that you
9 would draw?
10    A. There would be a difference in the
11 retirement pay, and the City would pay a hundred
12 percent of my insurance had I reached 30 years.
13    MR. JACKSON: Can we take a brief break?
14    MR. MCKOON: Yes. We're fixing to. I'm
15    almost through with that part of it. Let me
16    just finish this question if I could.
17    MR. JACKSON: Sure.
18    Q. So you got a hundred percent -- they pay a
19 hundred percent of the Blue Cross-Blue Shield, and
20 there would be some differential in the salary. Do
21 you know what it would be roughly?
22    A. No, I don't. Because, see, my retirement
23 is based on the years I had plus ten months sick
24 leave. And I would have to, you know, go back and
25 figure that.

**63**

1    Q. Have to calculate it? Well, I guess what
2 I'm really trying to find out, do you know if there
3 would be a significant difference -- let's say more
4 than a thousand dollars a year -- than what you're
5 drawing now?
6    A. It would be, yes.
7    Q. And the part -- this is the last thing on
8 this line. And the part that you're paying for your
9 wife right now, this $476, do you know how much of
10 that is for her?
11    A. I -- my part is $53. It's less $53.
12    MR. MCKOON: All right. You said you
13    wanted to take a break. Now is a good time.
14    We'll take about a five-minute break.
15    (Brief recess.)
16    MR. MCKOON: Let's go back on the record.
17    Q. Just before we left, your lawyer asked
18 could we have a break and we have now taken a
19 break. And I really, at this point, don't think I
20 have any other questions.
21    A. Can I go back and give you some -- I
22 misunderstood maybe a question or two there on the
23 budget.
24    Q. Well, if your lawyer wants to ask you some
25 questions, he can, but I --

**64**

1    MR. JACKSON: Yes. I'll be glad to.
2    Q. If that brings up anything else, I'll ask
3 some more questions.
4    A. Okay. Good.
5    EXAMINATION
6 BY MR. JACKSON:
7    Q. Max, earlier you were asked some questions
8 by one of the city attorneys about reasons for your
9 termination.
10    A. Okay.
11    Q. And I think you might have misunderstood
12 one of those questions. You were asked if you
13 learned of anything else other than conversations
14 with city council members that indicated to you that
15 you were fired for a reason other than the budget.
16 Is there anything else that you haven't put on the
17 record today that you would like to?
18    A. I did. I got, you know, talking about the
19 budget and then I guess it kind of -- everything was
20 tied in to the budget.
21    I had talked to Wallace Hunter, our fire
22 chief. And he indicated that he came to see
23 Mr. Roberts, and Mr. Roberts was a little perturbed
24 with the mayor about a situation, and he was just in
25 general talking and said that he was talking to

65

1  Mr. Roberts and said he was talking to some ladies
2  earlier that day and, you know, he was thinking
3  about who might be good candidates for mayor in the
4  next election. And he mentioned to Bubba that Sonny
5  Colter and Max Wilkes might be good candidates for
6  the position of mayor in the next election.
7       And he noticed that Council Member Bush was in
8  the hallway looking at some mail, and he immediately
9  went into the conference room where Mayor Hardin
10 was. And his feeling was that possibly he told
11 Mayor Hardin about the conversation he was having
12 with Bubba. They were just generally talking. And
13 then that was pretty much what Fire Chief Wallace
14 Hunter had remembered about a situation.
15      And so later on, prior to this budget being --
16 during the time this budget was being put together,
17 Bubba came to Stephen Smith, the finance director,
18 and it was actually on the morning prior to the
19 meeting with the council with all the department
20 heads. And Mr. Roberts told Stephen Smith, you need
21 to take -- go ahead and take Max's position out of
22 the budget. Said I was called into a meeting with
23 Mayor Hardin, Council Member Bush and Council Member
24 Storey. And Mayor Hardin said, I understand that
25 Max Wilkes is possibly going to be a candidate for

66

1  mayor and I want him out of the budget. And so
2  Stephen Smith took that position out of the budget
3  so it could be presented without me as the director
4  of municipal court in the budget.
5       And so when it was presented to council at that
6  two o'clock meeting, I was no longer in the budget.
7  And that's when Mr. Roberts asked council, are y'all
8  satisfied with the municipal court's budget,
9  including Max being cut out. And that's -- goes
10 back to the conversation that we had about that
11 there were two had no comments, the mayor said yes,
12 and Mr. Bush said, yes, I think it's top heavy and
13 we need to -- we need to eliminate that position.
14      And that's when Mrs. Brantley said, why are
15 y'all picking on one particular person? And there
16 was no other personnel cuts in the entire budget,
17 and there was thirteen new positions in the budget
18 in fire and police. And why are y'all picking on
19 one person.
20      So that was -- that was tied in to the budget
21 however -- I'm sorry. I misunderstood the question
22 on that.
23      Q. Okay. When was your conversation with
24 Wallace Hunter that you recall?
25      A. The conversation with Wallace, it was after

67

1  this budget hearing that we had with the city
2  council. It was probably that -- I'm not sure it
3  was that same day. It was that same week.
4       Q. Did Wallace tell you when he had his
5  conversation with Bubba Roberts?
6       A. He did tell me, but I don't remember the
7  date.
8       Q. Would that have been before the budget was
9  presented to the city council?
10      A. It was, uh-huh. It was prior to that.
11          MR. JACKSON: That's all the questions I
12      have.
13                FURTHER EXAMINATION
14 BY MR. MCKOON:
15      Q. Let me go back and ask you a few things
16 about that and a couple other things. At any time
17 while the budget process was going on or when you
18 first learned that you might be taken out of the
19 budget, did you start taking any notes or anything
20 like that?
21      A. When I found out I would be taken out of
22 the budget?
23      Q. Right.
24      A. Starting in July, I believe is when
25 Mr. Roberts and Mrs. Goodwin came to tell me. I

68

1  did, you know, just make me some notes just to kind
2  of keep up with what was going on.
3       Q. Had you hired counsel at that time?
4       A. I had not.
5       Q. Had you consulted with a lawyer at that
6  time?
7       A. Not in July, no.
8       Q. So you did begin keeping up with -- or
9  making some notes about things that were happening;
10 is that correct?
11      A. Some. Not many, because I still felt like
12 that --
13      Q. Things would work out?
14      A. -- I would -- yes, that things would work
15 out.
16      Q. Did you get -- did you date those notes or
17 keep up with the dates that things were happening?
18      A. Don't know if I kept dates or not. I would
19 have to go back and review that.
20      Q. Do you still have those notes?
21      A. I do have some notes.
22      Q. All right. Did you at any time ever record
23 any conversations with anybody?
24      A. No. No recordings.
25      Q. Okay. So the only thing that you did was

69

1    just kind of keep some kind of chronology of what
2    was going on? Is that fair enough?
3        A.   That's fair, yes.
4        Q.   Now, earlier in your deposition -- in fact,
5    when we first started off, I told you if at any time
6    you didn't understand my question, to let me know.
7    So thus far today any questions that I have asked
8    you, you've understood the questions, haven't you?
9        A.   I think so.
10       Q.   I mean, you've never told me to stop. I'm
11   not sure about that.
12       A.   I didn't ask you to stop. I just --
13       Q.   All right. Now, let me go through a couple
14   of things here. When was it that you -- when was
15   the meeting that you were actually taken out of the
16   budget, if you recall? Just the month would be all
17   right.
18       A.   Month -- it would have had to have been in
19   August, I think.
20       Q.   Was it prior to -- but it was prior to the
21   official adoption of the budget?
22       A.   It was.
23       Q.   And it wasn't like the day or two before?
24       A.   No, it was not.
25       Q.   Because --

70

1        A.   There was a final draft, I think would be
2    the best way to put it.
3        Q.   Because you actually resigned in September
4    of '06; is that right?
5        A.   September 22.
6        Q.   Okay. And you went in and signed your
7    resignation papers so you could get your retirement?
8        A.   I didn't resign. I retired because --
9        Q.   Okay. Retirement.
10       A.   I didn't want to resign or retire, but in
11   order to get credit for my ten months of sick leave,
12   I had to show retired. And I attached a letter that
13   Mr. Roberts gave me that city council had eliminated
14   my position in the budget.
15       Q.   Okay. Now I'm going to go to paragraph 24
16   of your Complaint. It says: At this point, Fire
17   Chief Hunter noticed that City Councilman Ray Bush
18   had been standing in the hall near Roberts' door.
19       Let me back up to 23. It says here: In the
20   early summer of 2006, Phenix City Fire Chief Wallace
21   Hunter met with City Manager Roberts at City Hall.
22   During this meeting, Hunter told Roberts that Hunter
23   had told a group of women that Sonny Colter and Max
24   Wilkes would make good candidates for mayor in
25   2008.

71

1        Then the next paragraph, 24:  At this point,
2    Fire Chief Hunter noticed that City Councilman Ray
3    Bush had been standing in the hall near Roberts'
4    office. After hearing Hunter's comments, Hunter saw
5    Bush go into the conference room where Mayor Hardin
6    was working.
7        Did anybody tell you what was said between Bush
8    and Mayor Hardin in the conference room?
9        A.   No.
10       Q.   Do you know if -- do you know, sitting here
11   today, if the reason Bush went into the conference
12   room was to talk anything about that situation?
13       A.   I can't say that, you know, what they
14   talked about, but --
15       Q.   I mean, that's what you suspect?
16       A.   We suspect that.
17       Q.   But you don't know that?
18       A.   Chief Hunter did, too, but we don't know
19   that.
20       Q.   And you don't have any evidence that that
21   occurred?
22       A.   No.
23       Q.   Then it says:  In June of '06, City Manager
24   Roberts prepared a proposed budget for the fiscal
25   year 2006-2007 and the budget as proposed by

72

1    Roberts, including funding for plaintiff's job. We
2    have already talked about that.
3        A.   Uh-huh.
4        Q.   Then the next thing it says, it says on or
5    about July 26, 2006, Mayor Hardin, Councilman Ray
6    Bush and Councilman John Storey met with City
7    Manager Roberts and told Roberts to take plaintiff's
8    salary out of the budget because Hardin had heard
9    that plaintiff was going to run for mayor in 2008.
10   Where did you learn about this allegation?
11       A.   About what he had said?
12       Q.   Yes. Look at 26 there, if you would.
13       A.   26?
14       Q.   Just take a minute to review it.
15       A.   I got that from -- in the conversation with
16   Stephen Smith.
17       Q.   Okay. Did Stephen Smith say he was present
18   when this occurred?
19       A.   He was not present. Mr. Roberts came to
20   his office and told him this had taken place and --
21       Q.   So Stephen Smith was told by Mr. Roberts
22   that Bush, Storey, and Hardin had had a conversation
23   with Mr. Roberts where they said that you were to be
24   taken out of the -- that your salary was to be taken
25   out of the budget specifically because Hardin had

73

1 heard that you were going to run for mayor in 2008?
2     A.  That's right.
3     Q.  And that's what Stephen Smith told you?
4     A.  That's right.
5     Q.  Okay.  And Stephen Smith said he heard that
6 from City Manager Roberts?
7     A.  That's correct.
8     Q.  Okay.  And this says that that happened on
9 July 26, 2006.
10     A.  That would probably be the correct date.
11     Q.  Where did you get that date from?
12     A.  Apparently, that was one of my notes
13 that -- when I talked to Mr. Smith.
14     Q.  Okay.  How did that conversation between
15 you and Mr. Smith take place?
16     A.  We were just talking about the budget and
17 how it might have come about.
18     Q.  Well, I mean, were y'all present with one
19 another or was that on the phone?  Or how did that
20 occur?
21     A.  I think it was probably on the phone.
22     Q.  Okay.  And why were you speaking with him
23 on the phone about the budget?
24     A.  The reason I spoke to him was to just try
25 to determine how it all came about, because he's the

74

1 one that eventually puts it together.
2     Q.  Okay.  Well, at this time, you were still
3 in the budget, weren't you?
4     A.  Up until that date.
5     Q.  Up until that date, you say?
6     A.  Yes.
7     Q.  And you say you -- but I thought you said
8 earlier that the meeting where they took you out of
9 the budget was in August?
10     A.  Well, I thought it was August, but I had
11 not specified a specific date.  But it was the end
12 of July.
13     Q.  Okay.
14     A.  I was mistaken on the actual date.
15     Q.  Okay.  So, basically, this allegation in 26
16 is based on what you were told someone else said; is
17 that right?
18     A.  That's right.  Yes.
19     Q.  You don't know that it was said.  Mr. Smith
20 told you that's what Mr. Roberts told him that he
21 was told by three council members --
22     A.  That's correct.
23     Q.  -- is that right?
24     A.  That's how it all came about.
25     Q.  Now, it looks to me from looking at the

75

1 Complaint -- and I'll substitute a clean copy of
2 it -- that you actually read this and swore to it
3 before it was filed with the Court.
4     A.  I did.
5     Q.  Is that your signature --
6     A.  That is correct.
7     Q.  -- on the end?
8     A.  That's correct.
9         MR. MCKOON:  I'll just make a copy of this
10 as Exhibit 1 to the deposition and put it in
11 here.
12     Q.  There's a count in here for breach of
13 contract.  You didn't have an employment contract
14 with the City, did you?
15     A.  No.  No written contract.
16     Q.  Okay.  And I believe you previously
17 testified on all these positions that you worked in,
18 you were in agreement with what you were compensated
19 for those positions; is that correct?
20         MR. JACKSON:  Object to form.
21     A.  Well, when you say in agreement, that's all
22 I was offered.  So I took it so I could continue.
23     Q.  You didn't say, well, I'm not doing this
24 for that and leave?
25     A.  I didn't.  Didn't leave or didn't refuse

76

1 it.  But when you -- you know, you look at --
2     Q.  Well, did you ever ask for more?
3     A.  I can't recall.  I know I talked to the
4 city managers about the salary and about the amount
5 of money I was saving the City by doing two
6 departments when you look at what two department
7 heads would be making, but they never offered any
8 other compensation.
9     Q.  Okay.  Have you had to terminate people for
10 budgetary reasons when you were the city manager?
11     A.  No.
12     Q.  Did you ever do that?
13     A.  No.
14     Q.  Did you ever terminate a department head
15 for any other reason?
16     A.  No.  Well -- department head?  No.  No
17 department head.
18     Q.  Anyone else that you can think of?
19     A.  There was two people in the fire department
20 when I was city manager that got dismissed, but --
21     Q.  Who was that, Max?  Do you remember?
22     A.  That was Dennis Duty and --
23     Q.  Randy Doster?
24     A.  -- Randy Doster, yes.
25         MR. MCKOON:  All right.  Let me take about

77

1  two minutes and we may be through.
2          THE WITNESS:  Okay.
3  (Brief recess.)
4          MR. MCKOON:  We're through.  We don't have
5   any further questions.  I am going to offer
6   this as Exhibit 1.
7  (The deposition concluded at 11:43 a.m.)
8                * * * * * * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

78

1              REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  MONTGOMERY COUNTY
4      I, Shannon Williams, Certified Court Reporter
5  #156 and Commissioner for the State of Alabama at
6  Large, hereby certify that on October 16, 2007, I
7  reported the deposition of MAX WILKES, who was first
8  duly sworn or affirmed to speak the truth in the
9  matter of the foregoing cause, and that pages 1
10  through 78 contain a true and accurate transcription
11  of the examination of said witness by counsel for
12  the parties set out herein.
13      I further certify that I am neither of kin nor
14  of counsel to any of the parties to said cause, nor
15  in any manner interested in the results thereof.
16      This 29th day of October, 2007.
17
18
19      SHANNON M. WILLIAMS, AL CCR #156
        Commissioner for the
20      State of Alabama at Large
        MY COMMISSION EXPIRES: 1/14/2010
21
22
24
25

79

**\***

**\***   (1:16) (1:25) (3:1) (4:3) (77:8)

**0**

**000**   (42:6) (42:11) (43:16) (43:21) (44:8) (56:23) (57:3) (57:19) (57:20)

**'01**   (12:20) (12:22) (16:19) (16:23) (17:22) (17:23) (20:10)
**'02**   (12:12) (20:10)
**'03**   (19:22) (20:19)
**'04**   (13:1) (13:4) (25:17) (25:18) (25:19) (31:4) (38:5) (38:6)
**'05**   (25:17) (31:7) (33:1) (38:4) (38:7) (38:9)
**'06**   (38:2) (45:16) (60:23) (70:4) (71:23)

**1**

**1/14/2010**   (78:20)
**10th**   (14:24) (38:1)
**13th**   (2:13) (25:14) (32:21)
**140**   (56:23) (57:3)
**156**   (1:19) (3:9) (78:5) (78:18)
**1965**   (7:21)
**1978**   (6:25) (7:2) (8:15) (8:17)
**1996**   (8:22) (11:6)

**2**

**2001**   (19:12) (20:4)
**2002**   (8:23)
**2003**   (21:2)
**2005**   (45:15)
**2006**   (7:1) (45:24) (46:22) (70:20) (72:5) (73:9)
**2006-2007**   (48:13) (71:25)
**2007**   (1:22) (78:6) (78:16)
**2008**   (70:25) (72:9) (73:1)
**2392**   (2:4)
**2413**   (4:14)
**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**   (6:12)
**29th**   (78:16)

**3**

**3220**   (2:11)
**3389**   (2:14)
**3575**   (2:7)
**36831**   (2:7)
**36868-3220**   (2:12)
**36868-3380**   (2:14)

**'**

**'39**   (6:9)

**4**

**476**   (62:2) (63:9)

**5**

**5th**   (6:9)

**6**

**600**   (43:23)

**'**

**'63**   (7:22) (7:23)

**7**

**712**   (2:13)

**'**

**'78**   (9:9)

**8**

**800**   (43:23)

**9**

**925**   (2:11)

**'**

**'95**   (8:18) (9:4) (9:5) (9:9) (9:12) (20:1)
**'96**   (8:18) (9:1) (10:14) (12:11)

**A**

**able**   (34:20)
**absentia**   (24:24)
**accept**   (21:8)
**accurate**   (78:10)
**acted**   (8:23)
**acting**   (26:5)
**activated**   (19:21) (44:15)
**active**   (17:10)
**actual**   (19:14) (74:14)
**actually**   (25:3) (60:15) (65:18) (69:15) (70:3) (75:2)
**adamant**   (54:2)
**add**   (41:20)
**addition**   (61:12)
**additional**   (11:16)
**address**   (4:13) (4:15)
**administration**   (9:1) (9:6) (12:19) (12:25)
**administrative**   (9:3) (9:13) (10:24) (12:12) (12:15) (13:9) (13:19) (13:25) (14:3) (15:13) (16:5) (18:19) (20:25) (42:13)
**adoption**   (69:21)
**affirmed**   (4:6) (78:8)
**afford**   (39:5) (51:9) (53:20) (54:5)
**after**   (12:4) (12:5) (15:18) (15:19) (18:17) (18:21) (20:6) (31:11) (31:19) (33:25) (34:1) (35:7) (36:19) (37:2) (37:13) (37:24) (39:9) (40:6) (44:25) (45:14) (46:17) (60:3) (66:25) (71:4)
**again**   (23:10) (43:14)
**against**   (4:20)
**agenda**   (50:8)
**ago**   (32:16)
**agreeable**   (11:20)
**agreed**   (3:3) (3:18) (3:24) (29:9)
**agreement**   (1:18) (3:6) (11:19) (45:11) (75:18) (75:21)
**ahead**   (29:8) (33:3) (65:21)
**air**   (6:19)
**alabama**   (1:3) (1:8) (1:10) (1:20) (1:22) (2:5) (2:7) (2:12) (2:14) (3:10) (3:16) (78:2) (78:5) (78:19)
**all**   (3:6) (5:24) (6:13) (8:11) (9:24) (13:8) (13:22) (14:11) (17:13) (17:17) (19:3) (19:15) (19:24) (20:3) (20:15) (25:2) (25:3) (25:8) (26:2) (27:21) (28:15) (29:11) (29:25) (30:9) (30:19) (31:11) (32:14) (32:22) (33:11) (35:9) (35:19) (36:8) (38:8) (38:23) (41:4) (42:14) (43:8) (44:3) (45:19) (46:21) (47:4) (48:15) (49:6) (50:1) (50:3) (50:10) (52:23) (53:3) (55:13) (55:14) (55:21) (56:8) (58:18) (58:24) (61:12) (62:3) (63:12) (65:19) (67:11) (68:22) (69:13) (69:16) (73:25) (74:24) (75:17) (75:21) (76:25)
**allegation**   (72:10) (74:15)
**allegations**   (59:17)
**allege**   (6:21)
**almost**   (62:15)
**along**   (4:19) (43:25) (56:10)
**already**   (54:21) (72:2)
**also**   (11:3) (12:11) (17:4) (20:6) (30:13) (30:21) (36:10)
**always**   (16:3)
**amendment**   (59:21)

**amount**   (9:18) (11:11) (21:14) (46:9) (61:9) (76:4)
**angry**   (28:19) (28:20) (28:21)
**animosity**   (53:24)
**annual**   (61:1)
**another**   (4:18) (34:7) (34:9) (34:11) (34:12) (56:11) (73:19)
**answer**   (5:5) (5:6)
**anybody**   (34:21) (35:4) (47:8) (51:10) (52:21) (54:6) (68:23) (71:7)
**anymore**   (46:1)
**anyone**   (76:18)
**anyplace**   (57:10)
**anything**   (5:24) (20:24) (21:4) (26:16) (33:8) (34:22) (35:4) (37:22) (48:4) (51:16) (51:25) (52:25) (53:22) (53:25) (54:14) (56:21) (60:5) (60:8) (60:11) (60:14) (60:17) (64:2) (64:13) (64:16) (67:19) (71:12)
**anytime**   (29:6)
**anyway**   (38:3) (49:23)
**apparently**   (73:12)
**appear**   (54:1)
**appearances**   (2:1)
**applied**   (7:9) (7:11)
**appoint**   (14:4) (38:11)
**appointed**   (8:16) (8:18) (9:2) (9:7) (9:13) (10:7) (10:14) (12:22) (13:16) (14:2) (14:10) (14:11) (16:3) (16:4) (16:15) (16:23) (18:2) (18:6) (18:9) (20:7) (21:7) (23:4) (23:8) (23:19) (23:22) (24:5) (24:8) (24:15) (25:1) (25:15) (38:10) (42:3)
**appointee**   (13:12)
**appointment**   (18:4) (21:8)
**approve**   (40:10) (40:11) (40:21) (41:11) (41:25)
**approved**   (40:19) (55:12)
**approximately**   (1:23)
**april**   (40:25) (41:4)
**areas**   (57:14) (58:19)
**arm**   (17:11)
**around**   (8:17) (39:6) (42:20) (61:3) (61:4)
**arrangement**   (16:9)
**ask**   (31:22) (40:1) (44:4) (45:20) (46:3) (46:19) (53:13) (63:24) (64:2) (67:15) (69:12) (76:2)
**asked**   (18:21) (18:24) (21:6) (25:23) (26:9) (27:4) (29:14) (30:12) (32:9) (33:20) (36:16) (51:4) (52:1) (52:7) (52:19) (53:16) (63:17) (64:7) (64:12) (66:7) (69:7)
**asking**   (4:25) (5:25) (48:21) (57:24)
**asks**   (39:25)
**assembled**   (39:9)
**assistant**   (9:3) (9:14) (10:24) (12:12) (12:16) (13:9) (13:19) (13:25) (14:4) (15:13) (16:5) (17:19) (18:19) (20:22) (22:1) (38:12) (42:13)
**associates**   (2:10)
**assume**   (5:6) (18:7) (22:25) (62:6)
**assuming**   (59:19) (62:5)
**attached**   (70:12)
**attitude**   (28:5)
**attorney**   (30:5)
**attorneys**   (64:8)
**auburn**   (2:7)
**august**   (15:19) (41:10) (69:19) (74:9) (74:10)
**automobile**   (7:10)
**away**   (22:16)
**awhile**   (36:6)

**B**

**back**   (13:6) (18:18) (18:21) (18:24) (20:1) (22:19) (23:6) (26:20) (26:21)

| background | | council |
|---|---|---|
| (27:16) (29:10) (32:12) (32:19) (33:12) (33:13) (33:17) (34:9) (34:13) (37:13) (38:1) (38:3) (38:5) (38:9) (38:10) (40:6) (42:1) (43:14) (44:11) (44:25) (46:17) (49:5) (53:5) (53:6) (56:12) (57:17) (62:24) (63:16) (63:21) (66:10) (67:15) (68:19) (70:19) | bush  (1:10) (4:22) (51:7) (51:14) (53:9) (55:14) (55:24) (56:6) (65:7) (65:23) (66:12) (70:17) (71:3) (71:5) (71:7) (71:11) (72:6) (72:22) | civil  (3:17) |
| background  (7:10) | business  (6:15) (6:18) (32:2) | claim  (4:25) |
| backing  (7:20) | **C** | claiming  (4:24) |
| balance  (56:25) (58:23) | calculate  (63:1) | clarify  (13:6) |
| barbara  (18:8) (46:24) (49:7) | call  (30:15) (30:25) (31:22) (39:23) | clean  (75:1) |
| based  (49:1) (62:23) (74:16) | called  (20:25) (24:12) (27:4) | clear  (15:5) (19:25) |
| basically  (17:11) (38:19) (39:2) | (27:17) (28:15) (29:21) (32:9) (32:18) | clerk  (8:16) (8:20) (8:23) (9:9) |
| (39:3) (41:4) (56:17) (74:15) | (65:22) | (9:12) (10:17) (10:19) (10:20) (12:2) |
| basis  (61:2) | calling  (31:20) | (12:8) (13:24) (17:18) (18:18) (19:7) |
| beacon  (4:14) | came  (12:22) (13:23) (14:2) (14:9) | (20:21) (21:21) (23:9) (23:13) (23:25) |
| became  (7:2) (22:5) (24:11) | (16:2) (22:19) (23:6) (24:21) (25:22) | (24:18) (25:1) (30:3) (30:4) (42:4) |
| before  (1:18) (3:8) (5:10) (31:24) | (32:12) (32:19) (34:9) (36:6) (36:10) | (42:10) (42:25) (43:19) (44:3) (44:22) |
| (32:4) (36:6) (36:19) (40:15) (40:22) | (36:21) (36:25) (37:13) (38:5) (44:25) | (45:14) |
| (44:8) (46:9) (46:13) (50:25) (51:1) | (46:24) (47:5) (47:13) (49:7) (51:3) | clerk's  (47:5) |
| (63:17) (67:8) (69:23) (75:3) | (64:22) (65:17) (67:25) (72:19) | close  (44:23) |
| begin  (68:8) | (73:25) (74:24) | colter  (65:5) (70:23) |
| beginning  (12:18) | candidate  (65:25) | columbus  (7:18) (8:1) (8:2) |
| being  (9:19) (18:18) (21:19) (42:15) | candidates  (65:3) (65:5) (70:24) | come  (26:20) (27:3) (32:10) (34:13) |
| (44:15) (48:9) (55:7) (56:22) (57:3) | cannot  (19:13) (49:9) (49:21) (49:22) | (36:7) (36:17) (49:10) (57:16) (73:17) |
| (59:23) (65:15) (65:16) (66:9) | can't  (29:1) (42:19) (48:20) (49:8) | comfortable  (55:20) (55:22) |
| believe  (9:5) (13:5) (19:22) (48:18) | (53:20) (54:5) (60:17) (71:13) (76:3) | commencing  (1:22) |
| (62:2) (67:24) (75:16) | capacity  (1:9) (1:10) (1:12) (12:7) | comment  (51:11) (51:13) (51:22) |
| benefit  (61:13) | (14:21) (20:3) (20:11) | (51:23) |
| benefits  (61:7) (62:8) | case  (1:7) (3:22) | comments  (66:11) (71:4) |
| besides  (52:22) | cause  (28:9) (28:10) (78:9) (78:14) | commission  (3:11) (78:20) |
| best  (13:5) (49:1) (70:2) | ccr  (78:18) | commissioner  (1:20) (3:10) (78:5) |
| better  (30:22) | central  (6:17) | (78:19) |
| between  (3:4) (3:19) (3:25) (41:12) | certain  (40:20) (50:21) | company  (7:5) (53:18) |
| (42:21) (71:7) (73:14) | certainly  (27:5) | compensated  (75:18) |
| beyond  (33:8) | certificate  (78:1) | compensation  (21:10) (76:8) |
| birth  (6:8) | certified  (1:19) (3:9) (78:4) | complaint  (2:22) (6:1) (6:21) (8:12) |
| blow-up  (30:24) | certify  (78:6) (78:13) | (59:18) (70:16) (75:1) |
| blue  (61:16) (61:17) (61:24) (62:19) | change  (24:20) | concluded  (77:7) |
| bobby  (9:6) (10:16) (14:13) | changed  (20:24) (21:4) (28:6) | conference  (36:13) (53:11) (65:9) |
| both  (8:23) (9:20) (12:8) (61:25) | (48:24) (50:20) (50:22) (50:24) | (71:5) (71:8) (71:11) |
| box  (2:4) (2:7) (2:11) (2:14) | changeover  (18:11) | confusing  (23:10) (38:8) |
| branch  (49:14) | char-broil  (8:4) | connected  (60:10) |
| brantley  (51:17) (54:10) (55:14) | char-broils  (8:6) | consider  (26:13) (26:17) (41:9) |
| (55:25) (56:6) (56:17) (66:14) | check  (7:11) | consideration  (11:15) (11:25) |
| breach  (75:12) | chief  (64:22) (65:13) (70:17) | considered  (10:17) (10:21) |
| break  (62:13) (63:13) (63:14) | (70:19) (71:2) (71:18) | consult  (40:15) |
| (63:18) (63:19) | christmas  (34:12) | consulted  (40:9) (68:5) |
| brief  (63:13) (63:15) (77:3) | christmastime  (34:8) | contacted  (53:8) |
| briefly  (27:15) | chronology  (69:1) | contain  (78:10) |
| bring  (35:13) | church  (39:3) | continue  (14:7) (16:10) (19:18) |
| brings  (64:2) | circuit  (1:1) | (45:13) (75:22) |
| broad  (2:11) | city  (1:8) (1:9) (1:11) (1:13) (1:21) | continued  (12:7) (13:21) (15:3) |
| bubba  (10:10) (12:22) (19:21) (20:7) | (2:5) (2:12) (2:14) (4:14) (4:20) | (16:11) (19:20) (23:13) (48:5) |
| (21:7) (21:8) (23:3) (33:5) (37:18) | (4:21) (6:22) (6:24) (7:2) (8:14) (9:3) | continuing  (12:1) (12:11) (13:22) |
| (43:6) (44:25) (49:7) (50:16) (52:7) | (9:7) (9:14) (10:16) (10:17) (10:19) | (14:22) |
| (65:4) (65:12) (65:17) (67:5) | (10:20) (12:12) (12:16) (12:23) | contract  (75:13) (75:15) |
| budget  (38:14) (38:23) (39:3) (39:9) | (13:13) (13:17) (13:25) (14:10) | conversation  (32:17) (36:8) (37:1) |
| (39:10) (39:16) (39:17) (39:24) | (14:25) (15:13) (16:5) (17:6) (17:12) | (47:9) (52:11) (65:11) (66:10) (66:23) |
| (40:15) (41:8) (41:17) (41:20) (41:23) | (17:20) (18:20) (20:1) (20:8) (20:21) | (66:25) (67:5) (72:15) (72:22) (73:14) |
| (45:19) (45:21) (46:23) (47:2) (48:6) | (20:22) (21:6) (21:11) (21:15) (21:18) | conversations  (35:19) (46:2) (53:7) |
| (48:8) (48:13) (48:16) (48:19) (49:4) | (21:19) (22:5) (22:8) (22:13) (22:19) | (64:13) (68:23) |
| (49:24) (50:19) (50:21) (51:5) (51:6) | (23:1) (23:4) (23:12) (23:19) (23:23) | copy  (26:24) (75:1) (75:9) |
| (52:17) (54:20) (55:11) (56:12) | (24:6) (24:11) (25:8) (25:21) (25:23) | corporation  (1:8) |
| (56:23) (57:1) (57:4) (57:8) (58:21) | (26:5) (26:10) (27:17) (29:2) (29:4) | correct  (8:25) (9:5) (9:11) (9:15) |
| (58:23) (60:7) (60:10) (60:15) (63:23) | (29:5) (29:14) (29:15) (30:2) (30:3) | (10:7) (13:11) (15:17) (19:9) (20:2) |
| (64:15) (64:19) (64:22) (65:15) | (30:4) (35:5) (36:10) (38:13) (38:19) | (20:9) (20:13) (20:14) (22:23) (25:11) |
| (65:16) (65:22) (66:1) (66:2) (66:4) | (39:11) (39:15) (39:17) (39:25) (40:2) | (25:19) (39:7) (44:24) (45:25) (47:7) |
| (66:6) (66:8) (66:16) (66:17) (66:20) | (41:15) (42:15) (42:22) (43:16) (44:5) | (48:14) (55:17) (55:19) (59:1) (61:22) |
| (67:1) (67:8) (67:17) (67:19) (67:22) | (44:18) (44:23) (45:3) (45:17) (47:1) | (68:10) (73:7) (73:10) (74:22) (75:6) |
| (69:16) (69:21) (70:14) (71:24) | (47:5) (47:17) (47:20) (49:12) (50:3) | (75:8) (75:19) |
| (71:25) (72:8) (72:25) (73:16) (73:23) | (50:7) (52:4) (53:11) (55:15) (58:7) | cost  (37:21) (61:23) |
| (74:3) (74:9) | (58:9) (58:12) (58:13) (58:25) (59:2) | could  (19:11) (28:3) (29:15) (30:15) |
| budgetary  (76:10) | (59:8) (59:23) (59:24) (60:4) (60:16) | (31:8) (49:20) (52:1) (54:24) (57:10) |
| budgets  (39:1) (41:1) | (60:19) (60:24) (61:16) (62:11) (64:8) | (57:14) (58:20) (62:16) (63:18) (66:3) |
| | (64:14) (67:1) (67:9) (70:13) (70:17) | (70:7) (75:22) |
| | (70:20) (70:21) (71:2) (71:23) (72:6) | couldn't  (34:10) (49:16) (55:9) |
| building  (36:7) | (73:6) (75:14) (76:4) (76:5) (76:10) | council  (1:11) (1:13) (4:21) (13:13) |
| burkett  (24:8) | (76:20) | (23:3) (23:17) (24:21) (29:5) (29:14) |
| | | (29:16) (30:2) (30:11) (34:22) (35:5) |
| | | (39:11) (39:15) (39:18) (39:25) (40:2) |
| | | (40:9) (40:15) (40:17) (41:8) (41:15) |
| | | (47:1) (47:18) (47:20) (48:9) (50:3) |

**council members**

(51:4) (51:12) (51:17) (52:4) (52:8) (52:17) (52:20) (54:8) (55:13) (55:15) (60:4) (64:14) (65:7) (65:19) (65:23) (66:5) (66:7) (67:2) (67:9) (70:13) (74:21)
**council members** (52:7)
**councilman** (70:17) (71:2) (72:5) (72:6)
**council's** (21:8)
**counsel** (3:4) (3:19) (68:3) (78:11) (78:14)
**count** (75:12)
**county** (1:3) (78:3)
**couple** (52:24) (67:16) (69:13)
**course** (4:17)
**courses** (6:15) (6:18)
**court** (1:1) (1:19) (3:9) (5:15) (6:20) (8:17) (8:20) (8:24) (9:10) (9:13) (10:21) (12:2) (12:8) (13:24) (14:3) (15:13) (16:4) (17:18) (18:19) (19:2) (19:7) (21:21) (22:2) (22:6) (22:7) (23:9) (23:13) (23:25) (24:18) (25:1) (38:10) (42:3) (42:4) (42:10) (42:25) (43:20) (44:4) (44:22) (47:5) (49:6) (49:11) (50:12) (50:13) (51:5) (51:8) (57:17) (66:4) (75:3) (78:4)
**court's** (66:8)
**cover** (29:15)
**coverage** (61:18) (61:23)
**credit** (7:5) (70:11)
**cross-blue** (61:16) (61:17) (61:24) (62:19)
**culpepper** (14:15) (16:6) (16:14)
**currently** (60:18)
**cursed** (28:15)
**cut** (40:3) (41:16) (43:7) (53:21) (57:14) (57:15) (58:20) (66:9)
**cut to** (58:22)
**cuts** (50:13) (52:16) (56:23) (57:10) (66:16)
**cv-07-049** (1:7)

### D

**daily** (38:24)
**dana** (17:3)
**date** (6:8) (13:3) (25:13) (29:2) (31:9) (31:16) (32:15) (38:2) (40:20) (40:22) (54:22) (67:7) (68:16) (73:10) (73:11) (74:4) (74:5) (74:11) (74:14)
**dates** (62:5) (68:17) (68:18)
**day** (25:4) (25:22) (29:14) (32:19) (33:13) (45:17) (49:6) (50:22) (52:23) (54:24) (55:4) (60:23) (62:6) (62:7) (65:2) (67:3) (69:23) (78:16)
**days** (22:11) (26:18) (31:13)
**deal** (29:19) (29:22) (56:25)
**december** (12:24) (23:23) (25:14) (25:19) (31:4) (32:21) (32:25) (38:6)
**decide** (35:12)
**decision** (54:16)
**decrease** (14:17) (14:19)
**decreased** (43:6)
**defendants** (1:14) (2:9)
**defendant's** (2:21)
**dennis** (76:22)
**department** (10:18) (10:21) (10:25) (11:1) (11:3) (17:4) (17:8) (17:9) (19:4) (19:8) (25:3) (38:21) (38:22) (39:23) (41:2) (43:8) (45:6) (45:9) (50:3) (50:10) (50:11) (57:21) (58:24) (59:3) (59:9) (59:24) (65:19) (76:6) (76:14) (76:16) (76:17) (76:19)
**departments** (76:6)
**depend** (38:21)
**deployed** (20:17)
**deposition** (1:17) (3:5) (3:8) (3:15) (3:20) (3:21) (4:1) (4:23) (5:9) (5:15)

---

(69:4) (75:10) (77:7) (78:7)
**depositions** (5:17) (5:18)
**deputies** (22:3) (57:18)
**deputy at** (57:18)
**describing** (51:3)
**detailed** (8:13)
**determine** (73:25)
**didn't** (12:21) (24:20) (25:9) (33:21) (33:24) (36:24) (37:3) (37:8) (37:12) (37:21) (47:23) (54:1) (54:16) (55:10) (69:6) (69:12) (70:8) (70:10) (75:13) (75:23) (75:25)
**difference** (62:8) (62:10) (63:3)
**differential** (17:14) (62:20)
**direction** (39:1)
**director** (8:24) (10:15) (11:2) (11:16) (12:1) (12:8) (14:1) (14:3) (14:4) (14:8) (14:15) (14:20) (15:7) (15:12) (15:22) (16:4) (16:7) (16:16) (16:23) (17:5) (17:15) (17:18) (18:3) (19:19) (19:20) (24:4) (24:9) (24:16) (35:15) (36:9) (38:11) (38:12) (38:22) (38:25) (65:17) (66:3)
**director's** (57:25)
**discover** (60:13)
**discrimination** (59:5) (59:20)
**discuss** (28:14) (55:7)
**discussion** (27:14)
**dismiss** (34:20) (49:9) (49:22) (59:3)
**dismissal** (35:11) (53:18)
**dismissed** (76:20)
**division** (8:4) (17:6)
**does** (40:18) (52:2) (52:16) (61:18) (61:19) (61:23)
**doing** (8:5) (19:2) (37:13) (39:10) (51:20) (75:23) (76:5)
**dollars** (63:4)
**done** (53:23) (54:24) (55:1) (55:4) (55:7) (55:9) (55:10)
**door** (70:18)
**doster** (76:23) (76:24)
**doubled** (58:13)
**down** (34:13) (39:20) (43:18) (47:5) (53:9) (53:16)
**draft** (39:17) (41:8) (70:1)
**draw** (14:22) (15:3) (61:10) (62:9)
**drawing** (63:5)
**drawn** (14:22) (15:11)
**drew** (15:1) (15:10)
**due** (21:1)
**duly** (4:5) (78:8)
**during** (11:24) (15:10) (22:15) (27:11) (27:12) (28:13) (37:12) (38:24) (39:9) (39:13) (47:8) (65:16) (70:22)
**duties** (10:4)
**duty** (7:17) (76:22)

### E

**each** (10:11) (16:3) (38:22) (39:23) (50:11) (51:12) (53:8)
**earlier** (64:7) (65:2) (69:4) (74:8)
**early** (20:10) (45:14) (70:20)
**easy** (42:14)
**education** (6:13) (6:14)
**effort** (21:1)
**eight-hour** (22:9)
**either** (3:22)
**election** (16:21) (65:4) (65:6)
**eliminate** (47:1) (66:13)
**eliminated** (45:21) (46:22) (70:13) (47:8) (47:11) (51:10) (51:16) (52:21) (52:25) (54:6) (54:7) (56:5) (57:10) (58:17) (64:2) (64:13) (64:16) (74:16)
**else** (14:10) (18:6) (19:24) (29:12) (76:18)
**else's** (16:24)

---

**five-minute**

**employed** (6:23) (6:25)
**employee** (6:22) (7:3)
**employees** (9:24) (12:4)
**employment** (20:25) (75:13)
**end** (12:17) (41:10) (41:12) (48:7) (74:11) (75:7)
**ended** (12:18) (15:19) (24:3) (24:5)
**engineer** (58:12) (58:14)
**enough** (5:2) (54:3) (69:2)
**entire** (36:2) (36:3) (66:16)
**entitled** (44:16)
**equifax** (6:20) (7:4) (7:13)
**estimate** (11:12) (42:21)
**even** (23:19) (54:16) (59:9)
**eventually** (74:1)
**ever** (5:9) (20:12) (34:21) (46:8) (55:23) (68:22) (76:2) (76:12) (76:14)
**every** (34:13)
**everybody** (4:17)
**everything** (29:3) (31:18) (64:19)
**evidence** (3:15) (71:20)
**exact** (11:11)
**exactly** (5:21) (9:17) (13:3) (27:24) (28:2) (42:19)
**examination** (2:16) (4:8) (64:5) (67:13) (78:11)
**examined** (57:7)
**example** (7:8)
**exception** (20:12)
**exclusively** (22:15)
**excuse** (31:4) (31:7)
**executive** (52:1) (52:3)
**exhibit** (2:20) (2:21) (75:10) (77:6)
**experience** (40:14)
**expires** (78:20)
**explain** (26:15) (26:16) (39:24)
**express** (28:21) (53:24)
**extent** (6:14)
**extra** (10:4)

### F

**face** (49:20)
**fact** (59:9) (69:4)
**fair** (5:2) (5:3) (69:2) (69:3)
**family** (61:18) (61:20)
**far** (6:6) (6:13) (20:24) (21:14) (31:20) (40:19) (44:18) (55:2) (55:4) (56:2) (69:7)
**feel** (55:20)
**feeling** (48:22) (65:10)
**felt** (28:2) (49:12) (55:22) (56:24) (58:20) (68:11)
**few** (26:18) (67:15)
**fifteen** (37:7)
**figure** (44:6) (62:25)
**file** (19:16)
**filed** (4:20) (75:3)
**filing** (3:20)
**fill** (10:8) (35:12) (53:20) (54:2) (60:21)
**final** (35:9) (40:15) (70:1)
**finance** (38:21) (38:25) (65:17)
**find** (4:24) (13:15) (63:2)
**finding** (39:6)
**fine** (5:22) (29:7) (29:8)
**finish** (62:16)
**fire** (64:21) (65:13) (66:18) (70:16) (70:20) (71:2) (76:19)
**fired** (64:15)
**firing** (60:6) (60:9)
**first** (4:5) (32:17) (32:19) (33:20) (35:20) (37:15) (39:15) (39:18) (41:10) (45:20) (45:22) (46:15) (51:19) (59:21) (67:18) (69:5) (78:7)
**fiscal** (40:23) (71:24)
**five** (10:3)
**five-minute** (63:14)

---

fixing            keep

**fixing**  (62:14)
**floor**  (8:5) (26:5)
**folks**  (5:17)
**followed**  (34:1)
**following**  (48:11)
**follows**  (4:7)
**football**  (32:7)
**foregoing**  (78:9)
**form**  (3:13) (35:11) (35:16) (36:20) (36:21) (36:24) (37:8) (75:20)
**formal**  (6:13) (6:14)
**formalities**  (3:6)
**formality**  (3:11)
**former**  (59:23)
**formerly**  (7:5)
**forms**  (41:2)
**forth**  (41:14) (42:1)
**forward**  (8:15)
**found**  (67:21)
**four**  (18:1) (18:7) (18:8) (58:5) (60:4)
**frame**  (20:11)
**friends**  (32:4) (32:7) (49:8) (49:16)
**full**  (46:12)
**functions**  (17:11)
**fund**  (51:9)
**funding**  (72:1)
**further**  (2:18) (3:18) (3:24) (67:13) (77:5) (78:13)

## G

**gail**  (51:17) (54:10) (54:13)
**gave**  (5:17) (5:18) (24:13) (35:11) (36:19) (60:22) (70:13)
**gaylor**  (9:6) (9:14) (10:16) (12:20) (13:10) (14:1) (14:5) (15:18) (19:25)
**general**  (64:25)
**generally**  (40:24) (41:7) (65:12)
**getting**  (34:8)
**give**  (7:8) (19:11) (28:12) (55:6) (63:21)
**given**  (5:15) (11:5) (11:7) (11:15) (11:25) (21:10) (21:13) (21:16) (24:1) (45:5)
**giving**  (5:19)
**glad**  (26:19) (64:1)
**glass**  (58:2)
**goes**  (33:12) (66:9)
**going**  (5:5) (5:23) (5:24) (11:21) (15:3) (26:10) (27:23) (29:3) (31:24) (33:23) (34:20) (35:8) (35:14) (37:14) (38:11) (42:20) (43:7) (43:11) (43:12) (46:4) (46:7) (46:14) (46:20) (47:1) (52:14) (53:1) (54:2) (59:18) (65:25) (67:17) (68:2) (69:2) (70:15) (72:9) (73:1) (77:5)
**gone**  (27:12) (28:13) (34:22) (35:5) (44:15)
**good**  (6:5) (18:16) (27:7) (34:6) (60:25) (63:13) (64:4) (65:3) (65:5) (70:24)
**goods**  (49:6)
**goodwin**  (18:8) (35:24) (37:25) (46:24) (47:5) (47:10) (67:25)
**got**  (9:22) (12:3) (12:4) (15:2) (19:21) (28:10) (29:10) (30:22) (34:12) (37:2) (38:23) (40:15) (43:3) (43:5) (43:15) (44:11) (44:13) (50:12) (53:6) (62:18) (64:18) (72:15) (76:20)
**gotcha**  (23:21)
**gotta**  (31:21)
**gotten**  (21:7) (43:2)
**graduate**  (6:16)
**graham**  (2:13) (4:19) (10:19) (25:18) (30:4) (30:12) (30:18) (31:12) (38:5)

~~greet~~ (41:23) (55:25)
**ground**  (8:5) (34:14) (34:18) (35:8)

**group**  (1:21) (2:6) (70:23)
**guard**  (6:19) (7:17) (7:21) (8:1) (8:8) (21:1) (22:16) (22:19) (24:13) (30:18)
**guess**  (8:18) (13:2) (24:23) (27:21) (42:14) (42:25) (43:2) (44:21) (49:1) (49:15) (63:1) (64:19)
**gut**  (48:22)

## H

**half**  (57:2) (57:4)
**hall**  (70:18) (70:21) (71:3)
**hallway**  (65:8)
**happen**  (53:15) (53:20)
**happened**  (15:21) (15:25) (16:12) (16:14) (22:24) (25:21) (26:8) (31:11) (33:11) (34:4) (37:24) (48:5) (50:1) (51:2) (51:3) (73:8)
**happening**  (68:9) (68:17)
**happy**  (30:7)
**hardin**  (1:9) (4:21) (51:13) (52:10) (52:22) (52:25) (55:13) (55:24) (56:6) (65:9) (65:11) (65:23) (65:24) (71:5) (71:8) (72:5) (72:8) (72:22) (72:25)
**has**  (19:24)
**hat**  (46:14)
**haven't**  (64:16) (69:8)
**having**  (4:5) (28:1) (65:11)
**head**  (10:18) (10:22) (10:25) (11:1) (11:3) (15:12) (17:4) (17:8) (17:9) (19:5) (19:8) (38:22) (39:23) (59:3) (59:9) (59:25) (76:14) (76:16) (76:17)
**headed**  (38:25)
**heads**  (25:3) (38:21) (41:2) (43:9) (45:7) (45:9) (50:3) (50:10) (57:21) (58:24) (65:20) (76:7)
**hear**  (45:22)
**heard**  (35:4) (49:2) (51:19) (72:8) (73:1) (73:5)
**hearing**  (41:14) (67:1) (71:4)
**heavy**  (51:8) (66:12)
**held**  (8:13) (12:23) (18:1) (42:15) (56:25)
**her**  (36:17) (36:22) (37:9) (37:10) (42:8) (49:14) (54:15) (63:10)
**hereby**  (3:3) (3:20) (4:2) (78:6)
**herein**  (78:12)
**hereto**  (3:3) (3:25)
**he's**  (20:11) (49:10) (49:12) (73:25)
**high**  (6:15) (6:16) (6:17)
**him**  (23:19) (25:23) (26:9) (26:22) (27:10) (28:23) (30:21) (31:22) (31:23) (32:12) (33:14) (33:16) (33:17) (33:21) (33:23) (33:25) (35:20) (35:22) (37:18) (46:5) (46:8) (52:19) (53:10) (55:15) (66:1) (72:20) (73:22) (73:24) (74:20)
**himself**  (56:13) (56:16)
**hired**  (68:3)
**his**  (1:9) (1:12) (15:19) (22:18) (23:4) (23:16) (23:23) (28:5) (32:19) (44:11) (53:17) (56:19) (58:14) (65:10) (67:4) (72:20)
**hold**  (17:24)
**holding**  (49:13)
**home**  (32:11) (33:13) (33:20)
**hon**  (1:9) (1:10) (1:12)
**hope**  (6:5)
**hours**  (22:10)
**however**  (66:21)
**hundred**  (62:11) (62:18) (62:19)
**hunter**  (62:11) (65:14) (66:24) (70:17) (70:21) (70:22) (71:2) (71:4) (71:18)
~~hunter's~~ (71:4)
**hurt**  (33:6) (33:7)

## I

**ideas**  (28:11) (28:12) (55:6)
**i'll**  (4:24) (5:4) (26:19) (30:25) (35:14) (64:1) (64:2) (75:1) (75:9)
**illegal**  (59:4) (59:22)
**immediately**  (65:8)
**impression**  (48:15)
**improved**  (31:19)
**in his**  (1:10)
**include**  (61:18)
**including**  (50:13) (56:13) (56:16) (66:9) (72:1)
**income**  (60:23)
**increase**  (9:16) (9:22) (9:25) (11:5) (11:7) (11:14) (43:3) (43:4) (43:5) (44:11) (44:13) (44:20)
**increased**  (42:6) (42:8)
**increases**  (44:14) (44:16) (44:17)
**independent**  (17:12)
**index**  (2:16) (2:20)
**indicated**  (60:6) (60:9) (60:11) (64:14) (64:22)
**individually**  (1:10) (1:11) (1:13) (52:8)
**initial**  (40:5)
**initially**  (13:23) (16:6) (48:3)
**input**  (39:11)
**inquire**  (30:15)
**insurance**  (7:7) (7:9) (7:10) (53:18) (61:5) (61:13) (61:17) (62:12)
**intend**  (33:24)
**interested**  (33:22) (78:15)
**interim**  (15:10) (18:3) (18:23) (21:6) (22:13) (22:25) (23:4) (23:9) (23:12) (23:23) (23:25) (24:5) (24:8) (24:11) (24:15) (25:8) (30:17) (42:4) (42:9) (42:15) (43:16)
**into**  (8:8) (11:23) (13:4) (13:23) (16:2) (23:3) (29:24) (33:8) (34:8) (41:5) (62:4) (65:9) (65:22) (71:5) (71:11)
**introduced**  (3:21)
**investigations**  (7:7) (7:12)
**investigator**  (7:4)
**involve**  (9:16) (17:14)
**involved**  (54:16) (59:20) (59:21)
**iraq**  (21:2)
**iron**  (7:18) (8:1) (8:2)
**isn't**  (39:7) (41:23)
**item**  (52:3)
**i've**  (28:10) (43:15) (49:2) (51:19)

## J

**jackson**  (1:21) (2:6) (2:17) (62:13) (62:17) (64:1) (64:6) (67:11) (75:20)
**james**  (2:10) (2:13)
**jan**  (19:21)
**january**  (6:25) (20:19) (21:2) (31:3) (38:1)
**jarrell**  (22:3) (23:8) (24:1) (25:1) (38:12) (42:2)
**jeff**  (1:9) (4:21)
**jim**  (4:18)
**job**  (8:7) (8:20) (11:2) (13:13) (14:8) (14:11) (19:5) (19:8) (21:5) (22:9) (22:20) (24:7) (25:9) (34:15) (43:3) (45:21) (46:22) (47:1) (48:16) (48:19) (50:9) (50:21) (58:14) (72:1)
**jobs**  (9:20)
**john**  (1:12) (4:22) (51:23) (72:6)
**july**  (41:10) (45:23) (45:24) (46:22) (67:24) (68:7) (72:5) (73:9) (74:12)
**june**  (71:23)

## K

**keep**  (26:24) (29:2) (48:16) (48:19)

keeping

now

| | | |
|---|---|---|
| (49:3) (49:24) (68:2) (68:17) (69:1) | **looking** (38:2) (39:4) (65:8) (74:25) | **messed** (32:15) |
| **keeping** (28:23) (54:11) (68:8) | **looks** (74:25) | **met** (38:22) (38:24) (70:21) (72:6) |
| **kept** (48:6) (48:8) (68:18) | **losing** (34:14) (34:18) (35:7) | **midway** (31:1) |
| **kin** (78:13) | **lost** (30:23) | **might** (40:3) (45:21) (46:13) (64:11) |
| **kind** (27:25) (30:24) (48:25) (49:13) | **lot** (29:3) (57:14) | (65:3) (65:5) (67:18) (73:17) |
| (49:17) (49:20) (51:5) (51:6) (64:19) | **lucy** (24:8) (24:15) | **military** (19:21) (20:12) (20:18) |
| (68:1) (69:1) | | (23:4) |
| **kindly** (17:12) | **M** | **mind** (9:19) (28:5) (49:13) (49:23) |
| **kinds** (28:16) | | (57:16) |
| **kite** (58:15) | **made** (3:13) (41:16) (43:16) (49:2) | **mine** (57:22) (58:1) (58:6) |
| **knew** (56:2) | (57:11) | **minute** (32:16) (72:14) |
| **known** (20:7) | **mail** (65:8) | **minutes** (37:4) (37:5) (37:7) (52:12) |
| **knows** (4:18) | **mainly** (5:25) (52:13) | (77:1) |
| | **maintained** (8:19) (24:18) | **mistaken** (74:14) |
| **L** | **majority** (22:8) | **misunderstood** (63:22) (64:11) |
| | **make** (6:6) (13:7) (19:25) (23:11) | (66:21) |
| **ladies** (65:1) | (38:25) (41:19) (42:22) (43:15) (45:8) | **moments** (5:24) |
| **laid** (54:20) | (46:12) (51:10) (58:22) (68:1) (70:24) | **money** (21:14) (54:4) (61:9) (76:5) |
| **large** (1:20) (3:10) (78:6) (78:19) | (75:9) | **montgomery** (78:3) |
| **last** (39:4) (42:24) (45:17) (60:22) | **making** (18:11) (19:12) (21:15) | **month** (37:15) (37:16) (37:17) |
| (63:7) | (21:17) (42:4) (42:5) (42:9) (42:12) | (69:16) (69:18) |
| **lasted** (13:10) | (42:16) (44:7) (44:22) (44:23) (45:3) | **monthly** (62:2) |
| **later** (14:5) (18:7) (18:8) (31:22) | (58:7) (58:10) (68:9) (76:7) | **months** (7:17) (15:1) (18:1) (18:7) |
| (33:16) (34:9) (35:1) (65:15) | **manager** (9:3) (9:7) (9:14) (10:16) | (18:8) (18:14) (22:14) (23:3) (23:5) |
| **latter** (31:5) (31:7) | (12:13) (12:16) (12:23) (13:13) | (62:23) (70:11) |
| **law** (1:21) (2:6) | (13:17) (13:25) (14:10) (14:25) | **morning** (65:18) |
| **lawsuit** (4:20) | (15:14) (16:5) (17:7)(17:20) (20:1) | **move** (29:6) (29:7) (29:8) (39:6) |
| **lawyer** (63:17) (63:24) (68:5) | (20:8) (20:22) (21:7) (21:11) (21:15) | **mrs** (35:24) (37:25) (42:2) (47:5) |
| **learn** (60:13) (72:10) | (21:18) (21:19) (22:5) (22:8) (22:13) | (47:10) (56:6) (56:17) (66:14) (67:25) |
| **learned** (45:20) (46:21) (64:13) | (22:20) (23:1) (23:5) (23:12) (23:19) | **much** (11:8) (56:18) (56:19) (60:1) |
| (67:18) | (23:23) (24:6) (24:11) (25:9) (26:5) | (63:9) (63:13) |
| **leave** (35:8) (35:15) (37:21) (37:23) | (38:13) (38:19) (40:2) (42:16) (42:22) | **municipal** (1:8) (6:20) (8:17) (8:20) |
| (43:8) (43:12) (62:24) (70:11) (75:24) | (43:16) (44:6) (44:18) (44:23) (45:4) | (8:23) (9:10) (9:13) (10:21) (12:2) |
| (75:25) | (49:12) (55:16) (58:7) (58:10) (58:25) | (12:8) (13:24) (14:3) (15:12) (16:4) |
| **leaving** (14:14) (16:15) (57:18) | (59:2) (59:8) (59:23) (59:24) (70:21) | (17:18) (18:19) (19:2) (19:7) (21:21) |
| **left** (13:10) (15:18) (17:1) (18:23) | (71:23) (72:7) (73:6) (76:10) (76:20) | (22:2) (22:7) (23:9) (23:13) (23:25) |
| (31:24) (37:8) (37:10) (44:8) (50:21) | **managers** (76:4) | (24:18) (25:1) (38:10) (42:3) (42:4) |
| (57:18) (63:17) | **manager's** (17:7) (17:12) (25:23) | (42:10) (42:25) (43:20) (44:3) (44:22) |
| **length** (30:21) (53:17) (54:15) (55:8) | (27:18) (29:2) (29:4) (36:11) (53:12) | (45:13) (49:5) (50:12) (50:13) (51:5) |
| **less** (16:11) (22:6) (31:15) (43:22) | **manner** (3:22) (78:15) | (51:7) (66:4) (66:8) |
| (45:2) (45:4) (45:5) (63:11) | **many** (6:23) (40:14) (68:11) | **myself** (5:11) |
| **let** (5:1) (8:25) (9:8) (13:6) (14:13) | **mason** (5:23) | |
| (24:10) (27:16) (43:14) (44:4) (45:19) | **matter** (78:9) | **N** |
| (59:16) (59:24) (60:15) (62:15) | **max** (1:5) (1:17) (3:5) (4:4) (4:12) | |
| (67:15) (69:6) (69:13) (70:19) (76:25) | (10:1) (10:2) (46:25) (49:21) (56:20) | **name** (4:10) (4:18) |
| **let's** (7:20) (12:24) (18:13) (25:16) | (64:7) (65:5) (65:25) (66:9) (70:23) | **named** (14:15) |
| (42:14) (42:19) (62:5) (63:3) (63:16) | (76:21) (78:7) | **national** (6:19) (7:17) (7:21) (7:25) |
| **letter** (24:25) (26:22) (26:24) | **max's** (5:14) (65:21) | (8:8) (21:1) (22:16) (22:18) (24:13) |
| (30:12) (30:19) (31:10) (33:14) | **maybe** (44:4) (63:22) | (30:17) (53:18) |
| (33:16) (33:25) (35:21) (70:12) | **mayor** (9:1) (52:10) (52:22) (60:4) | **nature** (7:6) (51:20) |
| **letters** (25:2) | (64:24) (65:3) (65:6) (65:9) (65:11) | **near** (70:18) (71:3) |
| **liberty** (53:18) | (65:23) (65:24) (66:1) (66:11) (70:24) | **need** (3:13) (26:11) (26:13) (26:17) |
| **life** (7:10) | (71:5) (71:8) (72:5) (72:9) (73:1) | (29:7) (35:16) (46:25) (47:2) (65:20) |
| **like** (5:15) (5:23) (5:25) (10:3) | **mckoon** (2:10) (2:17) (2:18) (4:9) | (66:13) |
| (21:4) (28:2) (29:19) (30:7) (32:8) | (4:18) (62:14) (63:12) (63:16) (67:14) | **needed** (22:25) (46:9) |
| (32:10) (32:25) (34:22) (37:7) (37:22) | (75:9) (76:25) (77:4) | **neighborhood** (7:12) |
| (38:17) (43:24) (46:12) (48:25) | **mcpherson** (17:3) | **neither** (78:13) |
| (49:12) (53:20) (54:23) (55:2) (56:22) | **mean** (9:19) (18:14) (25:5) (27:6) | **never** (5:14) (31:25) (53:6) (56:1) |
| (56:24) (59:5) (59:22) (64:17) (67:20) | (29:1) (29:23) (32:6) (34:17) (37:14) | (69:10) (76:7) |
| (68:11) (69:23) | (41:22) (48:24) (57:23) (61:1) (69:10) | **new** (16:25) (24:20) (66:17) |
| **liked** (56:2) (56:3) | (71:15) (73:18) | **next** (13:12) (15:21) (16:1) (29:14) |
| **line** (39:4) (43:8) (45:6) (45:8) | **meant** (34:19) | (32:14) (33:11) (34:10) (35:21) |
| (63:8) | **meantime** (26:21) | (37:24) (50:1) (50:2) (65:4) (65:6) |
| **listened** (52:13) | **meet** (25:23) (26:4) (29:15) (40:6) | (71:1) (72:4) |
| **little** (30:24) (36:13) (51:8) | (52:1) | **night** (28:15) |
| (59:19) (64:23) | **meeting** (26:2) (29:21) (29:23) | **nor** (78:13) (78:14) |
| **lived** (4:15) | (30:1) (30:10) (30:11) (32:15) (37:24) | **normal** (41:23) |
| **long** (4:15) (6:23) (7:13) (8:7) | (40:5) (40:6) (50:24) (52:4) (52:9) | **normally** (39:22) |
| (16:9) (17:24) (18:15) (19:18) (22:10) | (53:13) (54:6) (54:17) (65:19) (65:22) | **notes** (67:19) (68:1) (68:9) (68:16) |
| (22:11) (22:12) (27:14) (36:4) (37:1) | (66:6) (69:15) (70:22) (74:8) | (68:20) (68:21) (73:12) |
| (37:3) (45:13) (49:9) (49:11) (59:3) | **member** (1:11) (1:12) (51:13) (51:17) | **nothing** (4:7) (54:18) |
| (59:14) | (65:7) (65:23) | **noticed** (65:7) (70:17) (71:2) |
| **longer** (14:21) (14:25) (15:6) | **members** (4:21) (41:16) (52:8) (54:8) | **november** (16:16) (16:22) (17:22) |
| (22:25) (66:6) | (55:13) (55:15) (60:4) (64:14) (74:21) | **now** (8:25) (19:4) (20:15) (21:10) |
| **long-time** (41:4) | **memory** (13:5) | (22:24) (34:25) (36:9) (37:11) (49:8) |
| **look** (6:5) (19:13) (39:18) (57:21) | **mentioned** (59:11) (60:5) (65:4) | (55:13) (60:3) (60:23) (61:6) (63:5) |
| (70:15) (74:25) | | (63:9) (63:13) (63:18) (69:4) (69:5) |
| **looked** (48:24) (62:4) | | (70:15) (74:25) |

number                                                                          relax

**number**  (18:16)

## O

**object**  (75:20)
**objections**  (3:12)
**obligation**  (22:18)
**occasion**  (33:5) (34:5) (35:18) (35:24)
**occasions**  (41:15)
**occur**  (73:20)
**occurred**  (30:24) (71:21) (72:18)
**o'clock**  (66:6)
**october**  (1:22) (12:24) (13:4) (23:2) (23:14) (24:2) (40:22) (78:6) (78:16)
**of '04**  (31:7)
**of the**  (51:5)
**of this**  (57:3)
**off**  (37:16) (69:5)
**offer**  (77:5)
**offered**  (3:15) (75:22) (76:7)
**office**  (13:4) (13:10) (13:23) (14:14) (16:2) (16:14) (17:7) (17:12) (23:3) (23:17) (25:23) (26:6) (26:7) (27:18) (29:2) (29:4) (36:11) (46:25) (47:6) (49:7) (53:12) (71:4) (72:20)
**offices**  (1:21)
**official**  (1:9) (1:10) (1:12) (69:21)
**old**  (6:3) (49:16)
**olive**  (49:14)
**once**  (22:18) (22:25)
**one**  (4:18) (5:18) (5:19) (6:10) (28:15) (35:20) (35:21) (35:23) (43:4) (43:5) (44:20) (47:11) (51:18) (51:21) (53:8) (54:7) (56:24) (57:19) (64:8) (64:12) (66:15) (66:19) (73:12) (73:18) (74:1)
**only**  (12:3) (12:5) (33:4) (58:20) (68:25)
**open**  (29:23) (29:25)
**order**  (70:11)
**others**  (52:24) (58:19)
**ought**  (26:15) (27:18)
**our**  (30:4) (41:1) (59:7) (64:21)
**out**  (4:24) (12:20) (13:15) (15:25) (28:15) (31:11) (31:13) (31:13) (39:6) (41:2) (41:16) (44:6) (49:7) (49:13) (53:22) (54:20) (56:24) (60:21) (63:2) (65:21) (66:1) (66:2) (66:9) (67:18) (67:21) (68:13) (68:15) (69:15) (72:8) (72:24) (72:25) (74:8) (78:12)
**over**  (8:3) (13:17) (22:19) (24:7) (26:9) (39:20) (39:22) (41:5) (49:10) (52:9) (52:24) (56:23) (57:4)

## P

**pages**  (78:9)
**paid**  (9:20) (21:19) (37:17) (37:20)
**pam**  (22:3) (23:8) (25:1) (38:12)
**pam's**  (43:12)
**papers**  (60:22) (70:7)
**paragraph**  (70:15) (71:1)
**parks**  (8:19) (8:24) (10:15) (11:2) (11:16) (12:1) (12:9) (14:1) (14:5) (14:8) (14:14) (14:16) (14:20) (15:3) (15:7) (15:12) (15:23) (16:7) (16:15) (18:22) (18:24) (19:2) (19:4) (19:19) (19:20) (20:21) (24:4) (24:9) (24:14)
**part**  (19:1) (31:6) (31:7) (56:19) (62:15) (63:7) (63:8) (63:11)
**participate**  (38:14)
**particular**  (25:4) (66:15)
**parties**  (3:4) (3:19) (3:25) (78:12) (78:14)
**party**  (3:22)
**past**  (34:12)
**pay**  (18:15) (18:18) (18:19) (18:25) (14:17) (17:14) (19:10) (43:2) (43:4)

(43:5) (61:20) (62:11) (62:18)
**paying**  (63:8)
**pays**  (61:16)
**people**  (7:11) (10:7) (19:24) (39:12) (60:3) (76:9) (76:19)
**percent**  (10:3) (11:7) (15:2) (43:6) (43:7) (43:22) (45:2) (45:4) (45:5) (61:17) (62:12) (62:18) (62:19)
**percentage**  (9:17) (9:22) (9:25)
**period**  (11:25) (52:24)
**perry**  (5:23)
**person**  (10:9) (51:18) (51:21) (66:15) (66:19)
**personal**  (49:6)
**personnel**  (16:16) (16:23) (17:5) (17:6) (17:15) (17:19) (17:25) (18:3) (18:14) (18:24) (19:1) (19:16) (35:15) (36:9) (66:16)
**perturbed**  (64:23)
**phenix**  (1:8) (1:9) (1:11) (1:12) (1:21) (2:5) (2:12) (2:14) (4:14) (6:22) (6:24) (8:14) (70:20)
**phone**  (28:19) (73:19) (73:21) (73:23)
**physically**  (23:20)
**picking**  (51:18) (51:20) (66:15) (66:18)
**place**  (16:24) (17:1) (72:20) (73:15)
**plaintiff**  (1:6) (2:3) (72:9)
**plaintiff's**  (72:1)
**plaintiffs'**  (72:7)
**please**  (4:11)
**pleasure**  (58:25) (59:8)
**plus**  (62:23)
**point**  (20:15) (21:11) (21:22) (24:13) (27:7) (35:3) (36:16) (50:21) (63:19) (70:16) (71:1)
**police**  (66:18)
**portion**  (39:24) (51:6)
**position**  (11:3) (12:16) (13:9) (13:16) (13:17) (15:8) (16:13) (16:25) (17:5) (17:13) (17:25) (18:7) (18:14) (23:6) (23:25) (24:14) (25:20) (33:19) (37:11) (37:12) (42:12) (42:13) (43:18) (50:14) (51:9) (53:19) (53:21) (54:2) (54:11) (57:12) (59:23) (65:6) (65:21) (66:2) (66:13) (70:14)
**positions**  (8:13) (22:24) (42:15) (66:17) (75:17) (75:19)
**possibly**  (65:10) (65:25)
**predate**  (32:23)
**preliminary**  (4:11)
**prepared**  (38:23) (71:24)
**present**  (5:16) (12:18) (12:25) (23:2) (23:16) (26:2) (29:25) (42:8) (47:8) (54:6) (72:17) (72:19) (73:18)
**presented**  (66:3) (66:5) (67:9)
**preserved**  (57:11)
**pretty**  (27:7) (27:14) (44:23) (55:20) (56:18) (56:19) (60:1) (65:13)
**previous**  (53:17) (55:23)
**previously**  (14:23) (15:11) (75:16)
**printed**  (54:21)
**prior**  (7:2) (7:15) (7:16) (7:18) (7:25) (8:25) (9:1) (9:2) (14:13) (16:14) (23:16) (40:21) (42:15) (42:17) (42:20) (46:1) (49:1) (50:24) (65:15) (65:18) (67:10) (69:20)
**private**  (29:22)
**probably**  (8:17) (9:2) (10:3) (16:16) (31:1) (31:5) (31:8) (31:16) (31:24) (34:9) (37:5) (40:16) (49:18) (57:14) (67:2) (73:10) (73:21)
**problem**  (27:11) (27:16) (29:10) (33:5) (47:17)
**problems**  (55:23) (56:1)
**procedural**  (3:7)
**procedure**  (3:17)

**proceeded**  (29:5)
**process**  (38:14) (38:17) (39:3) (41:23) (45:19) (67:17)
**proposed**  (39:16) (48:9) (71:24) (71:25)
**protection**  (59:13) (59:15)
**proud**  (49:16)
**provided**  (3:16) (3:23)
**public**  (41:13) (58:13)
**pure**  (61:6)
**purpose**  (3:16) (4:23)
**pursuant**  (1:17) (3:5)
**puts**  (74:1)
**putting**  (38:20) (39:10) (39:13)

## Q

**qualify**  (52:2)
**question**  (5:1) (5:5) (6:10) (27:21) (28:8) (59:17) (60:25) (62:16) (63:22) (66:21) (69:6)
**questions**  (3:12) (3:13) (4:25) (5:25) (31:23) (39:25) (40:1) (63:20) (63:25) (64:3) (64:7) (64:12) (67:11) (69:7) (69:8) (77:5)
**quiet**  (51:6)
**quite**  (36:6)

## R

**raise**  (9:17) (10:3) (10:6) (10:11) (15:2)
**raises**  (11:25) (12:3) (12:5) (12:6)
**randy**  (76:23) (76:24)
**rate**  (19:10)
**ray**  (1:10) (4:21) (70:17) (71:2) (72:5)
**raymond**  (2:6)
**reached**  (62:12)
**reaching**  (56:25)
**read**  (19:25) (75:2)
**reads**  (60:2)
**ready**  (41:8)
**real**  (55:22)
**really**  (4:23) (9:21) (13:15) (26:16) (44:21) (48:20) (63:2) (63:19)
**reappointed**  (15:7) (15:22) (25:2) (25:5) (42:24) (43:19)
**reappointment**  (45:14)
**reason**  (5:12) (10:6) (45:5) (59:5) (59:22) (60:7) (60:9) (60:14) (60:15) (64:15) (71:11) (73:24) (76:15)
**reasons**  (64:8) (76:10)
**rec**  (8:24) (11:2) (12:9) (14:20) (15:7) (15:12) (15:23) (16:7) (18:25) (19:2) (19:4) (19:19) (19:20) (20:21) (24:14)
**recall**  (11:10) (13:3) (14:19) (19:14) (46:16) (51:24) (53:4) (60:11) (66:24) (69:16) (76:3)
**received**  (9:25)
**recess**  (63:15) (77:3)
**recommendations**  (41:16) (41:20)
**record**  (4:10) (19:23) (63:16) (64:17) (68:22)
**recordings**  (68:24)
**records**  (7:12)
**recreation**  (8:19) (10:15) (11:17) (12:2) (14:11) (14:5) (14:8) (14:15) (14:16) (15:3) (16:15) (18:22) (24:4) (24:9)
**refereed**  (32:7)
**refuse**  (75:25)
**regard**  (16:12)
**regarding**  (46:2)
**regular**  (21:14)
**relation**  (51:14)
**relationship**  (27:7)
**relax**  (5:22)

relying                                                                                          storey

relying  (22:6)
remaining  (23:5)
remember  (16:18) (31:8) (42:19)
(58:5) (67:6) (76:21)
remembered  (65:14)
removed  (14:14)
rephrase  (5:2) (5:4) (14:13)
reported  (78:7)
reporter  (1:19) (3:9) (5:16) (78:4)
reporter's  (78:1)
represent  (4:19)
representing  (3:4) (3:19)
request  (27:10)
requests  (42:1)
requirements  (3:7)
reserved  (3:14)
resign  (70:8) (70:10)
resignation  (70:7)
resigned  (70:3)
respect  (3:7)
response  (47:12)
responsibilities  (11:16)
responsibility  (11:6) (14:23)
responsible  (38:20)
rest  (52:20)
result  (14:17) (30:9) (35:9)
results  (30:11) (78:15)
retail  (7:5)
retire  (26:23) (27:4) (27:10)
(27:19) (33:23) (33:24) (46:4) (46:7)
(46:10) (46:13) (46:20) (52:14) (53:1)
(70:10)
retired  (60:18) (62:7) (70:8) (70:12)
retiree  (60:24)
retirement  (26:13) (26:17) (33:22)
(46:2) (60:22) (62:1) (62:22) (70:7)
(70:9)
retiring  (32:10)
return  (23:16) (23:23)
returned  (23:15)
revenue  (39:7)
review  (24:10) (68:19) (72:14)
right  (5:21) (6:13) (8:11) (9:23)
(13:8) (13:14) (13:22) (14:11) (15:9)
(15:16) (15:20) (17:13) (17:17)
(18:21) (19:15) (20:3) (20:15) (21:20)
(22:17) (22:22) (23:18) (24:22) (25:8)
(25:10) (27:21) (29:8) (29:11) (30:9)
(30:19) (32:14) (33:11) (35:19) (36:8)
(37:1) (38:2) (38:7) (38:8) (39:1)
(39:8) (40:12) (40:13) (41:6) (41:13)
(43:17) (44:3) (45:19) (46:21) (47:4)
(48:10) (48:12) (48:15) (50:1) (50:25)
(51:1) (56:4) (56:8) (57:3) (57:5)
(57:6) (57:20) (58:9) (58:11) (59:15)
(61:8) (61:11) (61:12) (62:3) (62:5)
(63:9) (63:12) (67:23) (68:22) (69:13)
(69:17) (70:4) (73:2) (73:4) (74:17)
(74:18) (74:23) (76:25)
roberts  (10:10) (13:12) (13:16)
(13:23) (15:22) (20:6) (20:7) (20:25)
(22:16) (23:15) (24:12) (24:15)
(24:23) (25:22) (30:7) (30:12) (30:13)
(30:20) (31:12) (37:25) (46:2) (47:9)
(50:17) (50:18) (52:16) (52:19)
(64:23) (65:1) (65:20) (66:7) (67:5)
(67:25) (70:13) (70:21) (70:22)
(71:24) (72:1) (72:7) (72:19) (72:21)
(72:23) (73:6) (74:20)
roberts'  (44:5) (70:18) (71:3)
room  (4:18) (36:4) (37:2) (53:11)
(65:9) (71:5) (71:8) (71:12)
roughly  (62:21)
roy  (14:15)
ruby  (22:3)
ruling  (3:14)

run  (22:6) (72:9) (73:1)
running  (21:24) (21:25)
russell  (1:3)

**S**

said  (3:8) (5:23) (5:25) (7:25)
(13:16) (21:4) (26:11) (26:12) (26:13)
(26:17) (26:19) (28:16) (28:25) (29:7)
(30:14) (31:18) (32:10) (32:16)
(32:17) (32:25) (33:5) (33:6) (33:7)
(33:18) (34:7) (34:9) (34:11) (34:13)
(34:15) (35:8) (35:12) (35:14) (36:16)
(37:18) (38:9) (38:11) (41:25) (43:7)
(43:11) (46:11) (46:12) (46:25) (47:2)
(47:14) (47:15) (47:17) (47:19) (49:7)
(50:12) (50:15) (50:20) (51:7) (51:10)
(51:13) (51:14) (51:16) (51:17)
(51:18) (52:2) (52:6) (52:8) (52:13)
(52:16) (52:20) (52:25) (53:2) (53:5)
(53:19) (53:22) (54:5) (54:15) (54:18)
(54:23) (55:9) (56:10) (56:16) (56:20)
(56:21) (60:6) (63:12) (64:25) (65:1)
(65:22) (65:24) (66:11) (66:12)
(66:14) (71:7) (72:11) (72:23) (73:5)
(74:7) (74:16) (74:19) (78:11) (78:14)
salaries  (51:8) (57:22) (58:20)
salary  (14:22) (15:2) (15:4) (15:11)
(19:12) (19:14) (21:14) (21:16)
(37:23) (42:5) (42:8) (43:1) (43:12)
(43:20) (44:5) (44:11) (44:19) (58:1)
(58:14) (61:6) (62:20) (72:8) (72:24)
(76:4)
same  (9:24) (10:11) (13:20) (13:21)
(14:22) (15:1) (15:11) (21:13) (21:16)
(25:14) (32:1) (42:5) (43:13) (44:7)
(45:2) (45:3) (55:15) (58:8) (67:3)
sat  (53:9) (53:16)
satisfied  (66:8)
saving  (76:5)
saw  (58:19) (71:4)
saying  (8:22) (23:24) (43:20) (44:9)
(54:3)
says  (70:16) (70:19) (71:23) (72:4)
(73:8)
school  (6:15) (6:16) (6:17)
seeing  (39:4)
seem  (53:24)
send  (41:2)
sent  (24:25) (33:16)
september  (6:9) (7:1) (14:24)
(40:21) (41:5) (41:12) (45:16) (60:23)
(70:3) (70:5)
serve  (12:7) (12:11) (13:24) (21:1)
(21:6) (22:13) (58:25) (59:8)
served  (16:17) (20:3) (20:11)
(55:15) (62:4)
served as  (20:7)
service  (12:1) (19:21) (20:13)
(20:18)
services  (6:20) (7:4)
serving  (14:21) (20:20) (21:11)
(21:21) (37:11) (44:18)
session  (29:19) (50:2) (50:25)
(51:1) (52:2) (52:3)
sessions  (40:17)
set  (78:12)
setting  (4:7)
seven  (11:23)
seven-year  (11:24)
several  (15:1) (18:9) (31:13)
(40:16) (40:17)
shannon  (1:18) (3:8) (78:4) (78:18)
shield  (61:16) (61:17) (61:24)
(62:19)
shock  (32:11)
shoes  (27:22)
short-term  (11:22)

show  (70:12)
sick  (62:23) (70:11)
signature  (4:1) (75:5)
signed  (70:6)
significant  (63:3)
since  (20:12)
six  (4:11) (12:6) (42:18) (45:1)
sit  (39:20)
sitting  (36:14) (36:15) (71:10)
situation  (21:5) (64:24) (65:14)
(71:12)
six  (8:21) (18:13) (43:6) (43:7)
(43:22) (45:2) (45:4) (45:5)
slots  (10:8)
smith  (65:17) (65:20) (66:2) (72:16)
(72:17) (72:21) (73:3) (73:5) (73:13)
(73:15) (74:19)
so-called  (41:8)
social  (6:11)
solely  (9:9)
some  (8:13) (10:4) (13:16) (20:12)
(22:7) (22:10) (27:6) (27:13) (28:11)
(31:23) (33:17) (33:18) (34:8) (36:16)
(39:6) (40:3) (40:6) (40:20) (41:25)
(56:23) (58:21) (61:13) (62:20)
(63:21) (63:24) (64:3) (64:7) (65:1)
(65:8) (68:1) (68:9) (68:11) (68:21)
(69:1)
somebody  (16:24) (18:6) (19:24)
(29:12)
somehow  (24:25)
someone  (7:9) (14:10) (74:16)
someone's  (17:1)
sometime  (20:10) (31:5) (41:4)
(41:12) (45:14) (46:17)
sometimes  (40:7) (41:19) (53:21)
somewhere  (20:10) (40:25) (41:10)
(43:25)
sonny  (65:4) (70:23)
soon  (31:10)
sooner  (55:2)
sorry  (10:20) (38:7) (62:7) (66:21)
sort  (61:13)
sounded  (28:18)
source  (28:3)
speak  (4:6) (24:24) (47:22) (50:8)
(51:25) (52:6) (52:7) (52:21) (52:23)
(53:10) (59:14) (78:8)
speaking  (73:22)
specific  (46:9) (74:11)
specifically  (72:25)
specified  (74:11)
spent  (22:7) (39:4)
spoke  (54:18) (73:24)
standing  (70:18) (71:3)
start  (40:18) (40:24) (40:25) (41:1)
(67:19)
started  (8:5) (40:23) (69:5)
starting  (67:24)
state  (1:20) (3:10) (4:10) (78:2)
(78:5) (78:19)
stating  (26:22)
statute  (3:23)
stayed  (16:6) (18:9) (24:17)
stephen  (65:17) (65:20) (66:2)
(72:16) (72:17) (72:21) (73:3) (73:5)
stepped  (43:18)
still  (9:12) (17:18) (17:19) (20:20)
(21:24) (21:25) (24:17) (27:1) (27:2)
(34:15) (37:14) (68:11) (68:20) (74:2)
stint  (18:23) (24:3) (25:9)
stipulated  (3:3) (3:18) (3:24)
stipulation  (1:18) (3:6)
stipulations  (3:2)
stop  (69:10) (69:12)
storey  (1:12) (4:22) (51:23) (55:14)
(55:24) (56:20) (65:24) (72:6) (72:22)

straight

working

straight (9:8) (24:11) (43:15)
street (2:11) (2:13) (4:14)
strictly (32:2)
substitute (75:1)
suggestions (40:3)
sumbry (51:23) (55:14) (55:25)
(56:7) (56:8)
summer (4:21) (70:20)
sure (9:17) (10:2) (13:7) (23:11)
(31:15) (38:25) (43:15) (46:6) (58:18)
(60:1) (62:17) (67:2) (69:11)
surprise (27:3)
surprised (27:19)
suspect (71:15) (71:16)
swore (75:2)
sworn (4:5) (23:17) (78:8)
system (59:7) (59:10) (59:13)

**T**

table (36:13) (36:14) (36:15) (54:20)
take (10:4) (16:24) (26:17) (28:18)
(34:7) (34:11) (35:12) (35:14) (37:8)
(50:19) (54:11) (62:13) (63:13)
(63:14) (65:21) (72:7) (72:14) (73:15)
(76:25)
taken (1:17) (3:5) (3:8) (5:9)
(63:18) (67:18) (67:21) (69:15)
(72:20) (72:24)
taking (11:6) (11:15) (37:16) (49:6)
(67:19)
talk (26:11) (30:13) (31:25) (34:6)
(46:11) (46:19) (46:25) (47:17)
(47:20) (49:8) (50:7) (50:8) (52:19)
(56:5) (71:12)
talked (27:13) (28:16) (30:13)
(30:21) (32:22) (33:17) (34:6) (36:6)
(52:9) (52:12) (53:9) (53:17) (54:9)
(54:10) (54:15) (55:8) (55:11) (56:5)
(56:7) (56:19) (60:3) (64:21) (71:14)
(72:2) (73:13) (76:3)
talking (19:23) (34:25) (35:3)
(36:9) (55:20) (56:22) (58:15) (64:18)
(64:25) (65:1) (65:12) (73:16)
target (40:22)
tell (15:25) (26:8) (26:14) (27:15)
(30:16) (32:14) (33:21) (34:21)
(38:17) (46:5) (46:8) (46:15) (49:10)
(52:11) (53:7) (54:13) (67:4) (67:6)
(67:25) (71:7)
telling (31:20)
ten (37:4) (37:5) (62:23) (70:11)
term (15:19) (16:3) (16:17)
terminate (12:16) (59:24) (76:9)
(76:14)
termination (64:9)
terms (8:9) (49:1)
testified (4:7) (75:17)
testimony (5:20) (49:1)
thank (6:7)
them (22:6) (30:6) (38:23) (39:21)
(39:23) (40:7) (41:3) (50:8) (53:8)
(53:21) (55:21) (55:24) (56:1) (56:3)
(56:25) (57:3) (57:16) (60:5) (60:8)
thereof (78:15)
there's (5:23) (36:13) (75:12)
these (11:15) (19:11) (35:19)
(55:13) (55:14) (69:3) (75:17)
they're (46:14)
thing (11:22) (13:20) (13:21) (33:4)
(44:7) (49:17) (50:2) (63:7) (68:25)
(72:4)
things (26:10) (27:13) (28:14)
(28:16) (28:23) (29:4) (30:14) (30:15)
(30:16) (30:22) (31:18) (31:23) (32:7)
(35:1) (39:6) (41:16) (53:19) (58:21)
(68:17) (69:14)

think (9:4) (12:20) (25:16) (26:18)
(27:9) (31:11) (31:13) (32:5) (32:11)
(32:16) (33:18) (33:20) (34:7) (34:19)
(38:1) (38:4) (43:5) (44:13) (48:23)
(49:2) (49:25) (51:7) (51:9) (56:16)
(59:18) (60:17) (61:3) (63:19) (64:11)
(66:12) (69:9) (69:19) (70:1) (73:21)
(76:18)
thinking (27:23) (65:2)
third (26:4) (35:23) (35:24)
thirteen (7:14) (66:17)
thirty-something (57:19)
thomas (2:4)
though (10:5) (10:24) (14:8) (23:20)
thought (11:21) (22:12) (23:12)
(26:15) (27:18) (52:13) (53:1) (57:13)
(60:14) (74:7) (74:10)
thought the (27:16)
thoughts (27:25)
thousand (57:20) (58:6) (63:4)
three (4:21) (7:17) (8:10) (19:3)
(23:3) (23:5) (56:11) (58:5) (74:21)
through (6:19) (6:20) (7:11) (7:12)
(8:15) (25:21) (39:2) (40:16) (49:14)
(50:11) (53:8) (59:19) (62:15) (69:13)
(77:1) (77:4) (78:10)
thus (69:7)
tied (34:11) (64:20) (66:20)
times (40:14)
title (24:18)
today (4:23) (48:18) (49:2) (64:17)
(69:7) (71:11)
together (38:20) (38:24) (39:11)
(39:14) (39:19) (40:2) (65:16) (74:1)
told (27:18) (30:6) (33:4) (33:23)
(35:7) (37:12) (49:10) (65:10) (65:20)
(69:5) (69:10) (70:22) (70:23) (72:7)
(72:20) (72:21) (73:3) (74:16) (74:20)
(74:21)
took (13:17) (17:1) (17:13) (17:15)
(22:19) (24:7) (34:12) (43:3) (66:2)
(74:8) (75:22)
top (22:1) (51:8) (66:12)
touch (43:12)
towards (28:5) (53:25)
track (30:23)
training (18:10) (18:12)
transcription (78:10)
trial (3:21)
trick (59:17)
tried (51:12)
triggered (27:9)
true (58:24) (78:10)
truth (4:6) (4:7) (78:8)
try (24:10) (73:24)
trying (13:15) (15:5) (25:16)
(29:24) (44:6) (44:21) (48:16) (48:18)
(49:3) (49:24) (63:2)
turn (23:22)
turned (11:23)
twenty-three (22:14)
two (10:7) (10:8) (22:3) (31:1)
(35:22) (35:23) (43:4) (55:1) (57:18)
(62:1) (63:22) (66:6) (66:11) (69:23)
(76:5) (76:6) (76:19) (77:1)
type (29:19)

**U**

uh-huh (7:24) (17:20) (20:5) (20:16)
(27:24) (28:4) (31:17) (32:3) (32:24)
(36:18) (44:2) (44:10) (51:15) (58:12)
(58:16) (67:10) (72:3)
ultimately (36:10) (40:10) (43:19)
(48:1) (48:2)
unconnected (60:14)
under (13:23) (48:13) (58:9)
understand (5:1) (10:5) (11:13)

(13:7) (15:21) (18:2) (23:11) (50:22)
(55:9) (59:17) (60:21) (65:24) (69:6)
understood ~(5:6) (69:8)
until (6:25) (8:8) (9:9) (12:23)
(13:10) (14:24) (15:7) (16:11) (19:20)
(20:4) (23:14) (23:15) (23:23) (24:20)
(29:9) (36:24) (45:16) (48:7) (50:20)
(54:17) (62:4) (74:4) (74:5)
upshot (56:18)
upstairs (26:4)
used (3:15) (3:22)
usually (40:18)
utilities (57:25)

**V**

viewed (49:19)
violation (59:21)
visit (34:2) (34:3) (34:4)
vote (55:11)
voted (55:12)
votes (56:11)

**W**

waiting (36:7)
waived (3:7) (3:20) (4:2)
wallace (64:21) (65:13) (66:24)
(66:25) (67:4) (70:20)
wanted (34:22) (46:10) (63:13)
wanting (35:5)
wants (59:2) (63:24)
war (21:1)
wasn't (10:25) (24:24) (29:24)
(33:23) (42:6) (54:3) (69:23)
way (27:17) (30:13) (41:5) (44:4)
(49:19) (53:22) (56:21) (59:7) (60:2)
(70:2)
week (26:20) (26:21) (31:14) (31:15)
(33:16) (34:7) (34:9) (34:10) (34:11)
(34:12) (67:3)
weeks (18:9) (52:24) (55:2)
we'll (35:1) (63:14)
we're (20:15) (54:2) (59:18) (62:14)
(77:4)
were to (72:23)
weren't (25:5) (33:21) (35:8) (74:3)
whatever (11:14) (42:3) (44:14)
(47:2) (47:15)
whereas (32:4)
white (22:4)
who (7:15) (9:14) (10:9) (10:14)
(14:11) (17:2) (21:21) (22:1) (24:7)
(26:2) (29:25) (33:9) (47:22) (50:15)
(56:5) (57:23) (58:17) (65:3) (76:21)
(78:7)
whole (4:6) (37:16)
wife (61:21) (63:9)
wilkes (1:5) (1:17) (3:5) (4:4)
(4:12) (4:13) (10:1) (10:2) (40:18)
(65:5) (65:25) (70:24) (78:7)
will (29:8) (29:13) (43:7)
williajms (3:9)
williams (1:19) (78:4) (78:18)
wise (25:12)
wish (31:8)
witness (3:25) (4:1) (4:5) (77:2)
(78:11)
women (70:23)
word (24:25)
words (11:20) (15:6) (19:11) (38:17)
(44:6) (50:20) (59:22) (60:8) (61:6)
work (7:6) (8:7) (29:11) (29:19)
(37:14) (46:18) (49:11) (50:2) (50:25)
(51:1) (68:13) (68:14)
worked (7:16) (7:18) (8:4) (62:6)
(75:17)
working (27:7) (29:4) (40:24) (41:3)
(71:6)

works                                                                    you'll

```
works   (7:19) (8:1) (8:2) (58:13)
worthy   (2:4)
wound   (37:15)
write   (30:12)
written   (26:22) (75:15)
wrong   (32:25) (49:17) (49:21)
wrote   (25:2) (30:19) (33:13) (33:25)
(35:21)
```

                                   **Y**

```
year   (9:2) (12:24) (16:11) (16:18)
(23:2) (24:2) (25:15) (39:5) (40:23)
(43:16) (48:11) (57:8) (63:4) (71:25)
yearly   (19:12)
years   (4:16) (6:23) (7:14) (7:20)
(8:10) (8:21) (11:23) (31:2) (32:7)
(43:4) (46:12) (62:6) (62:7) (62:12)
(62:23)
yes   (8:10) (12:6) (16:22) (18:12)
(19:1) (19:17) (25:14) (26:7) (31:1)
(31:15) (32:6) (32:20) (33:2) (38:5)
(38:7) (42:18) (44:15) (45:1) (45:10)
(48:2) (49:15) (49:18) (51:13) (52:1)
(52:8) (56:14) (62:1) (62:14) (63:6)
(64:1) (66:11) (66:12) (68:14) (69:3)
(72:12) (74:6) (74:18) (76:24)
you ask   (55:7)
you'll   (52:3) (56:12)
```

# DEFENDANTS' EXHIBIT "C"

# EXCERPTS FROM THE DEPOSITION OF STEPHEN SMITH

IN THE UNITED STATES DISTRICT COURT

FOR MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

MAX E. WILKES,                          )        ⒸCOPY
                                        )
          Plaintiff,                    )
                                        )
vs.                                     )CIVIL ACTION
                                        )FILE NO. 3:07-CV-244-WKW
CITY OF PHENIX CITY, ALABAMA, an        )
Alabama municipal corporation;          )
Hon. JEFF HARDIN, in his official       )
Capacity as Mayor of Phenix City,       )
Alabama, and individually; Hon.         )
RAY BUSH, in his official               )
Capacity as a member of the             )
Phenix City Council and                 )
Individually; and Hon. JOHN             )
STOREY, in his official capacity        )
As a member of the Phenix City          )
Council and individually,               )
                                        )
          Defendants.                   )

     Oral Deposition of **MR. STEPHEN SMITH**, Witness, called

by the Plaintiff, before Courtney Tillman Peters,

Certified Court Reporter and Notary Public for the State

of Alabama, taken at 612 12th Street, Phenix City, Alabama

36867, on the 15th day of November, 2007, commencing at

10:05 a.m. EST.

**COURTNEY TILLMAN PETERS**
Certified in Alabama & Georgia
**CAUSEY & PETERSON CERTIFIED COURT REPORTERS**
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

1
2

## APPEARANCES OF COUNSEL

3  For the Plaintiff:              MR. RAYMOND L. JACKSON
                                   Jackson Law Group
                                   Post Office Box 3575
4                                  Auburn, Alabama 36831-3575

5                                  MR. THOMAS F. WORTHY
                                   Attorney at Law
6                                  Post Office Box 2392
                                   Phenix City, Alabama 36868
7

8  For the Defendants:             MR. JAMES P. GRAHAM, JR.
                                   The Graham Law Firm
9                                  Post Office Box 3380
                                   Phenix City, Alabama 36868
10

11                                 MR. JAMES R. MCKOON, JR.
                                   McKoon & Associates
                                   Post Office Box 3220
12                                 Phenix City, Alabama 36868

13  Also Present:                  MR. MAX WILKES

14

15                      ## INDEX TO EXAMINATIONS

16  WITNESS/ATTY              DIR        CR        RD        RC

17  Smith (Jackson)                      5

18

19

20                      ## INDEX OF EXHIBITS

21

22  INDEX NO.                                          PAGE
    Exhibit 1            City Budget                    22

23

24

25

# S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by and between counsel appearing for the respective parties that:

1)   The oral deposition of **MR. STEPHEN SMITH**, Witness, called by the Plaintiff, taken before Courtney Tillman Peters, Certified Court Reporter and Notary Public for the State of Alabama, at 612 12th Street, Phenix City, Alabama 36867, commencing at 10:05 a.m. EST, on the 15th of November, 2007;

2)   ALL FORMALITIES with reference to notice of taking, notice of time and place of taking, qualifications of the Court Reporter, and all other matters precedent to the taking of depositions are WAIVED;

3)   ALL OBJECTIONS, EXCEPT as to the form of the question and responsiveness of the answer, are RESERVED to the time of the hearing of the case;

4)   ALL FORMALITIES with reference to the filing of depositions, including notice of filing, etc., are WAIVED;

5)   With the consent of deponent, the reading and signing of the deposition by deponent is WAIVED;

– – – – – – – – – – – – –

1  budgets, but let's talk specifically about what we're

2  going to refer to is the fiscal year 2007, the year in

3  which Mr. Wilkes' job was eliminated from the city budget.

4  Can you describe what went into your preparation of drafts

5  for that year budget?

6    A.    Began normally, we -- Mr. Roberts had me send out

7  the paperwork with instruction for preparing the budget to

8  all the various department heads.  We got that back.  We

9  were about $2,000,000 out of budget with the original

10  drafts that we got back from the department heads.  We

11  made significant cuts in that, particularly in the capital

12  improvement and areas and tried to get that budget back to

13  a more balanced figure.  We had a little more difficult

14  time balancing the budget than normal primarily because

15  the new Wal-Mart's opening over in Columbus impacted

16  negatively our revenues significantly.  At the time we

17  were preparing the budget, we had anticipated a loss of

18  between $300,000 and $500,000 in revenue from that and we

19  were having to make those adjustments in the budget.

20    We had gotten down to about a $200,000 out of balance

21  budget where our revenues were about $200,000 short of

22  totally balancing the budget.  The first draft or first

23  work session we had with the council, we discussed that

24  with the council and that we needed to make some

25  additional cuts.  Mr. Roberts recommended that we -- that

1    we take a very hard look at where we are contributing to

2    what are called NGOs, non-government organizations, where

3    the City contributes to their budgets in various ways and

4    that we -- he had asked the city council to make

5    reductions in that area, and because that portion of the

6    budget we generally leave to the city council to do.  I

7    give the city council report listing all of the requests

8    and then they go through it and tell us what they want to

9    fund out of that.

10       We had made substantial cuts.  We had pretty much told

11   every department that you couldn't hire any additional

12   employees.  We had frozen operating expenditures to the

13   previous year levels with no increase.  We cut again

14   capital purchases back more than we normally do in terms

15   of cars and computers and other things of that nature

16   trying to get the budget into a balanced situation.

17       After the first meeting with the budget, a second

18   meeting was scheduled with the city council.  At that

19   time, I was out of town on vacation.  I had gone up to

20   visit family in Tennessee.  The day I got back, this would

21   have been right after the 4th of July, Mr. Roberts and I

22   met and went over his meeting with the city council and

23   the cuts that they had wanted to come up with.  He

24   informed me at that point in time that the city council

25   had told him that that position was going -- was not going

1    to be funded in the budget, and he asked me then to

2    prepare a new draft budget without that position in it and

3    with a couple of other cuts that we were make -- they did

4    make some reductions in the contributions to the

5    non-government organizations that helped get us back to a

6    balanced budget.  But that was the final number that

7    enabled us to balance the budget, that cutting that.  It

8    was in excess of $90,000 by the time you take salary and

9    benefits and all of the other costs.  It was about half of

10   what we needed to balance the budget.

11        Q.   And you refer to that position.  What position

12   are you --

13        A.   The position of the Director of Court System.

14        Q.   You mean Max Wilkes'?

15        A.   That's correct.

16        Q.   And you refer to a projected $300,000 loss in

17   revenues?

18        A.   Between $300,000 and $500,000; that's correct.

19        Q.   What is that in comparison to?

20        A.   Generally speaking, we take about $12,000,000 a

21   year in sales tax and we had anticipated a $300,000 to

22   $500,000 loss reduction.  It's actually worked out to be

23   more than that in practice; but at the time we were

24   preparing the budget, we were assuming that we'd lose

25   between $300,000 and $500,000 worth of revenue.

1    session with the city council and I knew that changes

2    would probably have been made.  And so I met with him and

3    asked him what changes were made in the budget.  He said

4    that the council had informed him that that was one --

5    that they had agreed to some of the changes in the

6    non-government organization that we had proposed, but they

7    did not want to cut as much as we had proposed there; and

8    that they had told him that they wanted to eliminate that

9    position from the budget, specifically, in order to save a

10   little over $90,000 total, you're talking about salary and

11   benefits and other costs.  He asked me to recalculate that

12   to be sure we had an accurate number there and in which I

13   did.  He said that at the council meeting, that there was

14   a general consensus that there were three votes to

15   eliminate that position from the budget and that he was

16   required to do so.

17        Q.   Did Mr. Roberts tell you anything about the

18   reasons, reason, for removing Max's salary from the

19   budget?

20        A.   He talked generally about the fact that the

21   council, particularly Mr. Storey, felt like that the

22   position was overpaid and that we were paying two people

23   to do one job in that department.

24        Q.   That was your opinion that two people were being

25   paid to do one job in that department?

1       A.   I wasn't asked for an opinion.  I don't generally

2  give an opinion.   That's the city manager's job.

3       Q.   Do you have an opinion?

4       A.   Like anyone else, I always have an opinion.  I --

5  if you look at what that job pays statewide in various

6  positions, we were paying substantially more than anybody

7  else in the State of Alabama for that position; and from a

8  fiscal accounting standpoint, that is unreasonable.

9       Q.   And so if you are paying someone too much, the

10 solution for that is to terminate them?

11      A.   That's not my decision to make in that regard.

12 It can be, it can be to reassign them, it can be to lower

13 the pay.  There's lots of decisions that can be made in

14 that regard.

15      Q.   Did Mr. Roberts mention to you any other

16 objections or problems that those three city councilmen

17 had with Mr. Wilkes?

18      A.   No, not at that time.

19      Q.   At any other point in time?

20      A.   Directly from Mr. Roberts, he -- the main

21 objection again all along was that the position was far

22 overpaid for what it was and that between Mr. Wilkes and

23 Pam Jerrell (phonetic), we were paying two people to do

24 the same job.  Mr. Roberts himself never told me

25 specifically any other reason that the council would have

1    wanted to make that job -- that change.

2        Q.    Did Mr. Roberts ever mention to you the mayor or

3    anyone else mentioning the fact that Mr. Wilkes may be

4    planning to run for mayor?

5        A.    After the budget was prepared, some considerably

6    time later, there was a rumor going around City Hall that

7    Mr. Wilkes was going to run for mayor.  I heard it from

8    several people.  I'm sure I heard it from Mr. Roberts

9    also.  It was -- it's something that I would normally call

10    open knowledge.  There was a lot of discussion around,

11    various people around City Hall that Max was planning to

12    run for mayor but this was some time later, not during the

13    actual budget preparation.

14        Q.    Any rumors around City Hall to the effect that

15    Max's position was removed because he was planning to run

16    for mayor?

17        A.    Nobody ever expressed that to me directly, no.

18        Q.    Did you ever have any conversations with Mr.

19    Wilkes as to his termination?

20        A.    I did.  I had numerous conversations with Mr.

21    Wilkes concerning that.  He came to my office at least

22    twice.  He expressed the desire to stay until May of the

23    fiscal year; that he said that he wanted to go out on his

24    own terms; that he felt like that he had all of his years

25    with the City, he deserved, you know, that.  He asked me

1    what I thought about it.  I agreed.  You know, I told him

2    at the time that I thought that that would have been

3    reasonable but that it was not my decision to make.  I was

4    told to cut it out of the budget and that I had -- that

5    he -- I volunteered at the time to discuss the issue with

6    the council in terms of trying to allow him to stay until

7    May.  I did talk later with John Storey about that.  John

8    was very firm that the position was not needed and that he

9    did not think it would go into the council.  After the

10   budget was prepared and submitted and passed, and I don't

11   remember the exact time frame, but it was some time

12   several weeks after the budget was done, Max called me at

13   home.  He specifically asked me if Mr. Roberts had been

14   the one to eliminate the position from the budget.  I told

15   him no, that was not the case.  I related what I related

16   here that that was in the budget submitted by Mr. Roberts

17   to the council, that the position was still in there, it

18   was the council that had directed him to take it out.  I

19   then asked him because I had heard the rumor if he was

20   going to run for mayor.  He very firmly said, no, that he

21   was not going to run for mayor.  I said, well, just about

22   everybody I have talked to seems to think that you are.

23   He then asked me if I thought that was the reason that his

24   position was cut from the budget.  And I said, you know,

25   it's certainly possible but nobody has specifically said

1   that to me and I can't say that it was but, you know,

2   obviously, it's possible.

3        Q.   So if Mr. Wilkes' recollection of that telephone

4   conversation is different from yours, if he ever recalls

5   that you had told him that Roberts had related to you that

6   he was told to remove the position from the budget because

7   Mr. Wilkes was going to run for mayor --

8        A.   That's not correct.

9        Q.   -- that's not correct?

10       A.   I never -- Mr. Roberts never specifically said to

11  me that he was -- that that was being taken out because

12  Mr. Wilkes -- I was not even aware of that until after the

13  budget was prepared that there was any discussion about

14  Mr. Wilkes running for mayor.  It was after the fact that

15  I heard that and it was after the fact that I asked Max if

16  he was running for mayor.

17       Q.   Is there any other -- any other things that were

18  said between you and Mr. Roberts regarding eliminating Mr.

19  Wilkes' position that you haven't shared here today?

20       A.   I'm -- I cannot recall anything specific.  We did

21  have, again, numerous conversations over the issue at one

22  time or another during the budget process and then we had

23  that one phone call where he called my home after the

24  budget was final, budget was submitted.

25       Q.   In your opinion, was there enough money in the

# DEFENDANTS'
# EXHIBIT "D"

# EXCERPT FROM THE
# DEPOSITION OF
# WALLACE HUNTER

IN THE UNITED STATES DISTRICT COURT

FOR MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


MAX E. WILKES,                         )    ⓕⓒ**COPY**
                                       )
          Plaintiff,                   )
                                       )
vs.                                    ) CIVIL ACTION
                                       ) FILE NO. 3:07-CV-244-WKW
CITY OF PHENIX CITY, ALABAMA, an       )
Alabama municipal corporation;         )
Hon. JEFF HARDIN, in his official      )
Capacity as Mayor of Phenix City,      )
Alabama, and individually; Hon.        )
RAY BUSH, in his official              )
Capacity as a member of the            )
Phenix City Council and                )
Individually; and Hon. JOHN            )
STOREY, in his official capacity       )
As a member of the Phenix City         )
Council and individually,              )
                                       )
          Defendants.                  )


     Oral Deposition of **CHIEF WALLACE HUNTER**, Witness,

called by the Plaintiff, before Courtney Tillman Peters,

Certified Court Reporter and Notary Public for the State

of Alabama, taken at 612 12th Street, Phenix City, Alabama

36867, on the 15th day of November, 2007, commencing at

11:20 a.m. EST.


**COURTNEY TILLMAN PETERS**
Certified in Alabama & Georgia
**CAUSEY & PETERSON CERTIFIED COURT REPORTERS**
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

1

## APPEARANCES OF COUNSEL

2

3    For the Plaintiff:              MR. RAYMOND L. JACKSON
                                     Jackson Law Group
                                     Post Office Box 3575
4                                    Auburn, Alabama 36831-3575

5                                    MR. THOMAS F. WORTHY
                                     Attorney at Law
6                                    Post Office Box 2392
                                     Phenix City, Alabama 36868

7

8    For the Defendants:             MR. JAMES P. GRAHAM, JR.
                                     The Graham Law Firm
9                                    Post Office Box 3380
                                     Phenix City, Alabama 36868

10

11                                   MR. JAMES R. MCKOON, JR.
                                     McKoon & Associates
                                     Post Office Box 3220
12                                   Phenix City, Alabama 36868

13   Also Present:                   MR. MAX WILKES

14

15                        INDEX TO EXAMINATIONS

16   WITNESS/ATTY                DIR        CR        RD        RC

17   Hunter (Worthy)                        4

18

19

20                        INDEX OF EXHIBITS

21
     INDEX NO.                                        PAGE
22   There were no exhibits marked for identification.

23

24

25

1                    **S T I P U L A T I O N S**

2

3         IT IS STIPULATED AND AGREED by and between counsel

4    appearing for the respective parties that:

5

6         1)   The oral deposition of **CHIEF WALLACE HUNTER**,

7    Witness, called by the Plaintiff, taken before Courtney

8    Tillman Peters, Certified Court Reporter and Notary Public

9    for the State of Alabama, at 612 12th Street, Phenix City,

10   Alabama 36867, commencing at 11:20 a.m. EST, on the 15th

11   of November, 2007;

12        2)   ALL FORMALITIES with reference to notice of

13   taking, notice of time and place of taking, qualifications

14   of the Court Reporter, and all other matters precedent to

15   the taking of depositions are WAIVED;

16        3)   ALL OBJECTIONS, EXCEPT as to the form of the

17   question and responsiveness of the answer, are RESERVED to

18   the time of the hearing of the case;

19        4)   ALL FORMALITIES with reference to the filing of

20   depositions, including notice of filing, etc., are WAIVED;

21        5)   With the consent of deponent, the reading and

22   signing of the deposition by deponent is WAIVED;

23                  – – – – – – – – – – – – –

24

25

1   I might have read that.  I know about the statement.

2       Q.   Okay.  Where did you read that?

3       A.   I'm trying to figure where -- it might have been

4   in the newspaper.  I know I have heard that he told -- Mr.

5   Wilkes said that's what the mayor told him.

6       Q.   Okay.  All right.  Were you aware of any

7   concerted effort on behalf of Mayor Hardin to get -- get

8   rid of Max Wilkes because he might be a candidate for

9   mayor?

10      A.   That wouldn't be nothing that they would let me

11  in on, no, sir.  I don't -- I don't -- I haven't been in

12  any meetings where anybody to tell me that, so I couldn't

13  -- I couldn't just say that and be right about it.

14      Q.   Okay.

15      A.   I mean...

16          MR. WORTHY:  All right.  That's all I have.

17  Okay.  Thank you very much.

18          MR. JACKSON:  Thank you very much.

19          **WHEREUPON, the deposition of Chief Wallace Hunter**

20              **concluded at 11:40 a.m. EST.**